UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Grand Strand Water and Sewer Authority, | ) | C/A No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Versus | ) | |
| | ) | |
| AGC Chemicals Americas, Inc.; | ) | |
| Aladdin Manufacturing Corporation; | ) | |
| Archroma U.S., Inc.; | ) | |
| Arkema, Inc.; | ) | |
| Burlington Industries, Inc.; | ) | |
| Clariant Corporation; | ) | |
| Corteva, Inc.; | ) | |
| Daikin America, Inc.; | ) | |
| Delta Mills, Inc., its predecessors, successors, | ) | |
| assigns, and/or responsible parties; | ) | |
| DuPont de Nemours, Inc.; | ) | |
| EIDP, Inc.; | ) | |
| Elevate Textiles, Inc.; | ) | |
| Fiber Industries, LLC; | ) | |
| Huntsman International, LLC; | ) | |
| International Paper Company; | ) | |
| INV Performance Surfaces, LLC; | ) | |
| J.P. Stevens & Company, Inc., its | ) | |
| predecessors, successors, assigns, and/or | ) | |
| responsible parties; | ) | |
| Mohawk Industries, Inc.; | ) | |
| Nan Ya Plastics Corporation, America; | ) | |
| PRET Advanced Materials, LLC; | ) | |
| Red Rock Disposal, LLC; | ) | |
| Sampson County Disposal, LLC; | ) | |
| Sonoco Products Company; | ) | |
| Syensqo Specialty Polymers USA, LLC (f/k/a | ) | |
| Solvay Specialty Polymers USA, LLC); | ) | |
| The Chemours Company; and | ) | |
| WestRock CP, LLC, | ) | |
| Defendants. | ) | |

**NOTICE OF REMOVAL**

Defendant EIDP, Inc. ("Defendant" or "EIDP"), by and through its undersigned counsel, hereby gives notice of removal of this action, pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, from the Court of Common Pleas, Fifteenth Judicial District, the State of South Carolina, County of Horry, to the United States District Court for the District of South Carolina. As grounds for removal, EIDP states as follows.

**PRELIMINARY STATEMENT**

1.        Plaintiff, Grand Strand Water and Sewer Authority, seeks to hold EIDP liable for alleged contamination of the Great Pee Dee River, Lynches River, Lumber River, Little Pee Dee River, Lynches Lake Swamp, Black Creek, and Bull Creek (collectively, the "Pee Dee River Watershed"); the Waccamaw River; the Intracoastal Waterway (the Pee Dee River Watershed, the Waccamaw River, and the Intracoastal Waterway, collectively, the "Waterways"); and the Plaintiff's properties and domestic water supply with per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctanoic acid ("PFOA"),  perfluorooctane sulfonic acid ("PFOS"), perfluorononanoic acid ("PFNA"), perfluorobutane sulfonate ("PFBS"), perfluorohexane sulfonate ("PFHxS"), and hexafluoropropylene oxide dimer acid ("HFPO-DA" or "GenX Chemicals"), which Plaintiff alleges originate from EIDP's manufacturing and supply of products that either contained or degraded into PFAS at industrial facilities upstream of Plaintiff's water intake. (*See* Ex. A at pp. 43–108, Amended Complaint, Dec. 29, 2025 ("Compl.") ¶¶ 1, 4-7, 35-38, 67-83).

2.        Plaintiff has previously filed a nearly identical Complaint alleging the same contamination of the same waterways. (*See* Ex. B, Third Amended Complaint, June 5, 2025 (the "Original Action") ¶¶ 1-7, 37-41, 62-72). On August 18, 2025, EIDP removed the Original Action

to federal court. (*See* <u>Ex. C</u>, Notice of Removal, *Grand Strand Water & Sewer Authority v. AGC Chemicals Americas, Inc., et al.*, No. 2:25-cv-11180-RMG, Doc. No. 1 (D.S.C.)). On September 29, 2025, Plaintiff moved to remand the Original Action. (*See* <u>Ex. C</u>, Joint Motion to Remand, *Grand Strand Water & Sewer Authority v. AGC Chemicals Americas, Inc., et al.*, No. 2:25-cv-11180-RMG, Doc. No. 29 (D.S.C.)). Plaintiff's motion to remand has been fully briefed and is pending before this Court.

3.      Despite both the Original Action and the current action seeking broad and practically identical damages, *see, e.g.*, Original Action ¶ 149 ("Plaintiff requests that this Court issue an order and decree requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to interfere with Plaintiff's use and enjoyment of its land and its use of Bull Creek and the Intracoastal Waterway to supply potable water to its customers."); Compl. ¶ 154 ("Plaintiff requests that this Court issue an order and decree requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to interfere with Plaintiff's use and enjoyment of its land and its use of the Intracoastal Waterway to supply potable water to its customers."), rather than amend its Original Action, Plaintiff has filed a new action to recover damages relating to a new surface water treatment plant not mentioned in the Original Action. Compl. ¶ 2 (alleging that due to rapid population growth, Plaintiff plans to construct "a new surface water treatment plant ("SWTP"), raw water intake, and related infrastructure improvements."). The new raw water intake (the "Socastee intake") is "to be sited at the confluence of the Intracoastal Waterway and the Waccamaw River." *Id.* ¶ 3. The current action should be immediately consolidated with the Original Action. Fed. R. Civ. P. 42(a) (providing that a court may consolidate actions if they "involve a common question of law or fact"). Or the current action should be dismissed as duplicative. *See Nicholson v. Clarke*, 2013 WL 12099299, at *1 (E.D.Va.

3

Nov. 20, 2013) ("Plaintiffs have no right to 'maintain two separate actions involving the same subject matter at the same time . . . against the same defendant[s].'").

4.        Regardless, removal is otherwise proper. Plaintiff alleges that Defendants, including EIDP, manufactured, supplied, and/or utilized products containing PFAS or products that degrade into PFAS.[1] According to the Complaint, these substances were released into surface waters through discharges from upstream dischargers, resulting in Defendants "so thoroughly pollut[ing] the Intracoastal Waterway and lower reaches of the Waccamaw River and Pee Dee River Watershed that any viable alternative location for the [Socastee intake] and SWTP would [] be impacted by Defendants' PFAS contamination." Compl. ¶ 83. Plaintiff contends that "sampling near the confluence of the Intracoastal Waterway and Waccamaw River confirms the presence of PFOA and PFOS at concentrations higher than what EPA deems unsafe for consumption. Defendants are the source." *Id.* ¶ 70. Plaintiff further contends that "Plaintiff must implement advanced water treatment technologies at the Socastee SWTP, which are more difficult and costly to build and operate, in order to remove Defendants' PFAS from the water treated by this facility." *Id.* ¶ 82.

5.        Plaintiff further alleges that it has incurred or will incur costs associated with the investigation, remediation and monitoring of the PFAS contamination and seeks to recover costs and damages associated with the alleged contamination, in addition to injunctive relief requiring EIDP to fund the evaluation, testing, acquisition, installation, operation, and maintenance of water treatment technologies to remove PFAS from Plaintiff's water system. (*Id.* ¶¶ 8, 151-156, 164-168, 180-181, 191-192, 214-215, 237-238, 255, Prayer for Relief at (a)-(d)).

