**Exhibit B**

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA
COUNTY OF HORRY

IN THE COURT OF COMMON PLEAS
FIFTEENTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

_____

Grand Strand Water and Sewer Authority,

                                        *Plaintiff*,

                    v.

AGC Chemicals Americas, Inc.; Aladdin Manufacturing Corporation; Archroma U.S., Inc; Arkema, Inc.; Burlington Industries, Inc.; Clariant Corporation; Corteva, Inc.; Daikin America, Inc.; Delta Mills, Inc., its predecessors, successors, assigns, and/or responsible parties; DuPont de Nemours, Inc.; EIDP, Inc.; Elevate Textiles, Inc.; Fiber Industries, LLC; Huntsman International, LLC; International Paper Company; INV Performance Surfaces, LLC; J.P. Stevens & Company, Inc., its predecessors, successors, assigns, and/or responsible parties; Mohawk Industries, Inc.; Nan Ya Plastics Corporation, America; PRET Advanced Materials, LLC; Red Rock Disposal, LLC; Sampson County Disposal, LLC; Solvay Specialty Polymers USA, LLC; Sonoco Products Company; The Chemours Company; and Westrock CP, LLC,

                                        *Defendants*.

C.A. No. 2024-CP-26-05523

**THIRD AMENDED SUMMONS**
(JURY TRIAL DEMANDED)

**TO THE ABOVE-NAMED DEFENDANTS:**

YOU ARE HEREBY SUMMONED and required to answer the Third Amended Complaint in this action, a copy of which is hereby served on you, and to serve a copy of your Answer to the Third Amended Complaint on the subscriber at 291 S. Pine Street, Spartanburg, SC

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

29302, within 30 days after service hereof, exclusive of the day of such service, and if you fail to answer the Third Amended Complaint, judgment by default will be rendered against you for the relief demanded in the Third Amended Complaint.

Respectfully submitted,

*/s/ John B. White. Jr.*
John B. White, Jr. (SC Bar No. 5996)
Marghretta H. Shisko (SC Bar No. 100106)
Christopher R. Jones (SC Bar No. 101265)
Griffin L. Lynch (SC Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

June 5, 2025

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

STATE OF SOUTH CAROLINA
COUNTY OF HORRY

IN THE COURT OF COMMON PLEAS
FIFTEENTH JUDICIAL CIRCUIT

IN RE:
PFAS LITIGATION COORDINATED DOCKET

_____

Grand Strand Water and Sewer Authority,

                                        *Plaintiff*,
                    v.

AGC Chemicals Americas, Inc.; Aladdin
Manufacturing Corporation; Archroma U.S., Inc;
Arkema, Inc.; Burlington Industries, Inc.; Clariant
Corporation; Corteva, Inc.; Daikin America, Inc.;
Delta Mills, Inc., its predecessors, successors,
assigns, and/or responsible parties; DuPont de
Nemours, Inc.; EIDP, Inc.; Elevate Textiles, Inc.;
Fiber Industries, LLC; Huntsman International,
LLC; International Paper Company; INV
Performance Surfaces, LLC; J.P. Stevens &
Company, Inc., its predecessors, successors, assigns,
and/or responsible parties; Mohawk Industries, Inc.;
Nan Ya Plastics Corporation, America; PRET
Advanced Materials, LLC; Red Rock Disposal,
LLC; Sampson County Disposal, LLC; Solvay
Specialty Polymers USA, LLC; Sonoco Products
Company; The Chemours Company; and Westrock
CP, LLC,

                                        *Defendants*.

C.A. No. 2024-CP-26-05523


**THIRD AMENDED COMPLAINT**
(JURY TRIAL DEMANDED)


Plaintiff, GRAND STRAND WATER AND SEWER AUTHORITY, by and through the

undersigned counsel, brings this action against the above-named Defendants for compensatory and

punitive damages, injunctive relief, and abatement of a nuisance, and alleges as follows:

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## STATEMENT OF THE CASE

1.     Plaintiff, Grand Strand Water and Sewer Authority, brings this action to address Defendants' ongoing contamination of the Great Pee Dee River, Lynches River, Lumber River, Little Pee Dee River, Lynches Lake Swamp, Black Creek, and Bull Creek (collectively the "Pee Dee River Watershed"); the Waccamaw River; the Intracoastal Waterway; and Plaintiff's properties with certain toxic per- and polyfluoroalkyl substances ("PFAS"): perfluorooctanoic acid ("PFOA"); perfluorooctanesulfonic acid ("PFOS"); perfluorononanoic acid ("PFNA"); perfluorobutane sulfonate ("PFBS"); perfluorohexane sulfonate ("PFHxS"); and hexafluoropropylene oxide dimer acid ("HFPO-DA" or "GenX Chemicals").

2.     As Plaintiff has recently discovered, Defendants have discharged and continue to discharge products that contain or degrade to these PFAS to the Pee Dee River Watershed, which travel downstream to Plaintiff's water intakes on Bull Creek and the Intracoastal Waterway, thereby contaminating Plaintiff's properties and the domestic water supply for over 115,000 water customers in Horry County. Plaintiff seeks a declaratory judgment, injunctive relief, abatement, damages, and an award of costs, including attorneys' fees, for Defendants' repeated and ongoing PFAS contamination.

3.     Plaintiff is a special purpose district that provides potable water to residents of various counties in South Carolina, including Horry County. It owns and occupies riparian properties in Horry County, on Bull Creek in Bucksport, South Carolina; and on the Intracoastal Waterway in Myrtle Beach, South Carolina. On these respective properties, Plaintiff operates the Bull Creek Surface Water Treatment Plant ("SWTP"); Myrtle Beach SWTP; and related buildings, improvements, property, and equipment that make up these water treatment and distribution

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

systems. Plaintiff's SWTPs draw raw water from Bull Creek and the Intracoastal Waterway for treatment before distributing treated water to customers.

4.      Defendants own and/or operate industrial facilities upstream of Plaintiff's water intakes and have in the past and/or currently use products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in their industrial processes ("Discharger Defendants") or otherwise supply these products to Discharger Defendants' manufacturing facilities ("Supplier Defendants"). Discharger Defendants then discharge wastewater contaminated with these products to surface waters in the Pee Dee River Watershed upstream of Plaintiff's water intakes. Some Defendants directly discharge PFAS-contaminated wastewater, while others do so indirectly via certain wastewater treatment plants ("WWTPs"). These WWTPs include the Johnsonville WWTP, the Lake City WWTP, and the Lumberton WWTP.

5.      Industrial wastewater from Discharger Defendants' facilities contains high levels of PFAS, which cannot be adequately removed by conventional wastewater treatment processes, are discharged to the Pee Dee River Watershed, and flow downstream to Plaintiff's water intakes. As a direct and proximate result of Defendants' actions, Plaintiff has suffered losses to the use and enjoyment of its property rights, and Plaintiff's properties have been, and will continuously be, trespassed and damaged by water contaminated with dangerous concentrations of PFAS.

6.      Defendants' PFAS contaminate Plaintiff's water sources at concentrations exceeding what the U.S. Environmental Protection Agency ("EPA") deems unsafe for consumption, and Plaintiff's existing water treatment processes cannot remove them. Instead, Plaintiff requires new water treatment technologies to remove, and provide water free from, Defendants' PFAS.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

7.     As a result of Defendants' intentional, willful, wanton, reckless, and/or negligent acts and omissions and the nuisance thereby created, maintained, and continued, Plaintiff has suffered injury to its property rights and resulting damages, including compensatory and consequential damages. Plaintiff is also seeking equitable and injunctive relief requiring Defendants to fund the evaluation, testing, acquisition, installation, operation, and maintenance of water treatment technologies at Plaintiff's SWTPs that will remove Defendants' PFAS from drinking water. In addition, based on the Defendants' intentional, willful, wanton, reckless, malicious, and oppressive misconduct, Plaintiff is seeking the recovery of punitive damages.

## DISCLAIMER

8.     Plaintiff makes no assertion of fact concerning, and brings no cause of action based on, the manufacture, sale, distribution, use, or disposal of PFAS associated with aqueous film forming foam ("AFFF"), whether commercial, Mil-Spec, or other variety. Plaintiff expressly disclaims any causes of action, injury, or damages resulting from the manufacture, sale, distribution, use, or disposal of any AFFF by any Defendant or third-party.

9.     Plaintiff's causes of action against Sampson County Disposal, LLC; Red Rock Disposal, LLC; Elevate Textiles, Inc.; and International Paper Company arise under North Carolina Law. Plaintiff brings no cause of action against these Defendants under South Carolina law.

10.     Plaintiff's causes of action against the remaining Defendants arise under South Carolina law.

11.      Plaintiff brings no cause of action against, and seeks no relief from, any Defendant under federal law or statute.

## JURISDICTION AND VENUE

4

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

12.    This Court has subject matter jurisdiction over this action pursuant to Article V of the Constitution of the State of South Carolina; sections 6-11-1610 and 14-1-80 of the South Carolina Code; and Act No. 337, 1971 S.C. Acts 444.

13.    This Court has personal jurisdiction over all Defendants, consistent with due process and South Carolina's long-arm statute, section 36-2-803 of the South Carolina Code.

14.    Venue is also properly in this Court pursuant to sections 15-7-10 and -30 of the South Carolina Code because the subject of the action is for injuries sustained to Plaintiff's property located in Horry County, and the most substantial part of Defendants' alleged acts or omissions giving rise to Plaintiff's claims occurred in Horry County. *See id.* at § 15-7-30(B) ("If there is more than one defendant, the action may be tried in any county where the action properly may be maintained against one of the defendants pursuant to this section.").

## PARTIES

### I.    Plaintiff

15.    Plaintiff Grand Strand Water and Sewer Authority is a special purpose district created for the distribution of potable water and provision of sewer services. Act No. 337, 1971 S.C. Acts 444.

16.    Plaintiff owns two properties at issue. The first is located at 8052 Treatment Plant Road, Bucksport, South Carolina 29527, where Plaintiff operates the Bull Creek SWTP. The Bull Creek SWTP is riparian to, and draws raw water from, Bull Creek. Plaintiff's second property is located at 3020 Mr. Joe White Avenue, Myrtle Beach, South Carolina 29577, where it operates the Myrtle Beach SWTP for the Myrtle Beach service area. The Myrtle Beach SWTP is riparian to, and draws raw water from, the Intracoastal Waterway.

5

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

17.     The Bull Creek SWTP provides potable water to approximately 115,000 customers. The Myrtle Beach SWTP services the Cities of Myrtle Beach and North Myrtle Beach, which distribute the water to their residents.

## II.     Discharger Defendants

18.     Defendant **Burlington Industries, Inc.** ("Burlington") was a Delaware corporation authorized to do business in South Carolina until its dissolution in 2004. On May 13, 2022, the South Carolina Circuit Court appointed Peter McCoy, Jr., a resident of Charleston County, South Carolina, as the receiver for Burlington. *See Mimms v. Burlington Indus., Inc. et al.*, C.A. No. 2021-CP-40-05873, Order Appointing Receiver Over Defendant Burlington Industries, Inc. (Richland Cnty. Ct. of Common Pleas May 13, 2022). Burlington was the owner and operator of an industrial facility located at 670 N. Main Street, Society Hill, South Carolina 29593. The facility is a former textile mill and finishing facility bordering Cedar Creek and the Great Pee Dee River, and it encompasses roughly 234 acres. Over the course of the facility's operations, Defendant used products that contain or degrade to PFOA, PFOS, PFNA, PFHxS, PFBS, and/or GenX Chemicals in the manufacture of textile products. As part of its processes, Defendant discharged industrial wastewater contaminated with these PFAS from its own wastewater treatment plant to Cedar Creek and the Great Pee Dee River upstream of Bull Creek. Wastewater lagoons and other storage basins at the facility have accumulated PFOA, PFOS, PFNA, PFHxS, PFBS, GenX Chemicals, and/or their precursors for decades. These PFAS overflow to the Great Pee Dee River upstream of Bull Creek.  Defendant's PFAS resist environmental degradation, flow downstream from the Great Pee Dee River to Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs. Burlington also manufactured and distributed agricultural biosolid products contaminated with PFOA, PFOS, PFHxS, PFNA, PFBS, GenX

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Chemicals, and/or their precursors to farms and other users throughout the Pee Dee River Watershed upstream of Plaintiff's water intake on Bull Creek. PFAS from Burlington's biosolids have accumulated in the Pee Dee River Watershed, continually flow downstream to Plaintiff's water intakes, and contaminate Plaintiff's properties and its water sources.