---

[1] The claims asserted against DuPont de Nemours, Inc. are derivative of the claims Plaintiff makes against EIDP, Inc. (f/k/a E. I. du Pont de Nemours and Company), The Chemours Company, and Corteva, Inc. Compl. ¶¶ 35-38.

6.     Plaintiff asserts claims for private and public nuisance, "negligence, gross negligence, and/or recklessness," strict products liability (failure to warn, design defect, and ultrahazardous activity), and breach of implied warranties. (Compl. ¶¶ 145–261).

7.     The alleged PFAS contamination of Plaintiff's water supply plausibly resulted at least in part from the use, storage, and/or disposal of PFAS-containing aqueous film-forming foams ("AFFF") that certain Defendants developed for the U.S. military in accordance with rigorous military specifications ("MilSpec AFFF") issued by the Department of Defense ("DoD"). AFFF is a firefighting foam that is highly effective for extinguishing fuel-based fires. Here, the alleged PFAS contamination of the Waterways plausibly resulted at least in part from nearby use of MilSpec AFFF, including at military facilities such as the Myrtle Beach Air Force Base, the Salisbury Army Aviation Support Facility National Guard Base ("Salisbury AASF NG Base") and Stanly County Air National Guard Base ("Stanly County ANGB") (the Salisbury AASF NG Base and Stanly County ANGB, collectively, the "Salisbury and Stanly Bases"). In fact, the State of South Carolina has filed an action against EIDP, and other Defendants, to recover for alleged PFAS contamination of groundwater and surface waters encompassing Plaintiff's water supply, and the State expressly alleges that such PFAS resulted from MilSpec AFFF use at military locations, including the Myrtle Beach Air Force Base. The State's case is pending in the *In re AFFF Products Liability Litigation MDL* ("MDL") before Judge Gergel in this District. *See* Compl., *South Carolina v. 3M Co., et al.*, No. 2:23-cv-05734-RMG (D.S.C.), ECF No. 1-1, ¶¶ 137-142 ("State AG Complaint"). Because the alleged PFAS contamination of Plaintiff's water supply plausibly resulted from the use, storage, and/or disposal of MilSpec AFFF, EIDP intends to assert in this action the federal government contractor defense recognized in *Boyle v. United Technologies*

5

*Corp.*, 487 U.S. 500 (1988), which bars Plaintiff from establishing, among other things, liability for the design and manufacture of MilSpec AFFF and for the provision of warnings for the product.

8.      Further, as set forth below, the Great Pee Dee River, an alleged source of contamination in this action, is also an alleged source of contamination in another case currently in this Court. *Town of Cheraw v. 3M Company, Inc., et al.*, D.S.C., Case No. 2:25-cv-00679-RMG. In the *Cheraw* case, 3M Company alleged that PFAS in the Great Pee Dee River plausibly derived from MilSpec AFFF use at military facilities such as the Salisbury and Stanly Bases. *See* Ex. D, Cheraw Notice of Removal ("Cheraw NOR"), ¶¶ 2, 31-34. 3M cited reports and court records indicating that AFFF was used, stored, and discharged at these military sites which ultimately lead to contamination at the Great Pee Dee River. *Id*. ¶¶ 31-34. Accordingly, 3M alleged that PFAS from AFFF at these military sites plausibly contributed to the alleged downriver contamination of the Great Pee Dee River. *Id*. ¶ 35. *See also* Ex. E, 3M's Consolidated Response to in Opposition to Motions to Remand at 7–8, July 30, 2025, Doc. No. 16, C/A No. 2:25-cv-00679-RMG, at 7-8 (D.S.C.).

9.      Although Plaintiff purports to disclaim causes of action based on aqueous film forming foam ("AFFF") (Compl. ¶ 9), the Fourth Circuit has held that an alleged disclaimer of AFFF-related relief does not preclude federal officer jurisdiction over putative "non-AFFF" cases when the plaintiffs seek recovery for alleged contamination where PFAS from AFFF and non-AFFF sources is plausibly commingled. *See Maryland v. 3M Co*., 130 F.4th 380, 392 (4th Cir. 2025). Judge Gergel agrees. Case Management Order No. 36, *In re: AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG (D.S.C. Aug. 22, 2025) ("The Court finds unconvincing artful pleading, disclaimers, omission of AFFF exposure, and bare conclusory allegations that a personal injury was caused by exposure to PFAS, but not by exposure to AFFF.").

10.     AFFF purchased by the military was manufactured by a select group of suppliers in accordance with the military's rigorous specifications.

11.     Under the federal "government contractor" defense recognized in *Boyle v. United Technologies Corp*., 487 U.S. 500 (1988), EIDP is immune to tort liability as a contractor or subcontractor to AFFF manufacturers who designed and sold their products in compliance with MilSpec.

12.     Under the federal officer removal statute, 28 U.S.C. § 1442, EIDP is entitled to remove this action to have its federal defense adjudicated in a federal forum. *See Papp v. Fore-Kast Sales Co*., 842 F.3d 805, 810–15 (3d Cir. 2016). Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co*., 517 F.3d 129, 133 (2d Cir. 2008). Courts have held that AFFF manufacturers properly removed cases to federal court on the ground that the plaintiffs' claims plausibly arose at least in part from MilSpec AFFF. *See, e.g.*, *Nessel v. Chemguard*, No. 1:20-cv-1080, 2021 WL 744683, at *3-4 (W.D. Mich. Jan. 6, 2021).

13.     The Amended Complaint naming EIDP was filed on December 29, 2025, in the Court of Common Pleas of the State of South Carolina, Fifteenth Judicial Circuit, County of Horry, bearing Case No. 2025-CP-2609305 (Ex. A, Compl.). Venue is proper in this Court pursuant to 28 U.S.C. §§ 121 and 1441(a) because the Court of Common Pleas of the State of South Carolina, County of Horry, is located within the District of South Carolina.

14.     This Notice of Removal is timely filed in accordance with 28 U.S.C. § 1446(b).

15.     EIDP is not required to notify or obtain the consent of any other defendant in this action in order to remove Plaintiff's action as a whole under § 1442(a)(1). *See, e.g.*, *Durham v.*

7

*Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Hilbert v. McDonnell Douglas Corp.*, 529 F. Supp. 2d 187, 195 (D. Mass. 2008).

16.     Pursuant to 28 U.S.C. § 1446(d), EIDP is serving a copy of this Notice of Removal upon all other parties to this case and filing a copy with the Clerk of the Court of Common Pleas, Fifteenth Judicial Circuit, Horry County, South Carolina.

17.     By filing a Notice of Removal in this matter, EIDP does not waive the right to object to service of process, the sufficiency of process, jurisdiction over the person, or venue; and EIDP specifically reserves the right to assert any defenses and/or objections to which it may be entitled.