19.    Defendant **Elevate Textiles, Inc. ("Elevate")** is a Delaware corporation authorized to do business in South Carolina. Elevate owns and operates an industrial facility located at 740 Old Cheraw Highway, Rockingham, NC 28379 ("Richmond Plant"), which was previously owned and operated by Defendant Burlington. Throughout the facility's operation, both Burlington and Elevate used, and Elevate continues to use, products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals. As part of their processes, Burlington and Elevate discharged, and Elevate continues to discharge, industrial wastewater contaminated with products that contain or degrade to these PFAS from the Richmond Plant to Hitchcock Creek upstream of Great Pee Dee River and Bull Creek. The Richmond Plant does not remove Defendants' PFAS, and it discharged and continues to discharge their PFAS into the Great Pee Dee River upstream of Plaintiff's Bull Creek intake. Defendants' PFAS resist environmental degradation, flow downstream from the Great Pee Dee River and Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs.

20.    Defendant **Fiber Industries, LLC ("Darling Fibers")** is a South Carolina limited liability company, and it owns and operates a textile manufacturing facility located at 1000 E. McIver Road, Darlington, South Carolina 29532. There, Darling Fibers uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of textile fibers and fabrics. As part of its processes, the Darlington facility directly discharges industrial wastewater contaminated with products that contain or degrade to these PFAS into Black

7

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Creek upstream of the Great Pee Dee River and Bull Creek. Darling Fibers' PFAS resist environmental degradation, flow downstream from Black Creek, the Great Pee Dee River, and Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs.

21.    Defendant **International Paper Company ("IP")** is a New York corporation authorized to do business in South Carolina. IP owns and operates an industrial facility located at 820 Canton Road, Lumberton, North Carolina 28358. There, it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of paper-based packaging products. As part of its processes, IP's facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Lumberton WWTP. The Lumberton WWTP cannot remove IP's PFAS, which it discharges to the Lumber River upstream of Bull Creek. IP's PFAS resist environmental degradation, flow downstream from the Lumber River, Little Pee Dee River, Great Pee Dee River, and Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs.

22.    Defendant **J.P. Stevens & Company, Inc.** was a Delaware corporation authorized to do business in the State of South Carolina until 1999. J.P. Stevens & Company, Inc. and its predecessors, successors, assigns, and/or responsible parties are collectively referenced as **"JPS."** From 1946 to 1987, JPS operated the Delta Mills industrial facility located at 4351 Brickyard Road, Wallace, South Carolina 29596. JPS transferred the Delta Mills facility to Defendant **Delta Mills, Inc.,** who owned and operated the facility from 1987 to 2006. Delta Mills, Inc. was a Delaware corporation with its principal place of business located at 700 North Woods Drive, Fountain Inn, South Carolina 29644. Delta Mills, Inc. and its predecessors, successors, assigns,

8

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

and/or responsible parties are collectively referenced as **"Delta Mills."** Over the course of the Delta Mills facility operations, Defendants JPS and Delta Mills used products that contain or degrade to PFOA, PFOS, PFNA, PFHxS, PFBS, and/or GenX Chemicals in the finishing of textile products. As part of their processes, JPS and Delta Mills discharged industrial wastewater contaminated with these PFAS from the facility's own WWTP to the Great Pee Dee River upstream of Bull Creek. JPS and Delta Mills also created wastewater lagoons on the facility property, which were contaminated with high levels of these PFAS that accumulated over decades. Delta Mills did not remediate this contamination when it ceased operations in 2006, and the PFAS continually overflow and/or migrate to the Great Pee Dee River upstream of Bull Creek. JPS's and Delta Mills' PFAS resist environmental degradation, flow downstream from the Great Pee Dee River and Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs.

23.    Defendants **Mohawk Industries, Inc.** and **Aladdin Manufacturing Corporation** are Delaware corporations authorized to do business in the State of South Carolina (collectively **"Mohawk"**). Mohawk owns Oak River Mill located at 2118 Marlboro Road, Blenheim, South Carolina 29516, which Mohawk operated until its closing in October 2022. For nearly 60 years, Mohawk used products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of carpet products at Oak River Mill. As part of its processes, Oak River Mill discharged industrial wastewater contaminated with products that contain or degrade to these PFAS directly into the Great Pee Dee River upstream of Bull Creek. Oak River Mill also utilized wastewater lagoons contaminated with high levels of these PFAS and/or their precursors on the border of the Great Pee Dee River. These lagoons currently and continually overflow and/or release contaminated wastewater into the Great Pee Dee River upstream of Bull

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Creek. PFAS and/or their precursors from both Mohawk's legacy discharges and continuing lagoon discharges resist environmental degradation, flow downstream from the Great Pee Dee River and Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs.

24.     Defendant **Nan Ya Plastics Corporation, America ("Nan Ya")** is a Delaware corporation authorized to do business in the State of South Carolina. Nan Ya owns and operates an industrial facility located at 140 E. Beulah Road, Lake City, South Carolina 29560, where it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of plastics, polyester chips, resin, fibers, and yarns. As part of its processes, the Nan Ya facility discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Lake City WWTP. The Lake City WWTP cannot remove Nan Ya's PFAS, and the WWTP discharges water contaminated with Nan Ya's PFAS into Lake Swamp upstream of Bull Creek. Nan Ya's PFAS resist environmental degradation, flow downstream from Lake Swamp, Lynches River, the Great Pee Dee River, and Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs.

25.     Defendant **PRET Advanced Materials, LLC ("PRET")** is a Delaware limited liability company that does business in South Carolina. PRET owns and operates an industrial facility located at 520 Kingsburg Highway, Johnsonville, South Carolina 29555, where it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of plastics and resins. As part of its processes, the PRET facility discharges industrial wastewater with products that contain or degrade to these PFAS to the Johnsonville WWTP. The Johnsonville WWTP cannot remove PRET's PFAS, and the WWTP discharges water

10

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

contaminated with PRET's PFAS into Lynches River upstream of Bull Creek. PRET's PFAS resist environmental degradation, flow downstream from Lynches River, the Great Pee Dee River, and Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs.

26.     Defendants **Red Rock Disposal, LLC ("RRD")** and **Sampson County Disposal, LLC ("SCD") (together, "GFL Landfills")** operate landfills in North Carolina that have transported and/or continue to transport leachate to the Lumberton WWTP in Lumberton, NC for disposal. Defendant RRD is a North Carolina limited liability company and operates the Red Rock Disposal Landfill located at 7130 New Landfill Drive, Holly Springs, North Carolina 27540. Defendant SCD is a North Carolina limited liability company and operates the Sampson County Landfill located at 7434 Roseboro, North Carolina 28382. Leachate generated by the two landfills operated by the respective GFL Landfills contains significant amounts of PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors, and has been transported to Lumberton WWTP for disposal. As of in or around December 2024, RRD ceased transporting leachate from the Red Rock Disposal Landfill to the Lumberton WWTP for disposal; however, its legacy discharges of leachate containing high levels of PFAS continue to contaminate Plaintiff's water sources and properties. The Lumberton WWTP could not and cannot remove the GFL Landfills' PFAS from the leachate they generate before the WWTP discharged and/or discharges their PFAS into the Lumber River upstream of Bull Creek. GFL Landfills' PFAS resist environmental degradation, flow downstream from the Lumber River, Little Pee Dee River, Great Pee Dee River, and Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

27.     Defendant **Sonoco Products Company ("Sonoco")** is a South Carolina corporation, and it owns and operates an industrial complex at and around 1 N 2nd Street, Hartsville, South Carolina 29550. There, it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of packaging products. As part of its processes, the Sonoco facility directly discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to Black Creek upstream of Bull Creek. The treatment processes employed by Sonoco do not remove PFAS prior to their discharge to Black Creek. Sonoco's PFAS resist environmental degradation, flow downstream from Black Creek, the Great Pee Dee River, and Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs.

28.     Defendant **WestRock CP, LLC ("WestRock")** is a Delaware limited liability company authorized to do business in South Carolina. WestRock owns and operates a paper mill at 7320 Paper Mill Road, Florence, South Carolina 29506. There, it uses products that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the manufacture of containerboard, kraft linerboard, and/or related paper-based packaging products. As part of its processes, the WestRock facility directly discharges industrial wastewater contaminated with products that contain or degrade to these PFAS to the Great Pee Dee River upstream of Bull Creek. The treatment processes employed by WestRock do not remove PFAS prior to their discharge to the Great Pee Dee River. WestRock's PFAS resist environmental degradation, flow downstream from the Great Pee Dee River and Bull Creek, and thereby contaminate Plaintiff's properties and its water sources at the Bull Creek and Myrtle Beach SWTPs.

## III.     Supplier Defendants

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

29.     Defendant **AGC Chemicals Americas, Inc. ("Asahi")** is a foreign Delaware corporation authorized to do business in South Carolina. Among other acts and omissions, Asahi has manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

30.     Defendant **Archroma U.S., Inc. ("Archroma")** is a Delaware corporation authorized to do business in South Carolina. Among other acts and omissions, Archroma has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

31.     Defendant **Arkema, Inc. ("Arkema")** is a Pennsylvania corporation authorized to do business in South Carolina. Among other acts and omissions, Arkema has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

32.     Defendant **Clariant Corporation ("Clariant")** is a New York corporation authorized to do business in South Carolina. Among other acts and omissions, Clariant has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

33.     Defendant **Daikin America, Inc. ("Daikin")** is a Delaware corporation authorized to do business in South Carolina. Among other acts and omissions, Daikin has for many years manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

34.     Defendant **EIDP, Inc. ("Old DuPont")**, f/k/a E.I. du Pont de Nemours and Company, is a Delaware corporation authorized to do business in South Carolina. Among other acts and omissions, Old DuPont has manufactured and supplied products containing or degrading

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

35.     Defendant **The Chemours Company ("Chemours")** is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions, Chemours has manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

36.     Defendant **Corteva, Inc. ("Corteva")** is a Delaware corporation that conducts business in South Carolina. Among other acts and omissions, Corteva has assumed PFAS-related liabilities from Old DuPont.

37.     Defendant **DuPont de Nemours, Inc. ("New DuPont")**, f/k/a DowDuPont, Inc., is a Delaware corporation that conducts business in South Carolina. Among other acts and omissions, New DuPont has assumed PFAS-related liabilities from Old DuPont.

38.     Defendant **INV Performance Surfaces, LLC ("Invista")** is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions, Invista has manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

39.     Defendant **Huntsman International, LLC ("Huntsman")** is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions, Huntsman has manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

40. Defendant **Solvay Specialty Polymers USA, LLC ("Solvay")** is a Delaware limited liability company authorized to do business in South Carolina. Among other acts and omissions, Solvay has manufactured and supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to one or more of the Discharger Defendants in this action.

**FACTUAL ALLEGATIONS**

**I.     Background and Hazards of PFAS**

41.     PFAS are a large group of man-made chemicals that do not occur naturally in the environment. Due to their strong carbon-fluorine bonds, PFAS are extremely stable, repel both oil and water, and are resistant to heat and chemical reactions. As a result of these properties, PFAS have a wide variety of industrial, commercial, and consumer applications.