18.     EIDP reserves the right to amend or supplement this Notice of Removal.

**ARGUMENT**

19.     Removal here is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides for removal of an action relating to a defendant's acts undertaken at the direction of a federal officer. Removal is appropriate under this provision where the removing defendant establishes that: (a) it is a "person" within the meaning of the statute; (b) it acted under federal authority; (c) its actions taken pursuant to a federal officer's direction have a causal nexus with plaintiff's claims or injuries or are otherwise related to the lawsuit; and (d) it can assert a "colorable" federal defense. *See Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2017); *cf. Mesa v. California*, 489 U.S. 121, 124–25, 129–31, 133–35 (1989); *Papp*, 842 F.3d at 812; *Cuomo v. Crane Co.*, 771 F.3d 113, 115 (2d Cir. 2014); *Hilbert v. McDonnell Douglas Corp.*, 529 F. Supp. 2d 187, 196 (D. Mass. 2008); *Isaacson v. Dow Chemical Co.*, 517 F.3d 129, 135 (2d Cir. 2008); *Durham*, 445 F.3d at 1251.

20.     Removal rights under the federal officer removal statute found in § 1442 are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting

on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999). "The statute's purpose is to give effect to the legislative principle that those acting at the federal government's direction should be able to defend themselves in federal— not state—court, lest states be able to stymy the federal government's operations." *State of Maryland*, 130 F.4th at 387. This is because § 1442(a)(1) protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prods.*, 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011) (citation omitted). Indeed, § 1442 as a whole must be "liberally construe[d]" in favor of removal. *Papp*, 842 F.3d at 812 (alterations in original) (internal quotation marks omitted). *Accord id.* at 811 ("Unlike the general removal statute, the federal officer removal statute [Section 1442(a)] is to be 'broadly construed' in favor of a federal forum."); *see also Cessna v. Rea Energy Cooperative, Inc.*, 753 Fed. Appx. 124, 1127 (3d Cir. 2018) (citing *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 147 (2007)).

21.    All requirements for removal under § 1442(a)(1) are satisfied where, as here, the notice of removal alleges (based on the Plaintiff's own allegations) that the Plaintiff's injuries are caused, at least in part, by products made in accordance with the military's rigorous specifications (here the AFFF MilSpec), regardless of whether the plaintiff has purported to disclaim MilSpec AFFF-related injuries. *See, e.g.*, *Ayo v. 3M Co.*, 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding that federal officer removal was proper in a lawsuit involving MilSpec AFFF); *Nessel*, 2021 WL 744683, at *3 (denying motion to remand in PFAS case because, notwithstanding plaintiffs' assertion "that they do not seek resolution of any claims related to MilSpec AFFF, . . . Plaintiffs cannot decide what defense Defendants might present").

Federal courts have found that removal under § 1442 is proper when the complaint seeks damages for alleged PFAS-related injuries from MilSpec AFFF at military facilities or airports. The Honorable Richard M. Gergel of this Court, in overseeing the *In re Aqueous Film-Forming Foams Products Liability Litigation* multi-district litigation has also found on multiple occasions that removal under §1442 is proper where the notice of removal alleges that Plaintiff's injuries are caused, at least in part, by MilSpec AFFF. *See* Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 103 (D.S.C. May 24, 2019) ("MDL Order 1"), at 3–6; Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 320 (D.S.C. Sept. 27, 2019) ("MDL Order 2"), at 3–5; Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 325 (D.S.C. Oct. 1, 2019) ("MDL Order 3"), at 3–6; Case Management Order No. 36, *In re: AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 7891 (D.S.C. Aug. 22, 2025), at 2. Given its experience with the claims and defenses in AFFF litigation, the MDL Court's holdings demonstrate that this case, too, has been properly removed to federal court.[2]

22.    Here, the alleged PFAS from non-AFFF sources plausibly commingled in Plaintiff's water supply with PFAS from MilSpec AFFF, and as a result, Plaintiff's claims for damages and other relief related to PFAS in its water supply relate to a single injury attributable at least in part to MilSpec AFFF. To the extent that alleged PFAS deriving from non-AFFF sources cannot actually be separated out from PFAS deriving from MilSpec AFFF sources, Plaintiff necessarily is seeking to impose liability on EIDP for alleged contamination attributable in part to MilSpec AFFF, despite its alleged disclaimer. Moreover, EIDP is entitled to a federal forum to litigate any apportionment of Plaintiff's damages between PFAS from non-AFFF sources and

---

[2] Because this case is one involving AFFF contamination, it should be assigned to Judge Gergel and the AFFF MDL proceeding (Case No. 2:18-mn-02873-RMG), together with claims against AFFF manufacturers for PFAS contamination *at the same locations*.

PFAS from AFFF sources, as the Seventh Circuit recently held in another case for alleged PFAS contamination in which the plaintiff similarly purported to disclaim injury from AFFF. *See People ex rel. Raoul v. 3M Co.*, 111 F.4th 846, 849 (7th Cir. 2024) (holding that "a federal court should be the one to resolve" difficult questions of apportionment of PFAS-related injuries between non-AFFF sources and AFFF sources subject to a federal defense, and ordering remand only because the plaintiff conceded that pursuant to its alleged disclaimer, it would not seek recovery for "mixed PFAS contamination" so its "recovery is barred" "[i]f even a morsel of contamination" is from AFFF). This case has been properly removed based on federal officer jurisdiction.

### I. Plaintiff's claims relate to MilSpec AFFF.

23.    Since the 1960s, the United States military has used MilSpec AFFF on military bases, airfields (including Air National Guard facilities), and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property. Indeed, the United States Naval Research Laboratory developed AFFF in response to catastrophic fires aboard the aircraft carriers USS Forrestal in 1967 and USS Enterprise in 1969.[3] Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[4]

24.    The manufacture and sale of MilSpec AFFF is governed by rigorous military specifications created and administered by Naval Sea Systems Command. The specification

---

[3] *See* Press Release 71-09r, U.S. Naval Research Lab., Navy Researchers Apply Science to Fire Fighting (Oct. 23, 2009), https://tinyurl.com/y2jq4q4w.
[4] U.S. Navy, NRL/MR/1001-06-8951, The U.S. Naval Research Laboratory (1923–2005): Fulfilling the Roosevelts' Vision for American Naval Power 37 (2006) ("Fulfilling the Roosevelts' Vision"), https://permanent.fdlp.gov/gpo125428/roosevelts.pdf.

applicable to AFFF, Mil-F-24385, was first promulgated in 1969 and has been revised a number of times since then.[5]

25.     All MilSpec AFFF products must be qualified for listing on the applicable Qualified Products List prior to military procurement. Prior to such listing, a manufacturer's products are examined, tested, and approved to be in conformance with MilSpec requirements.[6] The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements. After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[7] Naval Sea Systems Command reserves the right to perform any of the quality assurance inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements.