42.     The stable carbon-fluorine bonds that make PFAS pervasive in industrial, commercial, and consumer products also result in their persistence in the environment. They are colloquially termed "forever chemicals," as terminal PFAS have no known environmental breakdown mechanism, are readily absorbed into biota, and tend to bioaccumulate with repeated exposure.

43.     There are both polymer and non-polymer PFAS. Non-polymer PFAS include substances like PFOA, PFOS, PFHxS, PFNA, PFBS, and HFPO-DA (a/k/a GenX Chemicals). Polymer PFAS include fluoropolymers and side-chain fluorinated polymers that are often the active chemistry in the PFAS-containing products sold and utilized by Defendants.

44.     There are also both terminal PFAS and their precursors. Precursors may undergo environmental degradation that ultimately results in the formation of terminal PFAS—meaning no further degradation occurs under normal environmental conditions. PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are all terminal PFAS.

15

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

45.　Both polymer and non-polymer PFAS can degrade to terminal PFAS. Generally, terminal PFAS are present in or otherwise form from PFAS products via three primary routes: (1) as a direct byproduct of the manufacturing process; (2) the degradation of precursor PFAS that are byproducts of the manufacturing process; and/or (3) the degradation of polymer PFAS into terminal PFAS and precursor PFAS.

46.　Further, PFAS are manufactured by either electrochemical fluorination ("ECF") or telomerization.

47.　PFAS leach from soil to groundwater and are highly mobile and water soluble, making groundwater and surface water particularly vulnerable to contamination. Therefore, a major source of human exposure to PFAS is through ingestion of contaminated drinking water. Exposure is dose-additive, meaning that exposure to low levels of multiple PFAS, which individually would pose little or no risk, can result in a combined dose capable of causing adverse health effects.

48.　While there are thousands of different PFAS chemicals, current scientific evidence shows that harmful health effects can result from consuming drinking water with any level of PFOA or PFOS, and at certain aggregate levels of PFHxS, PFNA, PFBS, and GenX Chemicals. Depending on the type of PFAS, negative health effects include increased risk of certain types of cancer and adverse impacts on fetal growth and development; reproduction; and on liver, thyroid, immune, cardiovascular, and/or nervous system function.

49.　PFOA and PFOS have been the most widely used PFAS, and they are the most studied by regulators and the scientific community. While some industries voluntarily phased out products containing PFOA and PFOS by 2015, their limited use continues even in the United

16

States. Due to their persistent nature, PFOA and PFOS remain in the environment from decades of legacy industrial use.

50.     Products based on PFAS consisting of shorter fluorinated carbon chains were developed to replace "long-chain" PFAS like PFOA and PFOS, and they are now used in industrial applications to confer similar properties and characteristics. These "short-chain" PFAS are still bioaccumulative and environmentally persistent, and some short-chain PFAS products nevertheless still contain PFOA and PFOS and their precursors.  Terminal short-chain PFAS include PFBS and GenX Chemicals.

51.     Based on the science available in 2009, EPA published provisional drinking water health advisories for short-term exposure to PFOA and PFOS.[1] The advisory levels at that time were 400 parts per trillion ("ppt") for PFOA and 200 ppt for PFOS. In the same publication, EPA reported that it conducted sampling of public drinking water in Alabama communities, finding PFOA and PFOS levels lower than 40 ppt. It explained, "Based on its current understanding, EPA believes these levels are not of concern and residents may rely upon public water systems."[2]

52.     On May 16, 2016, due to the evolution of science on the health effects of PFOA and PFOS, EPA published lifetime health advisory levels for each chemical in drinking water.[3] Superseding the 2009 provisional levels, the 2016 levels for PFOA and PFOS were 70 ppt, independently or in the aggregate. EPA explained that its new health advisories "identify the

---

[1] U.S.E.P.A., Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS) (Jan. 8, 2009), *available at* https://www.epa.gov/sites/default/files/2015-09/documents/pfoa-pfos-provisional.pdf.

[2] *Id.*

[3] Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 33250 (May 25, 2016).

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

concentration of PFOA and PFOS in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure."[4]

53.     EPA's 2016 Health Advisories were based on peer-reviewed studies of the effects of PFOA and PFOS on laboratory animals and epidemiological studies of human populations exposed to PFOA and PFOS. These studies indicated that exposure to PFOA and PFOS over certain levels may result in adverse health effects, including developmental defects to fetuses, cancer (testicular, kidney), liver effects, immune effects, thyroid effects, and other adverse effects. But based on its review of the science, EPA stated that its analysis indicated exposure to PFOA and PFOS at or below health advisory levels "will not result in adverse health effects (including cancer and non-cancer) to the general population over a lifetime (or any shorter period) of exposure to these chemicals."[5]

54.     On June 15, 2022, EPA again updated health advisory levels for PFOA and PFOS on an interim basis, which replaced the 2016 advisory levels.[6] EPA explained that updated human epidemiological data indicated "that the level at which negative health effects could occur are much lower than previously understood when the agency issued its 2016 health advisories for PFOA and PFOS"—finding "associations between PFOA and/or PFOS exposure and effects on the immune system, the cardiovascular system, development (e.g., decreased birth weight), and cancer."[7] Concerned with the public health implications of its data, EPA issued interim levels

---

[4] *Id.*

[5] *Id.*

[6] Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances, 87 Fed. Reg. 36848 (June 21, 2022).

[7] *Id.*

18

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

pending determination of maximum contaminant levels and maximum contaminant level goals. The interim levels were 0.004 ppt for PFOA and 0.02 ppt for PFOS.

55.     Simultaneously, EPA also issued health advisories for the first time covering PFBS and GenX Chemicals. EPA reported that "GenX Chemicals have been linked to health effects on the liver, the kidney, the immune system, and developmental effects, as well as cancer."[8] For PFBS, it noted studies indicating health effects on the thyroid, reproductive system, development, and kidney. Based on its 2021 toxicity studies for these chemicals, EPA released final health advisories for each: GenX Chemicals at 10 ppt and PFBS at 2,000 ppt.

56.     In March of 2023, EPA issued proposed maximum contaminant levels ("MCLs") and maximum contaminant level goals ("MCLGs") for PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals.[9] An MCLG is the maximum level of a contaminant in drinking water at which no known or anticipated adverse effect on the health of persons would occur, allowing an adequate margin of safety. An MCL is the maximum allowable level of a contaminant that may be delivered to any user of a public water system and is based on the feasibility of existing technology to detect PFAS at a threshold level.

57.     At that time, EPA announced that, "[f]ollowing a systematic review of available human epidemiological and animal toxicity studies, EPA has determined that PFOA and PFOS are likely to cause cancer (e.g., kidney and liver cancer) and that there is no dose below which either chemical is considered safe."[10] Therefore, it proposed MCLG levels for both chemicals at zero

---

[8] *Id.*

[9] PFAS Nat'l Primary Drinking Water Regulation Rulemaking, 88 Fed. Reg. 18638 (Mar. 29, 2023) (to be codified at 40 C.F.R. pt. 141, 142).

[10] *Id.*

19

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ppt. Enforceable MCL levels for each chemical were proposed at 4 ppt. According to EPA, "[a]ny exceedance of this limit requires action to protect public health, regardless of any mixture in which they are found."[11]

58.     Due to their toxic effects, dose additivity, and presence in drinking water, EPA proposed a hazard index approach covering mixtures of PFHxS, PFNA, PFBS, and GenX Chemicals. The hazard index is the sum of each PFAS's "hazard quotient." Hazard quotients are first calculated by dividing the applicable PFAS's "exposure metric" (i.e., concentration in drinking water) by its "health reference value" (PFHxS: 9 ppt; GenX Chemicals: 10 ppt; PFNA: 10 ppt; PFBS: 2,000 ppt). If the sum of each's hazard quotient is below 1.0, then it "represents a level at which no known or anticipated adverse effects on the health of persons is expected to occur and which allows for an adequate margin of safety."[12] If greater than 1.0, then "potential risk is indicated."[13]

59.     EPA stated that, once its proposed MCLs became final, it would "save thousands of lives and prevent tens of thousands of avoidable illnesses."[14]

60.     EPA finalized its proposed MCLs and MCLGs on April 10, 2024.[15] In accompanying publications, EPA declared, "The science is clear: exposure to these six PFAS is

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] U.S.E.P.A., *EPA Releases Annual Report Showing Steady Progress to Protect Communities from PFAS Pollution* (Dec. 14, 2023), *available at* https://www.epa.gov/newsreleases/epa-releases-annual-report-showing-steady-progress-protect-communities-pfas-pollution.

[15] U.S.E.P.A., PFAS Nat'l Primary Drinking Water Regulation Rulemaking (Apr. 10, 2024), *available at* https://www.epa.gov/system/files/documents/2024-04/pfas-npdwr_prepubfederalregisternotice_4.8.24.pdf (pre-publication version).

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

linked to significant health risks" that include "certain cancers and heart impacts in adults, and immune and developmental impacts in infants and children."[16]

61.     The final regulation solidifies MCLs of 4.0 ppt for PFOA and PFOS and 10.0 ppt for PFNA, PFHxS, and GenX Chemicals, including a Hazard Index that covers mixtures of PFBS with PFNA, PFHxS, and GenX Chemicals. It also enshrines MCLGs of zero ppt for PFOA and PFOS, which EPA states "reflects the latest science showing that there is no level of exposure to these two PFAS without risk of health impacts."[17] According to EPA, "[t]he more you reduce your exposure to PFAS, the more you reduce your risk."[18]

62.     EPA's final regulations mandate several new obligations regarding PFAS, including the implementation of solutions to reduce regulated PFAS concentrations in the drinking water that Plaintiff distributes, maintenance of ongoing compliance monitoring, and informing the public of PFAS levels in the water and of any violations.

63.     EPA's April 10, 2024 regulation imposed a deadline of 2027 for Plaintiff to begin conducting and reporting regular PFAS monitoring and a deadline of 2029 for Plaintiff to comply with all MCLs.

64.     On May 14, 2025, EPA affirmed its intention to maintain the April 10, 2024 regulation MCLs and MCLGs for PFOA and PFOS, but it announced plans to propose extending the MCL compliance deadline by two years, to 2031, "[t]o allow drinking water systems more

---

[16] U.S.E.P.A., *Frequently Asked Questions and Answers: Final PFAS Nat'l Drinking Water Regulation* (Apr. 10, 2024); *see also* U.S.E.P.A., Final PFAS Nat'l Drinking Water Regulation Landing Page, http://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (providing links to EPA PFAS regulation publications).

[17] U.S.E.P.A., *Presentation: Overview EPA PFAS NPDWR* (Apr. 10, 2024).

[18] U.S.E.P.A., *Frequently Asked Questions and Answers: Final PFAS Nat'l Drinking Water Regulation* (Apr. 10, 2024).

time to develop plans for addressing PFOA and PFOS where they are found and implement solutions."[19] Although EPA announced its intention to rescind the MCLs concerning PFNA, PFHxS, and GenX Chemicals, as well as the Hazard Index covering mixtures of PFBS, PFNA, PFHxS, and GenX Chemicals, it did so "to ensure that the determinations and any resulting drinking water regulation follow the legal process laid out in the Safe Drinking Water Act," and EPA did not retract its prior statement that the science shows that exposure to these types of PFAS is linked to significant health risks.[20] At the same time, EPA expressed the importance of protecting public health and "ensur[ing] that polluters are held responsible."[21]

65.     EPA's recent announcement stated that "EPA plans to issue a proposed rule this fall and finalize this rule in the Spring of 2026."[22] Under the April 10, 2024 final National Primary Drinking Water Regulation, Plaintiff must begin conducting and reporting regular PFAS monitoring by 2027, and Plaintiff must comply with all MCLs by 2029. EPA's planned rule would extend Plaintiff's MCL compliance deadline for PFOA and PFOS from 2029 to 2031.