26.     From its inception until very recently, the MilSpec included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants." All fluorocarbon surfactants are PFAS, which includes PFOA, PFOS, and their chemical precursors—the very compounds at issue in the Complaint here. This requirement has been in force for virtually the entire time period at issue in the Complaint. In 2019, the MilSpec removed the modifier "fluorocarbon" from "surfactants," but it expressly states that "the DoD intends to acquire and use AFFF with the lowest demonstrable concentrations of . . . PFOS and PFOA" "[i]n the short term." PFOA or PFOS are unavoidably present at some concentrations in fluorocarbon surfactants, and the current MilSpec

---

[5] The 1969 MilSpec and all its revisions and amendments through April 2020 are available at https://tinyurl.com/yxwotjpg.
[6] Dep't of Defense SD-6, Provisions Governing Qualification 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.
[7] *Id.*

expressly contemplates that AFFF formulations will continue to contain PFOA and PFOS (subject to recently imposed limits).

27.     AFFF manufacturers, including 3M, Tyco, and National Foam sold PFAS-containing MilSpec AFFF to the U.S. military for over three decades pursuant to contracts with the United States. One or more of Tyco and National Foam's products were on the Navy's Qualified Products List for MilSpec AFFF since 1970.[8] Over time, the U.S. military used MilSpec AFFF throughout the United States, including in South Carolina.

28.     AFFF manufacturers historically manufactured and sold PFAS-containing MilSpec AFFF to non-military users, including in South Carolina. In particular, so-called "Part 139" airports—i.e., certain large civilian airports (see 14 C.F.R. § 139.1 (2019))—historically have used MilSpec AFFF. By 2006, the U.S. government was requiring Part 139 airports to use AFFF meeting MilSpec standards.[9] EIDP is alleged to have manufactured and/or sold fluorochemicals and/or fluorosurfactants containing PFAS used by AFFF manufacturers to manufacture MilSpec AFFF. *See* State AG Complaint at 20-28.

29.     From approximately 1973 to the 2020s, DuPont supplied two types of products for use in MilSpec AFFF: telomer intermediates and telomer fluorocarbon surfactants. Regarding telomer intermediates, DuPont sold them to surfactant manufacturers (i.e., Ciba Geigy) who then sold fluorocarbon surfactants made using the intermediates to MilSpec AFFF manufacturers (i.e., Ansul/Tyco). From 1975 to 1993, there were only three AFFF Manufacturers on the military's

---

[8] *See* MIL-F-24385 QPL/QPD History for Type 3 AFFF (Oct. 24, 2014) & MIL-F-24385 QPL/QPD History for Type 6 AFFF (Oct. 24, 2014) (available at *In re AFFF Prods. Liab. Litig.,* No. 2:18-mn-02873, ECF No. 1969-24 (D.S.C.)).
[9] *See* FAA Part 139 CertAlert 06-02, Aqueous Film Forming Foam (AFFF) meeting MIL-F-24385 (Feb. 8, 2006) (available at *In re AFFF Prods. Liab. Litig.,* No. 2:18-mn-02873, ECF No. 1971-14 (D.S.C.)).

QPL: 3M, National Foam, and Ansul.[10] During this period, Ciba-Geigy purchased and used DuPont's intermediates to form the fluorocarbon surfactants used by Ansul. From 1993 to the 2020s, DuPont (and beginning in 2015, Chemours) continued to supply fluorotelomer intermediate products to fluorocarbon surfactant manufacturers for the production of MilSpec AFFF.[11]

30.     Regarding DuPont's fluorocarbon surfactants, DuPont did not sell these products until 2002 after acquiring Atofina's fluorocarbon surfactant product line at which point DuPont began supplying fluorocarbon surfactants to MilSpec AFFF manufacturers, such as Tyco and National Foam. DuPont (and then Chemours beginning in 2015) has supplied Tyco and National Foam with fluorocarbon surfactants specifically made for use in MilSpec AFFF, namely Forafac 1157, Forafac 1157N, and others.[12]

31.     EIDP's products were not merely "off-the shelf" products; rather, these products were formulated specifically to allow for AFFF to satisfy not only the general "fluorocarbon surfactant" requirement of MilSpec AFFF but also allow AFFF to satisfy the MilSpec's stringent requirements that AFFF products form a film on a specific reference fuel, reach certain extinguishment times, and satisfy particular burnback resistance (i.e., the foam's ability to suppress reignition).[13]

---

[10] Stephen H. Korzeniowski, et al., Fluorosurfactants in Firefighting Foams 17, (Aug. 2018), https://www.researchgate.net/publication/333593528_Fluorosurfactants_in_Firefighting_Foams ("Korzeniowski").

[11] Korzeniowski at 17 (Figure 1.10).

[12] *See* Moe, et al., *The structure of the fire fighting foam surfactant Forafac 1157 and its biological and photolytic transformation products*, (Oct. 2012), https://www.sciencedirect.com/science/article/abs/pii/S0045653512006091 (Noting within the abstract that Forafac 1157 replaced PFOS for use in AFFF).

[13] *See, e.g.*, U.S. Navy, MIL-F-24385 §§ 3.4, 4.3, (Jan. 7, 1992), available at https://quicksearch.dla.mil/qsDocDetails.aspx?ident_number=17270; *see also* Dkt. No. 1965-1 at 14-16 (providing further detail on the precise characteristics required by the fluorocarbon surfactants used in MilSpec AFFF).

32.     The PFAS chemicals that allegedly are contaminating Plaintiff's drinking water supply plausibly have derived at least in part from the use, storage, and/or disposal of MilSpec AFFF in South Carolina. Accordingly, Plaintiff's claims to recover for the alleged PFAS contamination of its water and wastewater are related to or arise in part from MilSpec AFFF containing EIDP's products.

33.     Specifically, PFAS from the use, storage, and/or disposal of MilSpec AFFF at military facilities such as the Myrtle Beach Air Force Base and the Salisbury and Stanly Bases have plausibly contributed to the alleged PFAS contamination of Plaintiff's drinking water supplies. Those facilities are all located in areas of South Carolina that are nearby and upgradient from Bull Creek and the Intracoastal Waterway. PFAS releases from AFFF use at the Myrtle Beach Air Force Base plausibly migrated by groundwater and/or surface water to the Intracoastal Waterway and ultimately to the confluence of the Intracoastal Waterway and the Waccamaw River. PFAS releases from the Salisbury and Stanly Bases plausibly migrated by groundwater and/or surface water to the Waterways, which flow through the Great Pee Dee River to the Waccamaw River and the Intracoastal Waterway. PFAS from MilSpec AFFF at each facility therefore would be a plausible source of PFAS in Plaintiff's drinking water supplies.

34.     The Myrtle Beach Air Force Base is located in Myrtle Beach, South Carolina, and is a confirmed site where the U.S. military has used, stored, and disposed of AFFF. A PFAS investigation of the Myrtle Beach Air Force Base identified numerous historical sites of AFFF usage, storage, and disposal. *See* State AG Compl. ¶ 142 n.55 (citing *Strategy to Assess the Impact of Per- and Polyfluoroalkyl Substances on Ambient Surface Waters in South Carolina*, DHEC Bureau of Water (Apr. 30, 2021), https://des.sc.gov/sites/des/files/media/document/ BOW_PFAS_SurfaceWaterStrategy_0.pdf ("Strategy to Assess PFAS in South Carolina")). The

same investigation identified the HUC-10 watershed (denominated "Little River") as a "priority study area" by the South Carolina Department of Health and Environmental Control due to AFFF use at the Myrtle Beach Air Force Base. Strategy to Assess PFAS in South Carolina at 1, 7 13, 24, 29. PFAS contamination of the Intracoastal Waterway within the Little River Watershed could plausibly migrate south. As such, it is plausible that PFAS from AFFF migrated off-site to the Intracoastal Waterway and then southward to the "confluence of the Intracoastal Waterway and the Waccamaw River" where Plaintiff alleges it intends to construct the Socastee Intake. Compl. ¶¶ 2-3.