## II.     Contamination of Bull Creek and the Intracoastal Waterway with PFAS

66.     Bull Creek is a tributary of the Great Pee Dee River, branching off the river near Bucksport, South Carolina. By way of the Great Pee Dee River, Bull Creek is also hydrologically connected to the Little Pee Dee and Lumber Rivers to the northeast, and to the Lynches River, Lake Swamp, and Black Creek to the northwest.

---

[19] U.S.E.P.A., *EPA Announces It Will Keep Maximum Contaminant Levels for PFOA, PFOS* (May 14, 2025), *available at* https://www.epa.gov/newsreleases/epa-announces-it-will-keep-maximum-contaminant-levels-pfoa-pfos [hereinafter *EPA 2025 MCL Announcement*].

[20] *Id.*

[21] *Id.*

[22] *Id.*

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

67.     Defendants' industrial facilities, and/or their applicable WWTPs, operate upstream of Bull Creek.

68.     PFAS sampling of Bull Creek, the Great Pee Dee River, Little Pee Dee River, Lumber River, Lynches River, and Black Creek confirms the presence of PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals throughout these bodies of water. These PFAS flow downstream and contaminate the water at Plaintiff's water intake on Bull Creek at concentrations exceeding EPA's MCLs and MCLGs. Indeed, sampling at Plaintiff's water intakes confirm the presence of PFOA and PFOS at concentrations higher than what EPA deems unsafe for consumption. Defendants are the source.

69.     Discharger Defendants are, or were, owners and operators of manufacturing plants and related industrial facilities throughout the Pee Dee River Watershed. In their industrial processes, Discharger Defendants utilize, or utilized, products that contain or degrade to PFOS, PFOA, PFHxS, PFNA, PFBS, and/or GenX Chemicals. Discharger Defendants' industrial processes generate industrial wastewater containing these PFAS, which Discharger Defendants ultimately discharge to surface waters upstream of Bull Creek.

70.     As part of their industrial processes, Defendants Burlington, Darling Fibers, Delta Mills, Elevate, JP Stevens, Mohawk, Sonoco, and WestRock in the past discharged and/or currently discharge PFAS-contaminated wastewater directly to surface waters upstream of Bull Creek, as follows:

| Defendant(s) | Surface Waters |
|---|---|
| Burlington | Great Pee Dee River; Hitchcock Creek |
| Darling Fibers | Black Creek |
| Delta Mills & JP Stevens | Great Pee Dee River |

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

| Elevate | Hitchcock Creek |
| Mohawk | Great Pee Dee River |
| Sonoco | Black Creek |
| WestRock | Great Pee Dee River |

71. As part of their industrial processes, Defendants Nan Ya, PRET, and IP indirectly discharge PFAS-contaminated wastewater to WWTPs that lack filtration technologies to remove their PFAS. The WWTPs then discharge water contaminated with these Defendants' PFAS to surface waters upstream of Bull Creek as follows:

| **Defendant** | **WWTP** | **Surface Waters** |
| --- | --- | --- |
| Nan Ya | Lake City WWTP | Lynches Lake Swamp |
| PRET | Johnsonville WWTP | Lynches River |
| IP | Lumberton WWTP | Lumber River |

72. Defendants GFL Landfills operate landfills in North Carolina, and they transported and/or continue to transport PFAS-contaminated leachate to the Lumberton WWTP, which lacks filtration technologies to remove their PFAS. The Lumberton WWTP then discharged and/or discharges water contaminated with the GFL Landfills' PFAS to the Lumber River upstream of the Little Pee Dee River and Bull Creek.

73. Defendants' PFAS and their precursors flow downstream from the facilities where the chemicals are directly or indirectly discharged to surface waters to Plaintiff's water intake on Bull Creek, damaging Plaintiff's property and contaminating its water sources.

74. The Bull Creek SWTP utilizes conventional water treatment technologies to treat raw water, including coagulation, flocculation, sedimentation, filtration, and chlorination. None of

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

these methods remove PFAS from water, and the Bull Creek SWTP requires new water treatment technologies to do so.

75.     Plaintiff also owns and operates the Bucksport Regional and Conway WWTPs, which operate along the Waccamaw River upstream of the Intracoastal Waterway.

76.     Neither the Bucksport Regional nor the Conway WWTPs have industrial users. Instead, both provide sewer services primarily to residential and commercial customers that use potable water distributed from the Bull Creek SWTP.

77.      Because the Bull Creek SWTP cannot remove Defendants' PFAS from the water Plaintiff draws from Bull Creek, the water that sewer customers send to the Bucksport and Conway WWTPs remains contaminated with Defendants' PFAS.

78.     Like the Bull Creek SWTP, the Bucksport and Conway WWTPs are not equipped to address Defendants' PFAS. Both utilize conventional wastewater treatment methods, including screening and grit removal, aeration, clarification, chlorination, and UV disinfection—none of which remove Defendants' PFAS. Once the Bucksport and Conway WWTPs treat sewer water, both discharge treated effluent that consequently remains contaminated with Defendants' PFAS to the Waccamaw River upstream of the Intracoastal Waterway.

79.     Plaintiff's Myrtle Beach SWTP draws raw water from the Intracoastal Waterway for treatment and distribution to the Cities of Myrtle Beach and North Myrtle Beach, which in turn provide the water to tens of thousands of people. But because Defendants' PFAS resist environmental degradation and conventional treatment methods, they contaminate the waters of the Intracoastal Waterway at Plaintiff's water intake and damage Plaintiff's property at the Myrtle Beach SWTP. As with the Bull Creek SWTP, the Myrtle Beach SWTP utilizes conventional water

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

treatment methods that do not remove Defendants' PFAS, and the Myrtle Beach SWTP requires new treatment technologies to do so.

80.     All Defendants knew or should have known that conventional wastewater treatment technologies used by direct discharger Defendants and WWTPs cannot remove PFAS from wastewater. All Defendants also knew or should have known that their treated wastewater contaminates surface waters and the water Plaintiff draws for its customers.

81.     Despite knowing of the adverse health and environmental effects of PFAS, particularly the chemicals' capacity to endanger drinking water supplies when released to surface waters, Supplier Defendants did not require, instruct, advise, or otherwise direct the Discharger Defendants to dispose of their PFAS-containing wastewater in a manner that would prevent this effluent from entering surface waters and contaminating Plaintiff's properties.

82.     All Defendants knew or should have known that conventional treatment technologies used by public water systems like Plaintiff's cannot remove Defendants' PFAS from water that is treated and distributed as potable drinking water.

**III.     Supplier Defendants Had Superior Knowledge of PFAS's Hazardous Properties.**

83.     All Defendants have long known that PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are environmentally persistent, bioaccumulative, dose-additive, and toxic; that they cannot be removed by conventional water and wastewater treatment methods; and that there is no safe dose for PFOA and PFOS.

84.     Old DuPont pioneered the field of PFAS chemistry in the middle of the twentieth century, and it was long a leader in the industry. Old DuPont's knowledge of the properties of PFAS, including knowledge of the compounds' chemistry, toxicology, environmental fate, and

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

effects on human health has been virtually unmatched, typically exceeding that of government regulators, the scientific community, and the public.

85.     Old DuPont has maintained an in-house staff of doctors, environmental engineers, industrial hygienists, and scientists in health-related fields, as well as a corporate industrial medicine program. Old DuPont was thus well equipped to understand the potential dangers of exposing people to PFAS via drinking water.

86.     By the early 1960s, Old DuPont understood PFOA and PFNA to be toxic based on studies that found exposure to the chemicals to increase liver size in rats, and by the mid-1960s, if not earlier, Old DuPont knew that PFOA could leach from waste into water and groundwater.

87.     In 1978, Old DuPont began to review and monitor the health conditions of its workers who were potentially being exposed to PFOA. Old DuPont subsequently found that PFOA is "toxic" and that "continued exposure is not tolerable," but it did not disclose this to the public or to EPA. Three years later, Old DuPont again failed to disclose data demonstrating the transplacental movement of PFOA to fetuses. It also failed to disclose widespread PFOA contamination in public drinking water sources resulting from discharges at its Washington Works facility near Parkersburg, West Virginia, where PFOA concentrations exceeded Old DuPont's own Community Exposure Guideline.

88.     In 1991, Old DuPont researchers recommended following up a study from ten years earlier of employees who might have been exposed to PFOA. The prior study showed elevated liver enzymes in the blood of Old DuPont workers. On information and belief, for the purpose of avoiding or limiting liability, Old DuPont chose not to conduct the follow-up study, instead postponing it until after it was sued.

27

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

89.     By 1999, at the latest, Old DuPont knew that PFOA was present in its products based on telomer PFAS chemistry.

90.     In or around December 2005, Old DuPont agreed to pay a $10.25 million fine to the federal government arising from its failures to disclose information to EPA about PFOA's health risks. Upon information and belief, in statements to the public and government regulators, Old DuPont has repeatedly and falsely claimed that human exposure to PFOA has no adverse health consequences. In a May/June 2008 publication, for example, Old DuPont stated that "the weight of the evidence indicates that PFOA exposure does not pose a health risk to the general public," and "there are no human health effects known to be caused by PFOA, although study of the chemical continues." Old DuPont made those statements against the advice of its own Epidemiology Review Board, which urged it not to make public statements asserting that PFOA does not pose any health risks. In 2005, EPA levied a record-setting $16.5 million civil penalty against Old DuPont for failing to disclose to EPA information about the health risks of PFOA and about the company's environmental releases of PFOA in West Virginia and Ohio.

91.     For decades, Old DuPont purchased the PFOA it used in the manufacture of Teflon and other products from 3M Company ("3M").

92.     In May 2000, 3M announced it would phase out its manufacture and sale of products based on long-chain PFAS, including PFOA and PFOS, by 2002. In its public announcement of the phaseout, 3M cited the chemicals' environmental persistence and its finding that PFOS was present in the blood of the general public.

93.     In response to 3M's phaseout announcement, and despite the public concerns 3M cited for its phaseout decision and Old DuPont's own internal knowledge of the risks to human health and the environment posed by PFOA, Old DuPont did not cease using PFOA or eliminate

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

PFOA from its products. Instead, Old DuPont opened its own plant to manufacture PFOA to use in the manufacture of Old DuPont's products.

94.     As demonstrated by its material safety data sheet for PFOA, Old DuPont knew PFOA required disposal by incineration by at least 1991.

95.     Old DuPont participated in the Telomer Research Program ("TRP") that was convened by EPA in the early 2000s to coordinate research and data on PFOA and PFAS manufactured by the telomerization process. The TRP consisted of the leading telomer-based PFAS manufacturers. Through its participation in the TRP, Old DuPont obtained and shared with other PFAS manufacturers information about various aspects of PFOA and telomer PFAS, such as their chemical degradation pathways, the fate and transport of PFAS products from customer facilities to the environment and public water supplies, and human health risks associated with exposure to these chemicals.

96.     In 2015, Old DuPont spun off its Performance Chemicals business (which included the design, manufacture, marketing, and sale of PFAS, as well as the environmental liabilities) to Chemours. Chemours inherited Old DuPont's expertise, resources, and knowledge of PFAS, and PFOA in particular.

97.     Invista was formed in 2004 through the sale of Old DuPont's Textiles & Interiors division to Koch Industries and conducted bundled sales of textile products with Old DuPont PFAS products that it knew could degrade to PFOA. Invista inherited Old DuPont's expertise, resources, and knowledge of PFAS, and PFOA in particular.

98.     Huntsman uses PFAS manufactured by other Supplier Defendants, including Old DuPont and Chemours, to blend with other non-PFAS components in the manufacture of the PFAS products it sells. Upon information and belief, Huntsman has long known that PFAS are persistent,

29

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells.

99.     Daikin is a subsidiary of Daikin Industries, Ltd., which has been in the PFAS business in Japan since the 1940s. It entered the U.S. market in the early 1990s, establishing manufacturing operations in Decatur, Alabama, adjacent to 3M's plant there.