35.    The Salisbury AASF NG Base in Salisbury, North Carolina, plausibly has contributed to the alleged PFAS contamination of Plaintiff's drinking water supply, the Great Pee Dee River. The Salisbury AASF NG Base is located in the Yadkin-Pee Dee watershed (which stretches between North Carolina and South Carolina), and PFAS releases there plausibly would be a source of PFAS in Plaintiff's drinking water supply. Further, the Salisbury AASF NG Base is a confirmed site where the U.S. military has used and stored AFFF. *See* Cheraw NOR ¶ 31 (citing AECOM, FINAL Site Inspection Report, Salisbury Army Aviation Support Facility #2, North Carolina (May 2022), at 3-1 to 3-2, 7-1 to 7-2, https://www.nationalguard.mil/Leadership/ Joint-Staff/Personal-Staff/Public-Affairs/CommunityEngagement/Environmental/PFAS-Library/North-Carolina/FileId/343153/). A PFAS investigation for the Salisbury AASF NG Base identified pathways whereby PFAS from AFFF use plausibly had migrated off-site to surrounding groundwater and surface water that can have impacted Plaintiff's water supply, the Great Pee Dee River: a report detailing the PFAS investigation specifically identifies pathways whereby PFAS may have impacted the Yadkin River, which is the upper course of the Great Pee Dee River. *Id.* (citing AECOM at 7-1 to 7-3). Plaintiff specifically alleges that Defendants' contamination of the

Great Pee Dee River results in contamination of the confluence of the Intracoastal Waterway and the Waccamaw River. *See, e.g.*, Compl. ¶ 20. As use of MilSpec AFFF at the Salisbury AASF NG Base also resulted in contamination of the Great Pee Dee River, it is plausible that PFAS from this MilSpec AFFF use is a source of PFAS in Plaintiff's drinking water supplies.

36.     Additionally, PFAS in Plaintiff's water supply also plausibly derives from the use of MilSpec AFFF at the Stanly County ANGB and Stanly County Airport, located in Stanly County, North Carolina. The Stanly County ANGB and Stanly County Airport are also located in the Yadkin–Pee Dee watershed where PFAS releases plausibly would be a source of PFAS in Plaintiff's drinking water supply. The reports for PFAS investigations for Stanly County ANGB indicated that drainage from the site is towards a tributary of the Pee Dee River and identified pathways whereby PFAS plausibly migrated off-site into groundwater. *See* Cheraw NOR ¶ 32 (citing AMEC Foster Wheeler, *Final Report, FY16 Phase I Regional Site Inspections For Perfluorinated Compounds, Stanly Co. ANGB* at E-2 to E-3 (Mar. 25, 2019) (available at https://ar.cce.af.mil/Search) (AR#585624); BB&E, Inc., *Final Perfluorinated Compounds Preliminary Assessment Site Visit Report, Stanly County ANGB* at 7 (Jan. 2016) (available at https://ar.cce.af.mil/Search) (AR#470209)). Further, the State of North Carolina has a case pending in the MDL against 3M and other Defendants in which the complaint expressly alleges that AFFF use at the Stanly ANGB and Stanly County Airport have contaminated surrounding drinking water supplies including the Pee Dee River. Compl. ¶¶ 1-12, 36-51, 120-136, *North Carolina v. 3M Co., et al.*, No. 2:22-cv-00014 (D.S.C.), ECF No. 1-1.

37.     Notably, the State of South Carolina's own AFFF lawsuit pending in the MDL incorporates maps which purportedly show the "association between AFFF-using sites and chemicals known to appear in AFFF" and purportedly support the State's allegation that "AFFF is

the most probable source of contamination at these testing locations." State AG Complaint ¶ 138. Specifically, those maps identify both Salisbury AASF NG Base and Stanly ANGB as military facilities that allegedly are "probable source[s] of contamination" with PFAS. *Id.*; *compare id.* ¶ 136 n.54 (citing Environmental Working Group ("EWG") website for information depicted in the maps incorporated by the complaint), *with* EWG, *PFAS Contamination in the U.S.*, https://www.ewg.org/interactive-maps/pfas_contamination/map/ (identifying the Salisbury AASF NG Base and the Stanly ANGB as likely AFFF PFAS sites).

38.     MilSpec AFFF sources of PFAS in Plaintiff's water supplies are not necessarily limited to those military facilities. MilSpec AFFF use at other nearby military facilities and/or other sites also potentially contributed to PFAS in Plaintiff's water supplies

39.     Once PFAS from MilSpec AFFF has migrated from military bases and/or other MilSpec AFFF sites to surrounding groundwater or surface water, the PFAS would commingle with and become indistinguishable from PFAS from any non-AFFF sources. Tellingly, Plaintiff's own Complaint alleges that PFAS "resist environmental degradation" are "highly mobile and water soluble," Compl. ¶¶ 20, 47. Here, PFAS from MilSpec AFFF plausibly has migrated and commingled with PFAS from non-AFFF sources in Plaintiff's water supply so that Plaintiff's effort to recover for *any* PFAS levels in its water supply provides a basis for EIDP to assert its federal government contractor defense.

40.     Because the alleged PFAS contamination at issue in this action is, at least in part, plausibly attributable and/or related to MilSpec AFFF use that has inseparably commingled in the water supply with PFAS from non-AFFF sources, EIDP is entitled to remove this case as a whole pursuant to federal officer jurisdiction. Case Management Order No. 36, *In re: AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-02873-RMG, ECF No. 7891 (D.S.C. Aug. 22, 2025), at 2 ("3M and