100.     Daikin purchased PFOA from 3M for use as a processing chemical in its manufacture of fluoropolymers. Daikin knew from the early 1990s that PFOA was carcinogenic, bioaccumulative, environmentally persistent, and soluble in water.

101.     Though fully aware of the reasons that 3M decided to withdraw its products based on long-chain PFAS in 2000, Daikin rushed to fill as much of the PFAS market left by 3M as possible, with the specific intent to prevent customers from shifting to non-PFAS products.

102.     Underscoring its position as one of the world's leading PFAS manufacturers, Daikin participated in the TRP during the 2000s, through which it obtained and shared with other PFAS manufacturers information about various aspects of PFOA and telomer PFAS, such as their chemical degradation pathways, the fate and transport of PFAS products from customer facilities to the environment and public water supplies, and human health risks associated with exposure to these chemicals.

103.     Daikin was well aware of the need to incinerate or otherwise treat wastewater to remove PFAS; indeed, Daikin practiced incineration for the PFAS-containing wastewater generated at its Decatur, Alabama facility by or around the mid-2000s.

104.     Asahi is a subsidiary of AGC, Inc., f/k/a Asahi Glass Co., Ltd., a Japanese company that has manufactured and sold PFAS products since at least the 1970s. Upon information and belief, Asahi has long known that PFAS are persistent, bioaccumulative, and toxic, and that

30

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells.

105. Underscoring its position as one of the world's leading PFAS manufacturers, Asahi participated in the TRP during the 2000s, through which it obtained and shared with other PFAS manufacturers information about various aspects of PFOA and telomer PFAS, such as their chemical degradation pathways, the fate and transport of PFAS products from customer facilities to the environment and public water supplies, and human health risks associated with exposure to these chemicals.

106. Arkema is a subsidiary of Arkema S.A., a French company formed in 2004 from a reorganization of Total S.A.'s chemicals business. Arkema S.A. and its predecessors have been manufacturing PFAS since at least the 1950s. Upon information and belief, Arkema has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells.

107. Clariant was formed in 1995 and was previously known as Sandoz Chemical Corporation and as Sodeyco, Inc. Upon information and belief, Clariant has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells.

108. Underscoring its position as one of the world's leading PFAS manufacturers, Clariant participated in the TRP during the 2000s, through which it obtained and shared with other PFAS manufacturers information about various aspects of PFOA and telomer PFAS, such as their chemical degradation pathways, the fate and transport of PFAS products from customer facilities to the environment and public water supplies, and human health risks associated with exposure to these chemicals.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

109.    Archroma was formed in 2013 through the sale of Clariant's textile, paper, and emulsions business to SK Capital Partners. Archroma inherited Clariant's expertise, resources, and knowledge of PFAS.

110.    Solvay is the successor of Solvay Solexis, Inc. and Ausimont USA, Inc. Upon information and belief, Solvay has long known that PFAS are persistent, bioaccumulative, and toxic, and that terminal PFAS such as PFOA, and/or their precursors, are present in the products it manufactures and sells. At its Gloucester County, New Jersey facility, Solvay's use of PFOA and PFNA in the manufacture of fluoropolymer products has caused severe contamination of drinking water, surface waters, groundwater, and soils in the surrounding vicinity. In 2023, Solvay settled a lawsuit brought by the State of New Jersey arising from this contamination for $393 million.

111.    Safe or safer nonfluorinated alternatives to PFAS-based products exist, as demonstrated by some of Supplier Defendants' own current product offerings. Such nonfluorinated alternatives could have been commercially viable much earlier (and the harm to Plaintiff mitigated) if Supplier Defendants had not chosen to ignore the clear evidence of health and environmental dangers they possessed many years ago.

112.    Despite Supplier Defendants' knowledge that their products contained or degraded to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals; that these PFAS were environmentally persistent, bioaccumulative, dose-additive, and toxic; that conventional wastewater treatment technologies utilized by wastewater treatment facilities could not remove their PFAS from wastewater; and that Discharger Defendants discharged these PFAS to the Pee Dee River Watershed, damaging and interfering with Plaintiff's property rights and public health,

32

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Supplier Defendants continued to sell products containing or degrading to these PFAS to Discharger Defendants. Specifically:

(a)     Asahi continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Asahiguard and Surflon;

(b)     Arkema continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Kynar;

(c)     Clariant continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Nuva;

(d)     Archroma continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Nuva and Fluowet;

(e)     Daikin continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Unidyne;

(f)     Old DuPont continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Teflon, Zonyl, and Capstone;

(g)     Chemours continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Capstone;

(h)     Invista continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Stainmaster and Antron;

(i)     Huntsman continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Phobol and Oleophobol; and

(j)     Solvay continued to sell products containing or degrading to these PFAS to Discharger Defendants under brand names including Algoflon and Halar.

33

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

**IV.    Supplier Defendants Were Directly Involved in Discharger Defendants' PFAS Use and Disposal.**

113.    At all times relevant hereto, Supplier Defendants were directly involved in, and exercised control over, Discharger Defendants' use, handling, application, and disposal of Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals.

114.    Supplier Defendants specified the type and amount of PFAS-containing products to be used or applied, and the manner in which PFAS-containing products were to be used or applied, at Discharger Defendants' facilities upstream from Plaintiff's intake on the Bull Creek.

115.    Supplier Defendants designed and provided equipment for the use of their PFAS-containing products at Discharger Defendants' facilities upstream from Plaintiff's intake on Bull Creek.

116.    Supplier Defendants jointly conducted research with Discharger Defendants for new PFAS-containing products as well as methods of using or applying these products.

117.    Supplier Defendants monitored the products manufactured by Discharger Defendants for the amount of PFAS-containing products used in the manufacture of Discharger Defendants' products in order to ensure those products met Supplier Defendants' specifications on the amount of PFAS-containing products to be used or applied.

118.    Some Supplier Defendants, including Archroma, Arkema, Invista, and Huntsman, maintained offices and/or laboratories near Discharger Defendants' facilities upstream from Plaintiff's intake on Bull Creek, and all Supplier Defendants were in constant contact with the Discharger Defendants concerning the use, handling, application, and disposal of their PFAS-containing products.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

119.     Employees of the Supplier Defendants were routinely present in Discharger Defendants' facilities to provide direction, support, and technical assistance concerning the use, handling, application, and disposal of Supplier Defendants' PFAS-containing products.

120.     Supplier Defendants provided information to the Discharger Defendants concerning the health and environmental impacts of Supplier Defendants' PFAS-containing products, and the Discharger Defendants, at least in part, relied on this information.

121.     Supplier Defendants were familiar with the wastewater disposal practices of the Discharger Defendants' facilities, including that a portion of the Supplier Defendants' PFAS-containing products went into the Discharger Defendants' wastewater streams and that the treatment methods used by the Discharger Defendants' on-site treatment works and/or receiving WWTPs could not remove Defendants' PFAS from the effluent. Supplier Defendants nevertheless failed to require, instruct, advise, or otherwise direct the Discharger Defendants to dispose of their PFAS-containing wastewater in a manner that would prevent this effluent from entering surface waters and contaminating Plaintiff's property. Supplier Defendants continued to sell their PFAS-containing products to Discharger Defendants they knew or should have known were disposing of the products in an environmentally irresponsible manner.

122.     Supplier Defendants have been aware for many years of the presence of their PFAS chemicals in the Pee Dee River Watershed upstream of Plaintiff's intakes.

**V.     Supplier Defendants Delayed, Suppressed, and Interfered with the Advance of Scientific Understanding and Regulation of Their PFAS Products.**

123.     Supplier Defendants actively worked to suppress and delay scientific understanding and government regulation of PFAS by, among other things, suppressing and altering critical internal studies documenting the harms of their PFAS-containing products, distorting public discourse on and downplaying the harmful effects of PFAS, misleading EPA on the safety of their

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

PFAS-containing products and PFAS more generally, and hiring leaders in the scientific community to exert influence and suppress unwanted information contrary to their position.

124. Supplier Defendants, by agreement and/or tacit understanding between them, each knowingly pursued a common plan and design and/or acted in concert to market and promote products they knew to be dangerous to the environment and human health. Supplier Defendants engaged in concerted conduct for the purpose of suppressing, concealing, and minimizing information on the risks to human health and the environment posed by PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, and for the purpose of delaying, obstructing, and interfering with regulators' investigation and regulation of these chemicals.

125. The delay in PFAS regulation resulted directly from Supplier Defendants' concerted efforts, over decades, to conceal critical studies from the scientific community and simultaneously introduce studies and media downplaying the adverse effects of PFAS.

## VI.  Old DuPont Orchestrated a Multi-Step Corporate Restructuring Designed to Shield Its Valuable Assets from Its PFAS Liabilities.

126. By 2013, Old DuPont understood that it faced massive, mounting environmental liabilities arising from its decades-long manufacture, use, marketing, sale, and distribution of PFAS, likely totaling in the billions of dollars.

127. Beginning in or around 2013, Old DuPont sought to isolate these PFAS-related liabilities from its billions of dollars in valuable assets and to evade responsibility for the environmental harms it caused. This scheme unfolded over several years and involved the creation of multiple new corporate entities.

128. The first major step in this scheme was the 2015 spinoff of Chemours, a newly formed entity that received Old DuPont's Performance Chemicals business. Along with this

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

transfer, Old DuPont saddled Chemours with a significant portion of Old DuPont's environmental liabilities.

129. Per the separation agreement between Old DuPont and Chemours, Chemours assumed liabilities related to Old DuPont's manufacture, use, and sale of PFAS and agreed to indemnify Old DuPont against all liabilities associated with the Performance Chemicals business—regardless of when those liabilities arose and against whom those liabilities are asserted or determined.

130. Internally, Old DuPont knew that Chemours lacked the financial resources to adequately cover the PFAS-related liabilities Old DuPont had transferred to Chemours.

131. In 2017, Old DuPont completed a merger with The Dow Chemical Company ("Old Dow") to create DowDuPont, Inc. This so-called "merger of equals" was carefully structured to avoid exposing Old Dow's assets to Old DuPont's PFAS liabilities. Rather than a true integration, this transaction served as a temporary restructuring vehicle by which Old DuPont sought to further separate the company's valuable assets from its PFAS liabilities and other environmental obligations.

132. Following the merger, assets were stripped out of Old DuPont and transferred to DowDuPont, which then mixed and combined the assets of Old DuPont with the assets of Old Dow. DowDuPont then recognized its business into three distinct business segments: Agriculture, Materials Science, and Specialty Products.

133. This restructuring paved the way for the creation of three independent companies by 2019: (1) Corteva, which holds the Agriculture business and became the parent holding company of Old DuPont; (2) Dow, Inc. ("New Dow"), which holds the Materials Science business and became the parent company of Old Dow; and (3) DuPont de Nemours, Inc. (i.e., New DuPont),

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

which was formerly known as DowDuPont and retained the Specialty Products business as well as some non-core business segments and product lines once belonging to Old DuPont.

134.    Pursuant to the separation agreement between Corteva, New Dow, and DowDuPont/New DuPont, Corteva and New DuPont have each assumed responsibility for certain Old DuPont liabilities, including Old DuPont liabilities related to PFAS.

**VII.    Defendants Have Harmed Plaintiff and Plaintiff's Community.**

135.    Discharger Defendants have, for decades, discharged PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and their precursors into the Pee Dee River Watershed, which has caused, and continues to cause, contamination of these waters with PFAS chemicals exceeding EPA's current health advisories, MCLGs, and MCLs. Indeed, absent new treatment technologies, Plaintiff cannot use its properties and exercise its property rights to provide water that is either free of all PFOA and PFOS, or compliant with EPA's MCLs.

136.    Supplier Defendants have supplied products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to Discharger Defendants, while knowing that Discharger Defendants discharge wastewater laden with these PFAS to wastewater treatment facilities that cannot remove them from the wastewater before it is discharged to the Pee Dee River Watershed upstream of Plaintiff's water intakes.