other defendants have consistently argued that PFAS from its Military AFFF production and its non-AFFF production were inextricably linked, a theory that, if credited, holds sufficient water to substantiate federal officer removal.") (cleaned up). That is because Plaintiff's claims for alleged PFAS necessarily relate to PFAS deriving at least in part from MilSpec AFFF sources, i.e., "[i]t is entirely possible that Plaintiff['s] injuries occurred from actions taken while Defendants were acting under color of federal office: namely, MilSpec AFFF." *Nessel*, 2021 WL 744683, at *3. EIDP therefore is entitled to raise "the production of MilSpec AFFF as a defense or alternative theory," and on that basis, may remove this case. *Id*. Although the Complaint purports to allege that Plaintiff is not seeking any relief for PFAS contamination from AFFF (*see* Compl. ¶ 9), Plaintiff's claims nonetheless relate to alleged PFAS contamination that is, at least in part, plausibly caused by or related to MilSpec AFFF (and not just non-AFFF PFAS sources). Plaintiff's disclaimer thus does not preclude removal of this case. *See Maryland v. 3M Co.*, 130 F.4th 380, 392 (4th Cir. 2025) (declining "to give dispositive effect to the States' disclaimers"); *Puerto Rico v. Express Scripts, Inc*., 119 F.4th 174, 180 (1st Cir. 2024) (holding that defendant properly removed case under the federal officer removal statute, notwithstanding the plaintiff's alleged disclaimer of relief related to federal conduct, because "[t]o credit the disclaimer would permit [plaintiff] to recover based on what, when considered through [defendant's] theory of removal, were acts under a federal officer," and plaintiff's "attempts at artful pleading cannot serve as an end run around the federal officer removal statute"). Federal officer removal is proper despite the alleged disclaimer because the claimed injury from PFAS is plausibly due in part to PFAS from MilSpec AFFF—and at a minimum, EIDP is entitled to litigate any apportionment of Plaintiff's injury between PFAS from MilSpec AFFF sources and PFAS from other sources in federal court. *See Maryland*, 130 F.4th at 392; *Raoul*, 111 F.4th at 849 ("If the contamination came from AFFF,

then the government contractor defense could apply . . . even though the State's complaint expressly excluded 3M from liability for PFAS contamination sources from AFFF" because "a factfinder would need to apportion the contamination" between AFFF and non-AFFF PFAS sources); *Nessel*, 2021 WL 744683, at *3 (denying State of Michigan's motion to remand and concluding that federal officer removal was proper notwithstanding the complaint's allegation that Michigan was not seeking relief for MilSpec AFFF; "Plaintiffs' artful pleading does not obviate the facts on the ground.").

## II. All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied.

### a) *The "Person" Requirement Is Satisfied.*

41. The first requirement for removal under the federal officer removal statute is satisfied here because EIDP meets the definition of "person." Section § 1442(a)(1) specifically defines "person" to include "corporations, companies, associations, firms, [and] partnerships." *Papp*, 842 F.3d at 812 (quoting 1 U.S.C. § 1); accord *Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010); *Isaacson*, 517 F.3d at 135–36.

### b) *The "Acting Under" Requirement Is Satisfied.*

42. The second requirement ("acting under" a federal officer) is satisfied when an entity assists or helps carry out the duties or tasks of a federal officer. *Papp*, 842 F.3d at 812. "The words 'acting under' are to be interpreted broadly . . . ." *Isaacson*, 517 F.3d at 136 (citation omitted). Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813.

43. The "acting under" requirement, like the federal officer removal statute overall, is to be "liberally construe[d]" to cover actions that involve "an effort to assist, or to help carry out, the federal supervisor's duties or tasks." *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012)

(quoting *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142 (2007)); *see also In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Philadelphia,* 790 F.3d 457, 468 (3d Cir. 2015), as amended (June 16, 2015).

44.     The classic case of government assistance as it relates to government contractors is when "the private contractor acted under a federal officer or agency because the contractors 'help[ed] the Government to produce an item that it need[ed].'" *Defender Ass'n*, 790 F.3d at 468 (quoting *Watson*, 551 U.S. at 153). When "the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete," that contractor is "acting under" the authority of a federal officer. *Ruppel*, 701 F.3d at 1181; *see also Defender Ass'n*, 790 F.3d at 468–70.

45.     The requirement of "acting under" a federal officer is met here because the alleged PFAS contamination at issue in this action stems in part from MilSpec AFFF, a vital product provided by AFFF manufacturers and their subcontractors that otherwise "the Government would have had to produce itself." *Isaacson,* 517 F.3d at 137. MilSpec AFFF is a mission-critical military and aviation safety product that, without the support of private contractors, the government would have to produce for itself. *See Ayo,* 2018 WL 4781145, at *9 (describing MilSpec AFFF as a "mission-critical" and "life-saving product" used by all branches of the U.S. armed forces and NATO members (internal quotation marks omitted)); *cf. Isaacson,* 517 F.3d at 137. The Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations."[14] Accordingly, the federal

---

[14] Fulfilling the Roosevelts' Vision at 37.

government has long depended upon outside contractors like AFFF manufacturers and its subcontractors to develop and supply AFFF.

46.    From its inception until very recently, the MilSpec included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants." All fluorocarbon surfactants are PFAS, which includes PFOA, PFOS, and their chemical precursors—the very compounds at issue in the Complaint here. EIDP supplied particular PFAS products to MilSpec AFFF manufacturers which allowed these AFFF manufacturers to produce AFFF in conformance with MilSpec. *See, supra* ¶¶ 26-30.

47.    In designing, manufacturing, and supplying the MilSpec AFFF at issue, AFFF manufacturers and their subcontractors acted under the direction and control of federal officers. Specifically, AFFF manufacturers acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. Further, MilSpec AFFF products were subject to various tests by the U.S. Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the DoD.[15] For these reasons, EIDP has satisfied the "acting under" requirement. *See AFFF I*, 2019 WL 2807266, at *2 (finding that "acting under" requirement was satisfied because defendant demonstrated that it manufactured MilSpec AFFF under guidance of U.S. military); *AFFF II*, at 3-4 (finding that AFFF manufacturers satisfied the "acting under" requirement because "[d]esigning AFFF products to military specifications ('MilSpec') . . . may constitute 'acting under' the military guidance" even when the AFFF was then sold to civilian airports); *Nessel*, 2021 WL 744683, at *3 (holding that AFFF manufacturers

---

[15] *See* DoD, SD-6, at 1.

were "acting under" a federal officer in connection with manufacture and sale of MilSpec AFFF); *Ayo*, 2018 WL 4781145, at *8-9 (same).

48.     The government contractor defense applies equally to subcontractors for these same reasons. The Fourth Circuit applied the government contractor defense to a subcontractor for the first time in *Ramey v. Martin-Baker Aircraft Co.*, 874 F.2d 946 (4th Cir. 1989). There, the plaintiff sued McDonnell Douglas, a manufacturer of the Navy's F-18 fighter aircraft, as well as Martin-Baker, a subcontractor to McDonnell Douglas that manufactured the F-18 ejection seat plaintiff claimed was defectively designed and injured him. The question before the court was whether the district court had properly concluded that the government contractor defense insulated Martin-Baker from liability. The Fourth Circuit initially noted that the Supreme Court's decision in *Boyle* largely adopted the Fourth Circuit's reasoning in *Tozer v. LTV Corp.*, 792 F.2d 403 (4th Cir. 1986), *cert denied*, 487 U.S. 1233 (1988). Both *Tozer* and *Boyle* recognized that the defense must apply to entities "getting the government's work done" and that, if it did not, "[s]tate court judgments against contractors would effectively pass through to the United States in the form of higher costs." *Ramey*, 874 F.2d at 949-50, *citing Boyle*, 487 U.S. at 509 (internal citations and quotations omitted). With those principles in mind, the Fourth Circuit held the plaintiff "could not surmount the obstacle of the military contractor defense as [] articulated in *Tozer*." *Id.* at 950. The Navy both participated in the ejection seat's design with "more than a rubber stamping" and was aware of the potential hazard but continued using the seat anyway. That Martin-Baker designed the seat as McDonnell Douglas' subcontractor was irrelevant; Martin-Baker was "insulate[d]" from liability for the plaintiff's injuries because it satisfied the elements of the government contractor defense as articulated in *Tozer* and *Boyle*. *Id.* at 951.