137.    Defendants' conduct has proximately caused the contamination of the Pee Dee River Watershed; the Waccamaw River; the Intracoastal Waterway; and of Plaintiff's land, its Bull Creek and Myrtle Beach SWTPs, its Bucksport and Conway WWTPs, and its water treatment and distribution systems with PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals—including PFOA and PFOS at concentrations above EPA's MCLGs and MCLs.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

138. Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, and/or negligently engaged in acts and omissions that have proximately caused unreasonable interference with Plaintiff's right to use and enjoy its properties and its right to use the waters of Bull Creek and the Intracoastal Waterway, and have caused Plaintiff additional past, present, and future injury to property.

139. Despite knowing that there is no safe dose for PFOA or PFOS, and that PFHxS, PFNA, PFBS, and GenX Chemicals are hazardous to human health,

(a) Discharger Defendants, directly or indirectly, discharged industrial wastewater contaminated with these chemicals into the Pee Dee River Watershed or tributaries thereof, which they knew or should have known contaminated Plaintiff's property; and

(b) Supplier Defendants continued to supply these chemicals to Discharger Defendants, knowing that they discharged these chemicals into the Pee Dee River Watershed or tributaries thereof, which Supplier Defendants knew or should have known contaminated Plaintiff's property.

## FIRST CAUSE OF ACTION

### Private Nuisance

140. Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

141. Plaintiff is a special purpose district created for the purpose of constructing, operating, maintaining, improving, and extending a water treatment and distribution system for residents of Horry County and other counties. It uses its properties for those purposes, including the withdrawal of raw water from Bull Creek and the Intracoastal Waterway, the treatment of raw water into potable drinking water, and the distribution of treated potable drinking water to customers in Horry County and other counties.

39

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

142. Plaintiff owns riparian land abutting Bull Creek and the Intracoastal Waterway, and Plaintiff has a riparian property right in the reasonable use of these waters, including for the provision of water to its customers.

143. Through the conduct described herein, Defendants created, contributed to, and/or maintained a nuisance; that is, the contamination of the Pee Dee River Watershed, the Waccamaw River, and the Intracoastal Waterway with PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals at concentrations exceeding those EPA deems unsafe for consumption.

144. Due to Defendants' contamination, Plaintiff cannot provide water to its customers without PFAS, or even at PFAS concentrations that comply with EPA's MCLs, absent new water treatment technology.

145. Defendants' contamination caused, contributed to, and/or maintains a nuisance that substantially and unreasonably interferes with Plaintiff's use and enjoyment of its properties, interferes with Plaintiff's properties and its property rights and riparian rights, damages Plaintiff's properties, and causes Plaintiff additional inconvenience, annoyance, and harm.

146. Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, and/or negligently engaged in conduct that unreasonably interferes with Plaintiff's property rights.

147. As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered, now suffers, and will continue to suffer damages related to Defendants' contamination of the Pee Dee River Watershed, the Waccamaw River, the Intracoastal Waterway, and Plaintiff's property, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

148.    In addition to its claims for damages, Plaintiff is entitled to injunctive and/or equitable relief to abate the nuisance created, contributed to, and maintained by Defendants.

149.    The ongoing contamination of Bull Creek, the Intracoastal Waterway, and Plaintiff's properties constitutes a continuing irreparable injury for which there is no adequate remedy at law. Plaintiff requests that this Court issue an order and decree requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to interfere with Plaintiff's use and enjoyment of its land and its use of Bull Creek and the Intracoastal Waterway to supply potable water to its customers.

150.    Defendants' interference with Plaintiff's use of its properties can be abated by funding the evaluation, testing, acquisition, installation, operation, and maintenance of new water treatment technology at Plaintiff's SWTPs to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

151.    Defendants are jointly and severally liable to Plaintiff for all damages resulting from this nuisance, and the costs of its abatement, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

## SECOND CAUSE OF ACTION

### Public Nuisance

152.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

153.    Plaintiff is a special purpose district created for the purpose of constructing, operating, maintaining, improving, and extending a water treatment and distribution system for residents of Horry County and other counties. It uses its properties for those purposes, including the withdrawal of raw water from Bull Creek and the Intracoastal Waterway, the treatment of raw

41

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

water into potable drinking water, and the distribution of treated potable drinking water to customers in Horry County and other counties.

154.    Plaintiff's customers use the water Plaintiff provides for many purposes, including drinking, cooking, bathing, cleaning, washing, and watering plants and gardens.

155.    Plaintiff's customers, and indeed all residents in Plaintiff's community, have a right to potable water that is reasonably pure and safe for their use—and thus free from contamination by Defendants' PFOA, PFOS, PFNA, PFHxS, PFBS, and GenX Chemicals. Defendants' contamination unreasonably interferes with, disrupts, and threatens public health, safety, and order. Indeed, EPA makes clear that there is no safe dose for consuming PFOA and PFOS.

156.    Plaintiff has sustained special injuries as a result of Defendants' public nuisance, including but not limited to, the lost use of its properties; the inability to provide potable water to customers without concentrations of PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals deemed unsafe by EPA; expenses associated with the evaluation, testing, acquisition, installation, operation, and maintenance of required treatment technologies to remove unsafe concentrations of these PFAS from water; expenses incurred in discovering and identifying sources of Defendants' contamination; interference with Plaintiff's right to use Bull Creek and the Intracoastal Waterway; interference with the use of Plaintiff's SWTPs and water treatment and distribution systems; and lost revenue.

157.    As a direct and proximate result of Defendants' acts and omissions, Plaintiff has suffered, now suffers, and will continue to suffer special injury and damages related to Defendants' contamination of the Pee Dee River Watershed, the Waccamaw River, the Intracoastal Waterway, and Plaintiff's properties.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

158.     Defendants, individually and acting through their employees and agents, and in concert with each other, have knowingly, intentionally, recklessly, and/or negligently engaged in conduct that unreasonably interferes with Plaintiff's property rights and endangers the health of Plaintiff's customers, consumers of Plaintiff's drinking water, and Plaintiff's community.

159.     As a result of the nuisance caused by Defendants, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

160.     In addition to its claims for damages, Plaintiff is entitled to injunctive and/or equitable relief to abate the nuisance created, contributed to, and maintained by Defendants.

161.     Defendants' ongoing contamination constitutes a continuing threat to public health, safety, and order, and it constitutes irreparable injury for which there is no adequate remedy at law. Plaintiff requests that this Court issue an order and decree requiring Defendants to fund the measures necessary to prevent these PFAS from continuing to threaten public health and safety and ensure that Plaintiff's customers and residents of Plaintiff's community receive water free from PFAS.

162.     Defendants' contamination of potable water with unsafe concentrations of PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals can be abated by requiring Defendants to fund the evaluation, testing, acquisition, installation, operation, and maintenance of new water treatment technology at Plaintiff's SWTPs to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

163.     Defendants are jointly and severally liable to Plaintiff for all damages resulting from this nuisance, the costs of abatement in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

## THIRD CAUSE OF ACTION

### Trespass

164.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

165.    Plaintiff owns, possesses, and actively exercises its right to use its land, SWTPs, and related buildings, improvements, property, and equipment that make up its water treatment and distribution systems.

166.    Discharger Defendants Nan Ya, PRET, and IP intentionally discharged and continue to discharge PFAS and/or PFAS-containing products to the Lake City, Johnsonville, and Lumberton WWTPs, respectively, notwithstanding that they knew and/or reasonably should have known that:

(a)     these WWTPs cannot remove their PFAS and/or PFAS-containing products from wastewater before discharging to surface waters upstream of Plaintiff's water intake on Bull Creek;

(b)     Plaintiff draws water from Bull Creek for the provision of safe potable water to its customers;

(c)     water Plaintiff draws from Bull Creek is contaminated with the PFAS and/or PFAS-containing products these Defendants discharge to these WWTPs;

(d)     these Defendants' PFAS and/or PFAS-containing products that contaminate the water distributed from Plaintiff's Bull Creek SWTP pass through Plaintiff's Bucksport Regional and Conway WWTPs to enter the Waccamaw River and Intracoastal Waterway;

(e)     Plaintiff draws water from the Intracoastal Waterway for the provision of drinking water to the cities of Myrtle Beach and North Myrtle Beach;

(f)     water Plaintiff draws from the Intracoastal Waterway is contaminated with these Defendants' PFAS and/or PFAS-containing products; and, thereby,

44

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

(g)     water contaminated with high concentrations of these Defendants' PFAS and/or PFAS-containing products invades Plaintiff's properties.

167.     Discharger Defendants RRD and SCD intentionally delivered and/or continue to deliver leachate contaminated with PFAS and/or PFAS-containing products to the Lumberton WWTP, notwithstanding that these Defendants knew and/or reasonably should have known that:

(a)     the Lumberton WWTP cannot remove their PFAS and/or PFAS-containing products from the leachate before discharging to surface waters upstream of Plaintiff's water intake on Bull Creek;

(b)     Plaintiff draws water from Bull Creek for the provision of safe potable water to its customers;

(c)     that water Plaintiff draws from Bull Creek is contaminated with the PFAS and/or PFAS-containing products these Defendants send to the Lumberton WWTP;

(d)     these Defendants' PFAS and/or PFAS-containing products that contaminate the water distributed from Plaintiff's Bull Creek SWTP pass through Plaintiff's Bucksport Regional and Conway WWTPs to enter the Waccamaw River and Intracoastal Waterway;

(e)     Plaintiff draws water from the Intracoastal Waterway for the provision of drinking water to the cities of Myrtle Beach and North Myrtle Beach;

(f)     water Plaintiff draws from the Intracoastal Waterway is contaminated with these Defendants' PFAS and/or PFAS-containing products; and, thereby,

(g)     water contaminated with high concentrations of these Defendants' PFAS and/or PFAS-containing products invades Plaintiff's properties.

168.     Discharger Defendants Burlington, Darling Fibers, Delta Mills, Elevate, JPS, Mohawk, Sonoco, and WestRock intentionally discharged and continue to discharge PFAS and/or

45

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

PFAS-containing products to the Pee Dee River Watershed, notwithstanding that these Defendants knew and/or reasonably should have known that:

(a)    the wastewater treatment methods used by these Defendants cannot remove their PFAS and/or PFAS-containing products from wastewater before discharging to surface waters upstream of Plaintiff's water intake on Bull Creek;

(b)    Plaintiff draws water from Bull Creek for the provision of safe potable water to its customers;

(c)    water Plaintiff draws from Bull Creek is contaminated with the PFAS and/or PFAS-containing products they discharge to the Pee Dee River Watershed; and, thereby,

(d)    these Defendants' PFAS and/or PFAS-containing products that contaminate the water distributed from Plaintiff's Bull Creek SWTP pass through Plaintiff's Bucksport Regional and Conway WWTPs to enter the Waccamaw River and Intracoastal Waterway;

(e)    Plaintiff draws water from the Intracoastal Waterway for the provision of drinking water to the cities of Myrtle Beach and North Myrtle Beach;

(f)    water Plaintiff draws from the Intracoastal Waterway is contaminated with these Defendants' PFAS and/or PFAS-containing products; and, thereby,

(g)    water contaminated with high concentrations of Defendants' PFAS and/or PFAS-containing products invades Plaintiff's properties.