23

49.    Multiple Circuit courts are in accord. In *Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67 (3d Cir. 1990), the Third Circuit affirmed summary judgment for both the gas turbine helicopter engine manufacturer and ball bearing manufacturer that allegedly caused injuries to an Army helicopter pilot. The engine manufacturer designed the engine to conform to a detailed Military Specification. *Id.* at 71-72. After the initial design process, the engine manufacturer proposed incorporating a T63 engine ball bearing into the design, and the Army approved following a lengthy review process. *Id.* at 71. The engine manufacturer subsequently amended its design specifications to incorporate the new ball bearing and subcontracted with the ball bearing manufacturer to produce that part pursuant to the amended specifications. *Id.* The Third Circuit affirmed that the government contractor defense applied to both manufacturers given the Army's "measured" and "clearly discretionary" decisions regarding the engine's design. *Id.* at 72. And because the "Army's approved design required [the engine manufacturer] to include in the T63 engine the particular ball bearing" that plaintiff claimed injured him, the ball bearing subcontractor could not be held liable under state tort law. *Id.* The lower court had expressly so found, holding "[t]he government contractor defense can apply to subcontractors, as well as general contractors." *Maguire v. Hughes Aircraft Corp.*, 725 F. Supp. 821, 825 (D.N.J. 1989), *aff'd*, 912 F.2d 67 (3d Cir. 1990); *see also Tate v. Boeing Helicopters*, 140 F.3d 657 n.2 (6th Cir. 1998) (applying government contractor defense to both manufacturer of military helicopter involved in crash and to subcontractor manufacturer of component parts); *Kerstetter v. Pac. Sci. Co.*, 210 F.3d 431, 437 (5th Cir. 2000) (applying the government contractor defense to a subcontractor manufacturer of the pilot restraint system incorporated into the design of a Navy aircraft manufactured by a different party); *Garner v. Santoro*, 865 F.2d 629, 637 n.13 (5th Cir. 1989) (refusing to adopt a per se rule that would preclude a party without a *direct* government contract from asserting the

24

government contractor defense). District courts have likewise held that the government contractor defense extends to subcontractors. *Badilla v. Nat'l Air Cargo, Inc.*, No. 12-CV-1066A, 2013 WL 5723324, at *9 (W.D.N.Y. Oct. 21, 2013) (collecting cases recognizing the applicability of the defense to subcontractors). [16]

50.     Any decision finding the defense inapplicable to subcontractors would frustrate its purpose. In *Jackson v. Avondale Indus. Inc.*, 469 F. Supp. 3d 689, 704 (E.D. La. 2020), the plaintiff argued that the doctrine did not apply to parties with no "direct contractual relationship with the federal government." The court rejected plaintiff's position, reasoning it was "at odds with the purpose of the government contractor defense." *Id.* at 705 (internal quotations omitted). The defense was intended "at least in part to prevent the financial burden of liability judgments against government contractors from being passed through the United States." *Id.* Precluding subcontractors from asserting the defense would cause the same problem, as subcontractors would be incentivized to pass "increased costs to the prime contractors who will subsequently pass them to the government." *Id.*; *see also LaForge v. ECC Operating Servs.*, 2010 WL 497657, at *2 (E.D. La. Feb. 5, 2010) ("Because the principles underlying the government contractor defense support extending the defense to government subcontractors, the Court finds that [the subcontractor's] status as a subcontractor does not preclude it from relying on government contractor immunity as

---

[16] *See also Griffin v. JTSI, Inc.*, 2009 WL 8761211, at *12 n.35 (D. Haw. July 28, 2009) ("Subcontractors are afforded the same protections under the government contractor defense as prime contractors.") (citing *Maguire v. Hughes Aircraft Corp.*); *Ohio, ex rel. Dann v. Sherwin-Williams Co.*, 2008 WL 4115706, at *5 (S.D. Ohio Aug. 28, 2008)("[T]he government contractor defense protects subcontractors if the government approved 'reasonably precise specifications' for the subcontractor's product."); *Humphries v. OneBeacon Am. Ins. Co.*, 2014 WL 12773903, at *4 n.27 (E.D. La. Sept. 23, 2014) (rejecting plaintiff's argument that the defense requires a direct contractual relationship with the government).

an affirmative defense."). Failure to apply the defense equally to subcontractors would frustrate the Supreme Court's intentions as stated in *Boyle*.

51.     In designing, manufacturing, and supplying essential ingredients for MilSpec AFFF at issue, EIDP acted under the direction and control of one or more federal officers vis-à-vis their subcontractor relationship with AFFF manufacturers. AFFF manufacturers acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling, including when purchasing and incorporating Defendants' essential ingredient. Those AFFF products were subject to various tests by the United States Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the DoD.[17] The "acting under" prong is satisfied.

c)     *The Nexus Requirement Is Satisfied.*

52.     The third requirement, that the defendant's actions taken "under color of federal office" have a causal nexus with plaintiff's claims or injuries or be otherwise related to the lawsuit, erects a hurdle that "is quite low." *Isaacson*, 517 F.3d at 137.[18] To satisfy this requirement, it is sufficient for a defendant to establish that an act that allegedly caused or contributed to the plaintiff's injury occurred while the defendant was performing its official duties. *Id*. at 137–38. As set forth above, the alleged PFAS contamination here allegedly arose from contamination in the Great Pee Dee River, the same water source as in the *Cheraw* action, as well as contamination in the Intracoastal Waterway. In *Cheraw*, 3M Company, an AFFF manufacturer, alleged that PFAS in the Great Pee Dee River plausibly derived from MilSpec AFFF use at the Salisbury and Stanly

---

[17] *See* Dep't of Defense, SD-6, at 1.
[18] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532, at *5.

26

Bases located upriver from Cheraw. Cheraw NOR ¶¶ 2, 31-34. 3M cited reports and court records indicating that AFFF was used, stored, and discharged at the Salisbury and Stanly Bases. *Id*. ¶¶ 31-34. Accordingly, 3M alleged that PFAS from AFFF at the military sites plausibly had contributed to the alleged downriver contamination the Great Pee Dee River. *Id*. ¶ 35. *See also* Ex. C, 3M's Consolidated Response to Remand Motions, dated July 30, 2025, D.S.C., Case No. 2:18-mn-02873-RMG, at 7-8. Further, South Carolina has specifically admitted that the Myrtle Beach Air Force Base is a source of PFAS from Milspec AFFF that contaminates the Intracoastal Waterway. State AG Compl. ¶ 142. Thus, Plaintiff's alleged injury was plausibly caused, in part, by the use of Milspec AFFF authorized by the federal government. EIDP designed, manufactured, and supplied essential ingredients for MilSpec AFFF, and thus acted under the direction and control of one or more federal officers vis-à-vis their subcontractor relationship with AFFF manufacturers. The nexus requirement is therefore satisfied.

d)    *The "Colorable Federal Defense" Requirement Is Satisfied.*

53.    The fourth requirement ("colorable federal defense") is satisfied by EIDP's assertion of the government contractor defense in response to Plaintiff's claims.