169.    Supplier Defendants intentionally supplied and continued to supply PFAS-containing products to Discharger Defendants notwithstanding that Supplier Defendants knew and/or reasonably should have known that:

46

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

(a)     Discharger Defendants discharged and continue to discharge, directly or indirectly, Supplier Defendants' PFAS-containing products and/or PFAS to on-site wastewater treatment facilities or publicly owned WWTPs that cannot remove Supplier Defendants' PFAS-containing products and/or PFAS from wastewater before discharge to surface waters upstream of Plaintiff's water intake on Bull Creek;

(b)     Plaintiff draws water from the Bull Creek for the provision of safe potable water to its customers;

(c)     water Plaintiff draws from the Bull Creek is contaminated with Supplier Defendants' PFAS-containing products and/or PFAS that Discharger Defendants directly or indirectly discharged to the Pee Dee River Watershed;

(d)     Supplier Defendants' PFAS-containing products and/or PFAS that contaminate the water distributed from Plaintiff's Bull Creek SWTP pass through Plaintiff's Bucksport Regional and Conway WWTPs to enter the Waccamaw River and Intracoastal Waterway;

(e)     Plaintiff draws water from the Intracoastal Waterway for the provision of drinking water to the cities of Myrtle Beach and North Myrtle Beach;

(f)     water Plaintiff draws from the Intracoastal Waterway is contaminated with Supplier Defendants' PFAS-containing products and/or PFAS; and, thereby,

(g)     water contaminated with high concentrations of Defendants' PFAS and/or PFAS-containing products invades Plaintiff's properties.

170.     Plaintiff has not consented to, and does not consent to, the invasion of its properties by water contaminated with PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals at

47

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

concentrations exceeding EPA's MCLs and MCLGs and beyond what EPA deems unsafe for consumption.

171.    Defendants' invasions of Plaintiff's properties are continuing and ongoing, and each separate invasion of PFAS-contaminated water constitutes a new trespass each time Plaintiff's water pumps are active.

172.    Discharger Defendants Nan Ya, PRET, and IP intend that, while using PFAS in their industrial processes, PFAS-containing wastewater generated by those processes be discharged to the Lake City, Johnsonville, and Lumberton WWTPs, respectively. Discharger Defendants RRD and SCD intend and/or intended that their PFAS-contaminated leachate be disposed of by the Lumberton WWTP. Defendants Burlington, Darling Fibers, Delta Mills, Elevate, JPS, Mohawk, Sonoco, and WestRock intend and/or intended that, while using PFAS in their industrial processes, PFAS-containing wastewater be discharged to the Pee Dee River Basin. Defendants' conduct is wanton, willful, and in reckless disregard of Plaintiff's property and its property rights and riparian rights.

173.    Supplier Defendants intend that Discharger Defendants, while using Supplier Defendants' PFAS-containing products in their industrial processes, dispose of the resulting wastewater contaminated with Supplier Defendants' PFAS-containing products by discharging it, directly or indirectly, to surface waters. Supplier Defendants' conduct is wanton, willful, and in reckless disregard of Plaintiff's property and its property rights and riparian rights.

174.    Defendants' conduct is the actual and proximate cause of the invasion of PFAS-contaminated water into Plaintiff's properties, including its land, SWTPs, and related buildings, improvements, property, and equipment that make up its water treatment and distribution systems.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

The damage to Plaintiff's properties is the direct and proximate result of Defendants' intentional conduct.

175.    As a direct, proximate, and foreseeable result of Defendants' trespasses, Plaintiff has suffered, now suffers, and will continue to suffer invasion of its property rights and damages, including loss in value, the cost of removing Defendants' PFAS, and other damages to be proved at trial.

176.    Defendants' ongoing trespasses can be abated by requiring Defendants to fund the evaluation, testing, acquisition, installation, operation, and maintenance of new water treatment technology at Plaintiff's SWTPs to remove PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemical contamination.

## **FOURTH CAUSE OF ACTION**

### **Negligence, Gross Negligence, and/or Recklessness**

177.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

178.    Discharger Defendants have a duty to use due care in the handling, use, and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to avoid causing an unreasonable risk of harm to others, which includes preventing the direct and/or indirect discharge of these PFAS into surface waters upstream of Plaintiff's SWTPs, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property.

179.    Discharger Defendants knew or should have known that the PFAS they discharged were environmentally persistent, bioaccumulative, dose-additive, and toxic; that conventional wastewater treatment technologies utilized by themselves or their WWTPs could not remove their PFAS; and that surface waters—including the Pee Dee River Watershed—were vulnerable to the contamination that has taken and now takes place.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

180. Discharger Defendants nonetheless negligently, recklessly, wantonly, and/or willfully breached their duty in causing products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to escape their premises and contaminate the Pee Dee River Watershed, thereby interfering with Plaintiff's property rights and injuring Plaintiff's properties.

181. Supplier Defendants have a duty to use due care in the manufacturing, formulation, handling, control, disposal, labeling, and creation and dissemination of requirements and instructions for the use and disposal of products containing or that degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to ensure the proper use and disposal of these products and prevent their improper use and disposal.

182. Supplier Defendants had superior knowledge that their PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals contained in or degrading from their products were environmentally persistent, bioaccumulative, dose-additive, and toxic; that conventional wastewater treatment technologies utilized by wastewater treatment facilities could not remove these PFAS; that conventional water treatment technologies utilized by water systems like Plaintiff's could not remove these PFAS; and that surface waters, including the Pee Dee River Watershed, were vulnerable to the contamination that now takes place.

183. By continually supplying their PFAS-containing products without providing their customers with proper instruction and/or direction on appropriate PFAS disposal measures, or otherwise preventing the discharge of their PFAS to surface waters, Supplier Defendants breached their duty of care and negligently, recklessly, wantonly, and willfully created the risk that their PFAS would contaminate the Pee Dee River Watershed, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

184. Additionally, Defendant Burlington had a duty to use due care in the manufacturing, handling, control, disposal, labeling, and instructing for the use and disposal of biosolid products that contain PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors to ensure the proper use of these products and prevent contamination of surface waters.

185. By continually suppyling biosolid products without providing warnings, proper instructions, or direction on the dangers of these PFAS and their properties, or otherwise preventing their contamination of surface waters, Burlington negligently, recklessly, wantonly, and/or willfully created the risk that its PFAS would contaminate the Pee Dee River Watershed, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property.

186. Because Burlington created the risk of harm from PFAS-contaminated water, it had a duty to ensure that users of its biosolid products did not allow PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors to escape its users' premises and contaminate the Pee Dee River Watershed. Burlington also had a duty to warn others, including Plaintiff, of the danger presented by water contaminated with its PFAS.

187. Burlington negligently, recklessly, wantonly, and willfully breached its duty by failing to prevent the discharge of these PFAS from its biosolid products into the Pee Dee River Watershed, thereby interfering with Plaintiff's property rights and injuring Plaintiff's property, and by failing to warn Plaintiff of the danger presented by water contaminated by its PFAS.

188. As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, omissions, and inactions, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including but not limited to loss in value; the cost of removing Defendants' PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals; the costs of evaluating,

51

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Defendants' PFAS; and other damages to be proved at trial.

189. Defendants are jointly and severally liable to Plaintiff for all damages resulting from their conduct, practices, actions, omissions, and inactions, in an amount to be determined at trial, as well as punitive damages in an amount to be determined at trial, and costs and attorneys' fees.

## FIFTH CAUSE OF ACTION

### Strict Products Liability – Ultrahazardous Activity
### (Supplier Defendants)

190. Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

191. PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are unreasonably dangerous to humans and the environment.

192. Supplier Defendants manufactured, formulated, handled, sold, and/or distributed products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to Discharger Defendants, knowing that these PFAS have been, and are presently, discharged to surface waters, and thereby enter and contaminate Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

193. Rather than require the proper disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, Supplier Defendants required or permitted Discharger Defendants to discharge these products, which they knew to be hazardous, to surface waters upstream from Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

52

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

194.    Supplier Defendants knew that PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals were environmentally persistent, bioaccumulative, dose-additive, and toxic; and Supplier Defendants knew there was no safe dose of PFOA or PFOS.

195.    Supplier Defendants knew or expected that these hazardous PFAS that they were manufacturing, formulating, handling, selling, and/or distributing would reach Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system while in essentially the same condition as when they left the hands of Supplier Defendants.

196.    Supplier Defendants manufactured, formulated, handled, sold, and/or distributed their products that were dangerous and unsafe for the uses and purposes for which they were intended despite knowing the consequences of their use and of exposure to their products.

197.    Supplier Defendants or their agents were responsible for the unreasonably dangerous products sold and distributed to Discharger Defendants and received financial benefits from their sale and distribution.

198.    As a direct, proximate, and foreseeable result of Supplier Defendants' ultrahazardous activities, their PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals have damaged Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system, and Plaintiff is unable to provide potable water free from contamination with these chemicals at concentrations reasonably safe for consumption.

199.    As a direct, proximate, and foreseeable result of Supplier Defendants' ultrahazardous activities, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing Supplier Defendants' PFAS;

53

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Supplier Defendants' PFAS; and other damages to be proved at trial.

200.     Supplier Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Their conduct was performed to promote sales of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in conscious disregard of the probable dangerous consequences of their conduct and the reasonably foreseeable impacts on public health and property.

**SIXTH CAUSE OF ACTION**
**Strict Products Liability – Ultrahazardous Activity**
**(Burlington)**

201.     Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

202.     PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are unreasonably dangerous to humans and the environment.

203.     Burlington manufactured, handled, sold, and distributed biosolid products containing or degrading to these PFAS chemicals to agricultural and/or other users, knowing that these PFAS chemicals have been, and are presently, discharged to surface waters, and thereby enter and contaminate Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

204.     Burlington knew that these PFAS chemicals were environmentally persistent, bioaccumulative, toxic, and dose-additive; and Burlington knew that there was no safe dose of PFOA or PFOS.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

205.    Burlington knew or expected that these hazardous PFAS chemicals that it was manufacturing, handling, selling, and distributing would reach Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system while in essentially the same condition as when they left Burlington's hands.

206.    Burlington manufactured, handled, sold, and distributed its biosolid products that were dangerous and unsafe for the uses and purposes for which they were intended, despite knowing the consequences of the use and of, and exposure to, its products.

207.    Burlington and/or its agents were responsible for the unreasonably dangerous products that it sold and distributed, and Burlington and received financial benefits from their sales and distribution.

208.    As a direct and proximate result of Burlington's ultrahazardous activities, its PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors have damaged Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system, and Plaintiff is unable to provide potable water free from contamination with these chemicals.

209.    As a direct, proximate, and foreseeable result of Burlington's ultrahazardous activities, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing Burlington's PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Burlington's PFAS; and other damages to be proved at trial.

210.    Burlington committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Burlington's conduct was performed to

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

promote sales of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in conscious disregard of the probable dangerous consequences of their conduct and the reasonably foreseeable impacts on public health and property.

### SEVENTH CAUSE OF ACTION

**Strict Products Liability – Design Defect**
**(Supplier Defendants)**

211.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

212.    PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are unreasonably dangerous to humans and the environment.

213.    Supplier Defendants knew that Discharger Defendants would purchase and use their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals without inspection for defects.

214.    Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals have been, and are presently, discharged to surface waters, and thereby enter and contaminate Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

215.    Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals were used in a reasonably foreseeable manner and without substantial change in their condition.

216.    Supplier Defendants knew that the use of their products containing or degrading to these PFAS in their intended manner would result in PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals contaminating Plaintiff's water sources and Plaintiff's SWTPs and related

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

buildings, improvements, property, and equipment that make up its water treatment and distribution system.

217. Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals sold and/or distributed to Discharger Defendants were and are defective in design and unreasonably dangerous for their intended use because:

(a)     PFAS resist environmental degradation;

(b)     PFAS cause extensive and persistent surface water contamination when used and discharged to surface waters in their foreseeable and intended manner;

(c)     PFAS contamination in drinking water poses significant threats to public health and property; indeed, there is no safe dose of PFOA or PFOS in drinking water;

(d)     Supplier Defendants failed to conduct and/or failed to disclose reasonable, appropriate, and/or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of PFAS; and

(e)     There are and were safe or safer alternatives to PFAS that Supplier Defendants could have employed in their products.

218. Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals were and are dangerous to a degree beyond that which was and is contemplated by the ordinary consumer.