54.    At the removal stage, a defendant need only show that its government contractor defense is colorable; that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp*, 842 F.3d at 815 (alteration in original) (citation omitted). "A defendant 'need not win his case before he can have it removed.'" *Id*. (quoting Willingham, 395 U.S. at 407); *see also Isaacson*, 517 F.3d at 139 ("To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court." (citation omitted)); *O'Connell v. Foster Wheeler Energy Corp*., 544 F. Supp. 2d 51, 54 (D. Mass. 2008) (upon removal, defendant must raise "colorable federal defense"). At the removal stage, the inquiry "is purely jurisdictional, and neither

27

the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116.[19] Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (alteration in original) (citation omitted).

55.     Under the government contractor defense, the defendant is not liable for the design, manufacture, or warnings of equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

56.     EIDP has satisfied these elements for purposes of removal. As discussed above, Naval Sea Systems Command approved reasonably precise specifications governing MilSpec AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. EIDP's products were end-products that appeared on the DoD Qualified Products List, or essential ingredients of end-products, which happened only because Naval Sea Systems Command first determined that they conformed to the MilSpec. *See Ayo*, 2018 WL 4781145, at *13 ("[T]here is colorable evidence that Mil-Spec AFFF is not a stock product and that the government approved reasonably precise specifications requiring them to use PFCs, including PFOS and PFOA, in their

---

[19] *See* also *Kraus v. Alcatel-Lucent*, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage. Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense." (internal citation omitted)).

products."); *see also id*. ("There is also colorable evidence . . . that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications."); MDL Order 1, at 5 (finding defendant demonstrated a colorable defense "where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications"); MDL Order 2, at 4; MDL Order 3, at 5 (same); *see also Chemguard*, 2021 WL 744683, at *4.

57.     Moreover, the government was sufficiently informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring MilSpec AFFF. The military specifications have long included testing protocols and requirements for toxicity, chemical, oxygen, and biological demand. Indeed, it is clear that the United States has long understood that AFFF contains PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported by EPA that this may raise environmental or human health issues.[20] For example, as early as October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from firefighting exercises are considered to have adverse effects environmentally."[21] By no later than 2001, DoD was aware of data purportedly showing PFAS compounds in MilSpec AFFF to be "toxic" and "persistent." In 2002, the United States Environmental Protection Agency issued a draft hazard assessment for PFOA that reviewed in detail, among other data, human epidemiological studies and animal toxicology studies pertaining

---

[20] *See*, e.g., EPA, Revised Draft Hazard Assessment of Perfluorooctanoic Acid and Its Salts 1–6 (Nov. 4, 2002).
[21] *See Edward S. K. Chian et al.*, Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients 1 (Oct. 1980), https://apps.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

to alleged associations between PFOA and cancer. In a November 2017 report to Congress, the DoD acknowledged the concerns raised by the EPA regarding PFOS and PFOA. Nonetheless, it still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[22] Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF contain "surfactants," and recognizes that PFAS, including PFOS and PFOA, will be present (subject to recently imposed limits for PFOS and PFOA) in AFFF formulations.[23] *See Ayo*, 2018 WL 4781145, at \*12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design."); MDL Order 1, at 5 ("As to whether [defendant] adequately informed the U.S. military of dangers associated with its AFFF products of which the military was not already aware, [defendant] points to materials such as a November 2017 Department of Defense report to Congress, in which the agency acknowledged the [EPA]'s stated concerns with PFOS/PFOA in drinking water . . . .").

58.    At minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks. *See Twinam v. Dow Chem. Co.* (*In re "Agent Orange" Prod. Liab. Litig.*), 517 F.3d 76, 90 (2d Cir. 2008); *see also Albrecht*, 2011 WL 5109532, at \*5 ("A defendant is not required to warn the government where 'the government

---

[22] Dep't of Defense, Aqueous Film Forming Foam Report to Congress 1–2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/wshcww4.

[23] *See* MIL-PRF-24385F(SH), Amendment 4, § 6.6 & Tables I, III (2020), https://quicksearch.dla.mil/qsDocDetails.aspx?ident_number=17270; see also David Vergun, DOD Officials Discuss Fire-Fighting Foam Replacement, Remediation Efforts (Sept. 16, 2020), https://tinyurl.com/ty5ku8hp.

knew as much or more than the defendant contractor about the hazards of the product.'" (citation omitted)). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d at 89–90; *see also Ayo*, 2018 WL 4781145, at *13.

59.      EIDP's assertion of government contractor immunity constitutes a colorable federal defense because EIDP was at all relevant times manufacturing products or ingredient products that were subject to the federal government's guidance and control. *See County Bd. of Arlington Cty., Virginia v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 255 (4th Cir. 2021) (finding parties distributing opioids as subcontractors to contract between pharmacy and the DOD presented "colorable" argument that the government contractor defense insulated the subcontractors from liability thus supporting removal).

60.      EIDP supplied PFAS products to AFFF manufacturers so that the AFFF manufacturers could produce MilSpec AFFF. If EIDP did not supply these PFAS products, the government would have had to either produce it itself or find a different supplier. *Isaacson,* 517 F.3d at 137. By seeking to impose tort liability on EIDP for alleged injuries to Plaintiff that were caused in whole or in part by EIDP's compliance with military specifications, Plaintiff is attempting to use state tort law to attack design choices dictated by the military. The government contractor defense precludes such an attack. *See Boyle*, 487 U.S. at 509.

61.      In the MDL, the court has found based on an extensive factual record that the government contractor defense asserted by 3M and others present genuine issues of fact for trial. *See In re AFFF Prods. Liab. Litig.,* No. 2:18-mn-02873, 2022 WL 4291357, at *12, 15 (D.S.C.

Sept. 16, 2022). A defense that presents triable issues is, by definition, better than merely "colorable."

62.     Because all requirements are satisfied, this Court has jurisdiction under the federal officer removal statute.

WHEREFORE, EIDP hereby removes this action from the Court of Common Pleas for Horry County, South Carolina to this Court.

Dated March 2, 2026

Respectfully submitted,

HOOD LAW FIRM, LLC
172 Meeting Street/Post Office Box 1508
Charleston, SC  29402
Phone: (843) 577-4435/Facsimile: (843) 722-1630


*/s/ Molly H. Craig*
Molly H. Craig (6671)
molly.craig@hoodlaw.com
James B. Hood (9130)
james.hood@hoodlaw.com
Virginia R. Floyd (12212)
virginia.floyd@hoodlaw.com

and

SHOOK, HARDY & BACON L.L.P.
Brent Dwerlkotte (*pro hac vice forthcoming*)
2555 Grand Boulevard,
Kansas City, MO 64108
Tel: (816) 474-6550
Fax: (816) 421-5547
Email: dbdwerlkotte@shb.com

*Counsel for Defendant EIDP, Inc.*