219. The foreseeable risk of harm to public health and property posed by Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals outweighed and outweigh the utility of such products and the cost to Supplier Defendants of reducing or eliminating those risks.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

220.    A reasonable product manufacturer would have known of the significant dangers posed by Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals.

221.    As a direct, proximate, and foreseeable result of the use of Supplier Defendants' defective and unsafe products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, these PFAS have damaged Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system, and Plaintiff is unable to provide potable water free from contamination with these chemicals at concentrations reasonably safe for consumption.

222.    As a direct, proximate, and foreseeable result of the use of Supplier Defendants' defective and unsafe products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing Supplier Defendants' PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Supplier Defendants' PFAS; and other damages to be proved at trial.

223.    Supplier Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Their conduct was performed to promote sales of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in conscious disregard of the probable dangerous consequences of their conduct and the reasonably foreseeable impacts on public health and property.

**EIGHTH CAUSE OF ACTION**
**Strict Products Liability – Design Defect**
**(Burlington)**

58

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

224. Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

225. PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX Chemicals are unreasonably dangerous to humans and the environment.

226. Burlington knew that agricultural users would purchase and use its biosolid products containing these PFAS and their precursors without inspection for defects.

227. Burlington's biosolid products containing or degrading to these PFAS chemicals have been, and are presently, discharged to surface waters, and thereby enter and contaminate Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

228. Burlington's biosolid products containing these PFAS and their precursors were used in a reasonably foreseeable manner and without substantial change in their condition.

229. Burlington knew that the use of its biosolid products in their intended manner would result in PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals damaging Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

230. Burlington's biosolid products were and are defective in design and unreasonably dangerous for their intended use because:

    (a)    PFAS resist environmental degradation;

    (b)    PFAS leach from soil to groundwater, are highly mobile and water soluble, making groundwater and surface water vulnerable to contamination;

    (c)    Applying PFAS-contaminated biosolids to soil near surface waters exposes surface waters to PFAS contamination via overland and groundwater flow;

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

(d)     PFAS contamination in drinking water poses significant threats to public health and property; indeed, there is no safe dose of PFOA or PFOS in drinking water;

(e)     Burlington failed to conduct and/or failed to disclose reasonable, appropriate, and/or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of PFAS; and

(f)     There are and were safe or safer feasible alternatives to PFAS-contaminated biosolids that Burlington could have employed in its products.

231.     Burlington's products containing or degrading to these PFAS chemicals were and are dangerous beyond that which was and is contemplated by the ordinary consumer.

232.     The foreseeable risk of harm to public health and property posed by Burlington's products containing these PFAS outweighed and outweigh the utility of such products and the cost to Burlington of reducing or eliminating those risks.

233.     A reasonable product manufacturer knew or should have known of the significant dangers posed by Burlington's products containing PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors.

234.     As a direct and proximate result of the sale and application of Burlington's defective and unsafe biosolid products, these PFAS have contaminated Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system, and Plaintiff is unable to provide potable water free from Burlington's PFAS.

235.     As a direct, proximate, and foreseeable result of the sale and application of Burlington's defective and unsafe biosolid products, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Burlington's PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Burlington's PFAS; and other damages to be proved at trial.

236. Burlington committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Burlington's conduct was performed to promote sales of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in conscious disregard of the probable dangerous consequences of their conduct and the reasonably foreseeable impacts on public health and property.

## NINTH CAUSE OF ACTION

### Strict Products Liability – Failure to Warn
### (Supplier Defendants)

237. Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

238. Supplier Defendants design, manufacture, formulate, promote, market, and/or distribute products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals.

239. Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals are used by Discharger Defendants in a reasonably foreseeable manner and without substantial change in the condition of such products, and Supplier Defendants knew that Discharger Defendants purchase and use their products without inspection for defects.

240. Supplier Defendants knew that the use of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals purchased or otherwise acquired from them would result in their products being discharged to surface waters, and thereby enter and

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

contaminate Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

241. Supplier Defendants knew that their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals were environmentally persistent and bioaccumulative, that not all of their products are exhausted or adhere in Discharger Defendants' applications, that a portion of their products enter wastewater and are thus discharged via Discharger Defendants' sewer pipes, and that wastewater treatment facilities utilize conventional wastewater treatment methods that cannot remove their products from wastewater before it is discharged to surface waters that Plaintiff relies on to supply potable water to the public, making Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals unreasonably dangerous.

242. Despite the known and/or foreseeable risk of contaminating potable water sources and Plaintiff's properties, Supplier Defendants fail to provide adequate warnings to Discharger Defendants and other users or to take any other precautionary measure to mitigate these hazards.

243. Supplier Defendants fail to adequately describe such dangers or provide precautionary statements regarding such hazards, and they fail to provide instruction or direction on the proper disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the labeling of their products.

244. As a direct and proximate result of Supplier Defendants' failure to warn of the dangers and hazards posed by discharging their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, such PFAS have damaged Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

make up its water treatment and distribution system, and Plaintiff is unable to provide potable water free from contamination with these chemicals.

245.    As a direct, proximate, and foreseeable result of Supplier Defendants' conduct, practices, actions, omissions, and inactions, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing Supplier Defendants' PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Supplier Defendants' PFAS; and other damages to be proved at trial.

246.    Supplier Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Their conduct was performed to promote sales of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in conscious disregard of the probable dangerous consequences of their conduct and the reasonably foreseeable impacts on public health and property.

## TENTH CAUSE OF ACTION
### Strict Products Liability – Failure to Warn
### (Burlington)

247.    Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

248.    Burlington manufactured, formulated, promoted, marketed, and/or distributed biosolid products containing PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors.

249.    Burlington's biosolid products were used by agricultural users in a reasonably foreseeable manner and without substantial change in the condition of such products, and Burlington knew that agricultural users purchased and used its products without inspection for defects.

63

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

250. Burlington knew or should have known that the use of its biosolid products would result in these PFAS being discharged to surface waters, and thereby entering and contaminating Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system.

251. Burlington knew that these PFAS in its biosolid products were environmentally persistent and bioaccumulative, that use of its biosolids would cause PFAS to accumulate in soil and groundwater, and that its PFAS would infiltrate surface waters that Plaintiff relies on to supply potable water to the public—making Burlington's biosolid products unreasonably dangerous.

252. Despite the known and/or foreseeable risk of contaminating potable water sources and Plaintiff's properties, Burlington failed to provide adequate warnings to its customers and other users or to take any other precautionary measures to mitigate those hazards.

253. Burlington failed to adequately describe such dangers or provide precautionary statements regarding such hazards, and it failed to provide instruction or direction on the proper use and disposal of products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in the labeling of such products. As a result of these failures, Burlington's biosolid products were sold and distributed in an unreasonably dangerous and defective condition.

254. As a direct and proximate result of Burlington's failure to warn of the dangers and hazards posed by its biosolid products, PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and their precursors have damaged Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system, and Plaintiff is unable to provide potable water free from contamination with these chemicals.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

255.    As a direct, proximate, and foreseeable result of Burlington's conduct, practices, actions, omissions, and inactions, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties; including loss in value; the cost of removing Burlington's PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Burlington's PFAS; and other damages to be proved at trial.

256.    Burlington committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Burlington's conduct was performed to promote sales of their products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals in conscious disregard of the probable dangerous consequences of their conduct and the reasonably foreseeable impacts on public health and property.

## ELEVENTH CAUSE OF ACTION

### Breach of Implied Warranties
### (Supplier Defendants)

257.    Plaintiff incorporates all prior allegations by reference as if fully set forth herein.

258.    Supplier Defendants manufacture, sell, and distribute products to be used in Discharger Defendants' ordinary industrial applications with knowledge of the purposes for which Discharger Defendants use their products.

259.    Supplier Defendants' products include those that contain or degrade to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, and Supplier Defendants know or have reason to know that such products are not fit for the known and ordinary uses at Discharger Defendants' facilities.

260.    Supplier Defendants know that Discharger Defendants indirectly discharge Supplier Defendants' products containing or degrading to PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals to surface waters, including the Pee Dee River Watershed.

65

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

261.    Supplier Defendants know that PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals are environmentally persistent, bioaccumulative, dose-additive, and toxic, and Supplier Defendants know there is no safe dose of PFOA or PFOS.

262.    Supplier Defendants have breached applicable implied warranties, and as a result, Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system are contaminated with Defendants' PFOA, PFOS, PFHxS, PFNA, PFBS, and/or GenX Chemicals, and Plaintiff is unable to provide potable water free from contamination with these chemicals at concentrations reasonably safe for consumption.

263.    As a direct, proximate, and foreseeable result of Supplier Defendants' breaches of implied warranties, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing Supplier Defendants' PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Supplier Defendants' PFAS; and other damages to be proved at trial. Plaintiff is entitled to damages in an amount that will address its damages caused by Supplier Defendants' breaches of implied warranties.

**TWELFTH CAUSE OF ACTION**
**Breach of Implied Warranties**
**(Burlington)**

264.    Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

265.    Burlington manufactured, sold, and distributed its biosolid products to be used in ordinary agricultural applications with knowledge of those applications.

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

266.     Burlington's biosolid products include PFOA, PFOS, PFHxS, PFNA, PFBS, GenX Chemicals, and/or their precursors, and Burlington knew or had reason to know that such biosolids were not fit for the known and ordinary uses on agricultural lands.

267.     Burlington knew that agricultural users of its biosolid products would apply its biosolids to lands nearby or abutting surface waters in the Pee Dee River Watershed, causing Burlington's PFAS to infiltrate these surface waters.

268.     Burlington knew that these PFAS chemicals are environmentally persistent, bioaccumulative, toxic, and dose-additive, and Burlington knew that there is no safe dose of PFOA or PFOS.

269.     Burlington breached applicable implied warranties, and as a result, caused the contamination of Plaintiff's water sources and Plaintiff's SWTPs and related buildings, improvements, property, and equipment that make up its water treatment and distribution system, and Plaintiff is unable to provide potable water free from Burlington's PFAS.

270.     As a direct, proximate, and foreseeable result of Burlington's breach of implied warranties, Plaintiff has suffered, and will continue to suffer, losses resulting from injury to its properties, including loss in value; the cost of removing Burlington's PFAS; the costs of evaluating, testing, acquiring, installing, operating, and maintaining water treatment technologies capable of removing Burlington's PFAS; and other damages to be proved at trial. Plaintiff is entitled to damages in an amount that will address its damages caused by Burlington's breaches of implied warranties

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff demands trial by jury, and respectfully requests that the Court grant the following relief where available:

67

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

(a)     Enter a judgment and decree against all Defendants, jointly and severally, requiring them to abate the nuisance they have caused, created, and maintained;

(b)     Enter a judgment and decree against all Defendants, jointly and severally, requiring them to abate their trespasses onto Plaintiff's properties;

(c)     Enter a judgment and decree against all Defendants, jointly and severally, requiring them to remove their PFOA, PFOS, PFHxS, PFNA, PFBS, and GenX chemicals from Plaintiff's water systems by funding the evaluation, testing, acquisition, installation, operation, and maintenance of treatment technology capable of removing them;

(d)     Enter a judgment against all Defendants, jointly and severally, for past, present, and future compensatory damages in such amounts as the evidence shows Plaintiff to be justly entitled to recover, including interest and reasonable attorneys' fees and litigation expenses, and punitive damages, as applicable, in an amount sufficient to punish and penalize Defendants, and to deter them from repeating their wrongful conduct, and all costs; and

(e)     Award such other relief and further relief as this Court deems just, proper, and equitable.

*Signature Page Follows*

ELECTRONICALLY FILED - 2025 Jun 05 2:23 PM - HORRY - COMMON PLEAS - CASE#2024CP2605523

Respectfully submitted,

*/s/ John B. White. Jr.*
John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
Christopher R. Jones (S.C. Bar No. 101265)
Griffin L. Lynch (S.C. Bar No. 72518)
John B. White, Jr., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

*Attorneys for Plaintiff*

June 5, 2025