Exhibit C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | MDL No. 2:18-mn-2873-RMG |

**This Document Relates to:**

*City of Clinton, South Carolina v. AGC Chemicals Americas, Inc. et al.*
No. 2:25-cv-09486-RMG

*South Carolina Public Service Authority, a/k/a Santee Cooper, an agency of the State of South Carolina v. AGC Chemicals Americas, Inc. et al.*
No. 2:25-cv-10305-RMG

*Gaffney Board of Public Works v. AGC Chemicals Americas, Inc. et al.*
No. 2:25-cv-10635-RMG

*City of Union, South Carolina v. AGC Chemicals Americas, Inc. et al.*
No. 2:25-cv-11014-RMG

*Woodruff-Roebuck Water District v. AFL Telecommunications, LLC et al.*
No. 2:25-cv-11043-RMG

*Grand Strand Water and Sewer Authority v. AGC Chemicals Americas, Inc. et al.*
No. 2:25-cv-11180-RMG

*Laurens County Water and Sewer Commission v. AGC Chemicals Americas, Inc. et al.*
No. 2:25-cv-11655-RMG

*Greenwood Commissioners of Public Works v. AGC Chemicals Americas, Inc. et al.*
No. 2:25-cv-11669-RMG

*City of Florence, South Carolina v. AGC Chemicals Americas, Inc. et al.*
No. 2:25-cv-11725-RMG

1

**JOINT MOTION TO REMAND
AND FOR AN AWARD OF COSTS AND EXPENSES**

Pursuant to 28 U.S.C. § 1447, Plaintiffs City of Clinton, South Carolina ("Clinton");

Grand Strand Water and Sewer Authority ("GSWSA"); City of Florence, South Carolina

("Florence"); Greenwood Commissioners of Public Works ("Greenwood"); Laurens County

Water and Sewer Commission ("Laurens"); South Carolina Public Service Authority ("Santee

Cooper"); Woodruff-Roebuck Water District ("WRWD"); City of Union, South Carolina

("Union"); and Gaffney Board of Public Works ("Gaffney") move to remand their actions back

to South Carolina state court and for an award of expenses and costs against the removing

Defendants, DuPont de Nemours, Inc. and EIDP, Inc. ("DuPont").[1]

## INTRODUCTION

This Court is well-versed in the history of AFFF, its military specification, and the

contours of federal officer removal. Courts have sustained these removals for MilSpec AFFF

manufacturers under 28 U.S.C. § 1442's liberal application. But a line must be drawn here.

DuPont is not an AFFF manufacturer. It "only manufactured a component"—commercial

products like Forafac™—that it shipped "down the stream of commerce, never having any

control" over finished foam. AFFF manufacturers, not DuPont, "formulated, labeled, packaged,

and distributed" all MilSpec AFFF. These are DuPont's own words, wielded to shield itself from

AFFF-related liability in this MDL.

Now, DuPont turns its story inside-out, recasting its off-the-shelf ingredient sales as

government-sanctioned and supervised work. But it cannot rewrite history to manufacture federal

---

[1] DuPont de Nemours, Inc. is a removing defendant in only the City of Clinton's case, whereas EIDP, Inc. removed all eight others. For purposes of this motion, Plaintiffs' reference to "DuPont" encompasses all DuPont-related entities with responsibilities for PFAS-related liabilities, including DuPont de Nemours, Inc.; EIDP, Inc.; The Chemours Company; and Corteva, Inc.

jurisdiction. The MilSpec AFFF never required DuPont's products; the government never supervised or controlled DuPont's operations; and there is no link between federal authority and its charged conduct in this case.

Section 1442 is broad but not boundless. It does not transform commercial suppliers into federal agents because government contractors buy their products. DuPont's removal stretches the statute past recognition and should be rejected. Remand, with fees, is appropriate.

## BACKGROUND

The operative facts for this Motion already exist in this MDL's public record.

In response to shipboard fires in the 1950s and 60s, the Navy sought to develop a new firefighting foam. *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. 2:18-mn-2873-RMG, 2022 WL 4291357, at *2 (D.S.C. Sept. 16, 2022) (citing Dkt. Nos. 1967-2, 1967-5). To that end, the Naval Sea Systems Command ("NAVSEA") issued MIL-F-24385—the first military specification ("MilSpec") for AFFF—in 1969, and NAVSEA has overseen it on behalf of the Department of Defense ("DoD") ever since. *Id.* (citing Dkt. No. 1966-1).

From the outset, the MilSpec was a performance standard, not a recipe. *See id.* It was drafted "to give [AFFF] manufacturers the greatest flexibility as to how they would meet" the standard to foster competition on both cost and performance. *Id.* at *6 (citing Dkt. No. 2063-4, Resp. 3). Each contractor could concoct its own "magic witch's brew" so long as the foam passed performance tests. *Id.* (citing Dkt. No. 2063-3, at 41:10–42:5, 46:23–47:2).

The MilSpec's only chemical directive, up to 2019, was that AFFF contain "fluorocarbon surfactants" (or "fluorosurfactants")—a broad class of compounds that reduce the surface tension of water-based solutions. *Id.* at *2 n.3. But the MilSpec never identified which fluorosurfactants to use, nor did it prescribe any concentration. *Id.* at *2. At the time, "at least hundreds" of distinct

3

fluorosurfactants were available—and nothing in the MilSpec required using PFOA, PFOS, or any other C8 compound. *Id.* at *6. NAVSEA even approved C6-based foams, confirming that MilSpec performance never depended on C8s. *Id.* at *7 (citing Dkt. No. 2063, at 32).

The Navy Research Laboratory ("NRL") tests candidate foams against the MilSpec, placing those that pass on the Qualified Products List ("QPL") for procurement. *Id.* (citing Dkt. No. 1965-1, at 13; Dkt. No. 2063, at 10). Only finished foams were tested, not fluorosurfactants or any other ingredients. *See, e.g.*, **Ex. 1** (original MIL-F-24385), at § 4.7 (testing requirements applicable to the "liquid concentrate" and "solution[s]" of the liquid concentrate with water); **Ex. 2** (MIL-F-24385, Rev. F, Am. 2), at § 4.7 (same). The Navy never directed, inspected, or even knew the contents of the underlying formulations. Nor could it: contractors kept their formulations secret. *In re: AFFF*, 2022 WL 4291357, at *7. In fact, NAVSEA first learned that 3M's foam used PFOS in 2000—when 3M announced it would phase PFOS out of its products. *Id.* (citing Dkt. No. 2063-36, at 89:15-24).

Despite the Navy's performance-based specifications—and the weakness they create for contractor defenses—courts have sustained § 1442 removals for AFFF manufacturers in many cases. To Plaintiff's knowledge, successful removals all rest on allegations that AFFF manufacturers operated under Navy supervision and control in producing finished foams.[2]

But DuPont is not an AFFF manufacturer. By its own account, before 2002 it was "several steps removed"—producing only telomer intermediates that other companies converted

---

[2] *See, e.g.*, Order Denying Remand, *Ins. Auto Auctions, Inc. v. Carteret Fire Dep't et al.*, No. 2:22-cv-02593-RMG, Dkt. No. 47, at 3–4 (D.S.C. Aug. 24, 2022); Order Denying Mot. to Remand, *Nessel v. Chemguard, Inc.*, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021); Order Denying Remand, *Ridgewood Water v. 3M Co. et al.*, No. 2:19-cv-02198-RMG, Dkt. No. 43, at 4–5 (D.S.C. Oct. 1, 2019); Order Denying Remand, *New York v. 3M Co. et al.*, No. 2:19-cv-01022-RMG, Dkt. No. 48, at 4–5 (D.S.C. May 24, 2019); *Ayo v. 3M Co.*, 2018 WL 4781145, at *9 (E.D.N.Y. Sept. 30, 2018).

4

into fluorosurfactants, which were in turn sold to AFFF manufacturers. *In re: AFFF*, No. 2:18-mn-2873-RMG, Dkt. No. 600, at 3. In September 2002, DuPont acquired Atofina Chemicals, Inc. and, with it, the Forafac™ line of commercial fluorosurfactants. *Id.*; *see also* Dkt. No. 3393, at 5–6. At the time, DuPont publicly announced that the purchase made it "the largest supplier of fluorosurfactants for firefighting foam," reflecting Forafac™'s broad commercial application. *See* Dkt. No. 581-31, at 3. For example, National Foam used DuPont's Forafac™ products in formulations of Universal Gold AFFF—a commercial foam purchased by the City of Stuart, Florida. *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2023 WL 3550505, at \*1–2 (D.S.C. May 18, 2023).

DuPont's AFFF role never passed the ingredient level. And it has been adamant on this point: DuPont "never manufactured nor sold AFFF to any party," but "only manufactured a component, which [it] sold down the stream of commerce, never having any control over the final product, which was formulated, labeled, packaged, and distributed by third parties." DuPont MSJ, *City of Stuart v. 3M Co.*, No. 2:18-CV-03487-RMG, Dkt. No. 160, at 4 (D.S.C. Dec. 2, 2022); DuPont MSJ re: *Speers*, *Donnelly*, and *Voelker*, No. 2:18-mn-2873-RMG, Dkt. No. 7386-1, at 6 (D.S.C. June 17, 2025). By its own admission, DuPont has never done more than sell commercial chemicals into the marketplace with no role in formulating, packaging, labeling, or distributing AFFF products for the Navy or DoD. *See id.*; *see also* Declaration of Scott Summy, *In re: AFFF*, No. 2:18-mn-2873-RMG, Dkt. No. 3393-3, at ¶ 19 (D.S.C. July 10, 2023) ("DuPont also did not sell any of its fluorosurfactant or telomer raw material products to the Department of Defense[.]").

Plaintiffs are nine water utilities whose cases were previously pending in state court and were consolidated by order of the South Carolina Supreme Court. These cases concern the

5

contamination of public water supplies by local industries' use of non-AFFF products that contain or degrade into six PFAS—PFOS, PFOA, PFNA, PFBS, PFHxS, and GenX.

The cases originally named the dischargers of these commercial products, and most proceeded past motions to dismiss and into paper discovery. More recently, Plaintiffs added DuPont, its related entities, and other suppliers of the commercial PFAS products at issue. *See, e.g.,* Mot. for Leave to Amend, *City of Clinton v. AGC Chems. Americas, Inc. et al.*, No. 2:25-cv-09486-RMG, Dkt. No. 1-1, at 439–40; Mot. for Leave to Amend, *Woodruff-Roebuck Water Dist. v. AFL Telecomms., LLC et al.*, No. 2:25-cv-11043-RMG, Dkt. No. 1-1, at 350–51; *Grand Strand Water & Sewer Auth. v. AGC Chems. Americas, Inc. et al.*, No. 2:25-cv-11180-RMG, Dkt. No. 1-2, at 1277–78. DuPont has unjustifiably removed all of them.[3]

DuPont removed each case under the federal officer statute, asserting its entitlement to the government-contractor defense. *See, e.g.*, Clinton NOR, at ¶¶ 5–10; Gaffney NOR, at ¶¶ 5-10; Greenwood NOR, at ¶¶ 5-10. As a seller of commercial fluorosurfactants, DuPont alleges that it "acted under" federal authority through a "subcontractor relationship" with AFFF

---

[3] *See* Notice of Removal, *Clinton*, No. 2:25-cv-09486-RMG, Dkt. No. 1 (D.S.C. July 31, 2025) (hereinafter **"Clinton NOR"**); Notice of Removal, *S.C. Pub. Serv. Auth. v. AGC Chems. Americas, Inc. et al.*, No. 2:25-cv-10305-RMG, Dkt. No. 1 (D.S.C. Aug. 8, 2025) (hereinafter **"Santee Cooper NOR"**); Notice of Removal, *Gaffney Bd. of Pub. Works v. AGC Chems. Americas, Inc. et al.*, No. 2:25-cv-10635-RMG, Dkt. No. 1 (D.S.C. (Aug. 13, 2025) (hereinafter **"Gaffney NOR"**); Notice of Removal, *WRWD*, No. 2:25-cv-11043-RMG, Dkt. No. 1 (D.S.C. Aug. 15, 2025) (hereinafter **"WRWD NOR"**); Notice of Removal, *City of Union v. AGC Chems. Americas, Inc. et al.*, No. 2:25-cv-11014-RMG, Dkt. No. 1 (D.S.C. Aug. 15, 2025) (hereinafter **"Union NOR"**); Notice of Removal, *GSWSA*, No. 2:25-cv-11180-RMG, Dkt. No. 1 (D.S.C. Aug. 18, 2025) (hereinafter **"GSWSA NOR"**); Notice of Removal, *Greenwood Comm'rs of Pub. Works v. AGC Chems. Americas, Inc. et al.*, No. 2:25-cv-11669-RMG, Dkt. No. 1 (D.S.C. Aug. 28, 2025) (hereinafter **"Greenwood NOR"**); Notice of Removal, *Laurens Cnty. Water and Sewer Comm'n v. AGC Chems. Americas, Inc. et al.*, No. 2:25-cv-11655-RMG, Dkt. No. 1 (D.S.C. Aug. 28, 2025) (hereinafter **"Laurens NOR"**); Notice of Removal, *City of Florence v. AGC Chems. Americas, Inc. et al.*, No. 2:25-cv-11725-RMG, Dkt. No. 1 (D.S.C. Aug 29, 2025) (hereinafter **"Florence NOR"**).

manufacturers. *See, e.g.*, Clinton NOR, at ¶¶ 36–41; Gaffney NOR, at ¶¶ 34-39; Greenwood NOR, at ¶¶ 39-44. The Notices attach no contracts with any AFFF manufacturer, the Navy, or DoD, and they allege no facts purporting to show that the Navy or DoD exercised control or supervision over DuPont through an AFFF manufacturer. *See generally id.*

Factually, most of DuPont's removals rest on the same chain of inferences. In six of nine cases, it alleges that 3M and/or others made MilSpec AFFF for the Navy, that MilSpec AFFF was present at military or civilian facilities upstream of Plaintiffs' facilities, and that PFAS from that AFFF plausibly commingled with the non-AFFF PFAS alleged in Plaintiffs' complaints. *See* Clinton NOR, at ¶¶ 5–7, 28–30, 42; Santee Cooper NOR, at ¶¶ 5–7, 28–33, 45; GSWSA NOR, at ¶¶ 5–7, 28–34, 46; Florence NOR, at ¶¶ 5–7, 28–33, 45; Greenwood NOR, at ¶¶ 5–7, 28–33, 45; Laurens NOR, at ¶¶ 5–7, 28–33, 45. In none of them, however, does DuPont allege that 3M used DuPont's fluorosurfactants to make the AFFF in question, or that any AFFF was in fact released to Plaintiffs' waterways. And in the remaining three cases—those brought by Gaffney, Union, and WRWD—DuPont does not even identify an upstream source, asserting removal solely because each Plaintiff also has a case against 3M in this MDL. Gaffney NOR, at ¶¶ 6–7, 28, 40; Union NOR, at ¶¶ 6–7, 28, 40; WRWD NOR, at ¶¶ 6–7, 28, 40.

Despite this record, DuPont hauled Plaintiffs' cases to federal court.

## ARGUMENT

Section 1442(a)(1) authorizes removal by "any officer (or any person acting under that officer) of the United States . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). Thus, a private party must plausibly allege: "(1) that it 'acted under' a federal officer, (2) that it has a colorable federal defense, and (3) that the charged conduct was carried out for or in relation to the asserted federal authority." *Hunt v. CaremarkPCS Health, L.L.C.*, 140 F.4th 188,

197 (4th Cir. 2025). DuPont bears the burden on each element, and the failure of any one defeats jurisdiction. *Id.* at 194. It has not and cannot plausibly allege any of them—DuPont identifies no federal supervision or control, no plausible causal connection, and no government specifications concerning its products.

## I.   Dupont cannot show that it "acted under" federal officials in supplying commercial fluorosurfactants to AFFF manufacturers.

Section 1442's "acted under" prong is no free pass. *Mayor & City Council of Baltimore v. BP, P.L.C.*, 31 F.4th 178, 228 (4th Cir. 2022) (recognizing the "acted under" phrase is not "limitless") (quoting *Watson v. Phillip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007)). It requires an "unusually close" relationship "involving detailed regulation, monitoring, or supervision." *Caremark*, 140 F.4th at 197; *see also BP*, 31 F.4th at 229 (there must "at least be some exertion of 'subjection, guidance, or control' on the part of the federal government"). This must "involve an effort to *assist*, or to help *carry out*" federal duties. *BP*, 31 F.4th at 229 (quoting *Watson*, 551 U.S. at 152). A private company never meets this by merely "complying with the law" or "selling 'off-the-shelf' goods" to the government. *Id.* at 229–30 (quoting *Watson*, 551 U.S. at 152; *Washington v. Monsanto Co.*, 738 F. App'x 554, 555 (9th Cir. 2018)).

### A.   DuPont was never under federal control or supervision concerning AFFF or fluorosurfactants.

DuPont alleges that it acted under federal authority by virtue of its "subcontractor relationship" with MilSpec AFFF manufacturers. *E.g.*, Clinton NOR, at ¶ 41 (DuPont "acted under direction and control of . . . federal officers vis-à-vis its subcontractor relationships with AFFF manufacturers"). Anticipating challenge, it adds that § 1442 and the government-contractor defense "appl[y] equally" to subcontractors. *Id.* at ¶¶ 38–42. True, but that misses the

8

point. Even if DuPont were a subcontractor,[4] the "acted under" *standard* also applies equally to subcontractors: the government must exert "subjection, guidance, or control" over *the subcontractor's own work*. *See, e.g., BP*, 31 F.4th at 229.

Recent Fourth Circuit decisions illustrate the point. *See Caremark*, 140 F.4th at 188; *Cnty. Bd. of Arlington Cnty., Va. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243 (4th Cir. 2021). In both, federal contracts expressly contemplated the use of subcontractor PBMs, imposed requirements on them, and subjected them to direct oversight and audit. *Caremark*, 140 F.4th at 197–98; *Express Scripts*, 996 F.3d at 251–54. Their section 1442 removals succeeded not because they were subcontractors, but because *their own work* proceeded under federal supervision. *Caremark*, 140 F.4th at 197–98; *Express Scripts*, 996 F.3d at 251–54.

DuPont cannot make that showing in any removed case. It has already minimized its MilSpec AFFF involvement, asserting it made "only" a branded, commercial "component" that it sold "down the stream of commerce." DuPont MSJ, *City of Stuart v. 3M Co.*, No. 2:18-CV-03487-RMG, Dkt. No. 160, at 4 (D.S.C. Dec. 2, 2022). Likewise, the MilSpec prescribed no particular fluorosurfactant, no concentration, and no method of production—the Navy did not even know what chemical components any given formulation contained. *In re: AFFF*, 2022 WL 4291357, at *2–3, 6–7. The necessary conclusion is that DuPont sold chemicals into commerce—nothing more.

---

[4] Federal Acquisition Regulations define "Subcontract" as "any contract as defined in subpart 2.1 entered into by a subcontractor to furnish supplies or services *for performance of a prime contract* or a subcontract. It includes but is not limited to purchase orders, and changes and modifications to purchase orders." 48 C.F.R. § 44.101 (emphasis added). None of DuPont's Notices of Removal identify any contracts with an AFFF manufacturer showing that its fluorosurfactant sales were "for" fulfilling MilSpec AFFF procurements. *See generally* Clinton NOR; Santee Cooper NOR; Gaffney NOR; Union NOR; WRWD NOR; GSWSA NOR; Greenwood NOR; Laurens NOR; Florence NOR. By DuPont's own account in this docket, it merely sold branded commercial products into the stream of commerce.

9

Courts have rejected this fact pattern time and again. Monsanto's section 1442 removals failed in PCB cases because, although contractors used its products in defense specifications, the government never supervised Monsanto's manufacturing or directed it to produce PCBs in a particular way. *Washington v. Monsanto Co.*, 738 F. App'x 554, 555 (9th Cir. 2018) (finding no showing that "the federal government supervised Monsanto's manufacture of PCBs or directed Monsanto to produce PCBs in a particular manner, so as to come within the meaning of 'acted under'"); *Balderas v. Monsanto Co.*, 454 F. Supp. 3d 1132, 1141 (D.N.M. 2020) ("[T]he fact that the PCBs produced by Monsanto could be used by other manufacturers to meet government specifications in their end-products does not establish that the Government compelled Monsanto to produce PCB according to government specifications for the purposes of federal officer jurisdiction."); *Bailey v. Monsanto*, 176 F. Supp. 853 (D. Mo. 2016) (same). So too with lead pigment subcontractors: although contractors used it to make government-spec paint, the pigment was just an ingredient outside the scope of federal oversight or control. *Dann v. Sherwin-Williams Co.*, 2008 WL 4115706, at \*7 (S.D. Ohio Aug. 28, 2008) ("[T]here is no evidence that the pigment . . . was a unique product for the federal government that was otherwise unavailable on the commercial market."), R. & R., *adopted sub nom. Rogers v. Sherwin-Williams Co.*, 2008 WL 4279579 (S.D. Ohio Sept. 17, 2008). The parallels to DuPont are exact and inescapable.

There is a clear line for subcontractors under section 1442. They "act under" federal authority when the government directs their own work. *See Caremark*, 140 F.4th at 197–98; *Express Scripts,* 996 F.3d at 251–54. Not so when they merely sell commercial inputs that someone else uses to fulfill a government specification. *See, e.g., Washington,* 738 F. App'x at 555; *Dann*, 2008 WL 4115706, at \*7.  DuPont's tent fits firmly and only in the latter camp. It

sold commercial fluorosurfactants, not bespoke products manufactured under government supervision. That ends the "acted under" inquiry, and remand is necessary on this ground alone.

### B.    DuPont merely sold off-the-shelf fluorosurfactant products.

Even if DuPont could show attenuated contact with the government, removal would still fail for an independent reason: it sold standardized, off-the-shelf products. Courts reject federal officer jurisdiction in this scenario, even with direct sales to the government. *See BP*, 31 F.4th at 230 (rejecting that fuel suppliers "acted under" federal authority in supplying "standardized consumer" and "off-the-shelf" products to the Navy) (citing *Washington*, 738 F. App'x at 555); *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 757–58 (9th Cir. 2022) (same, reasoning that fuel suppliers' contracts show arm's-length relationship to supply Navy with "generally available commercial products"); *City of New York v. Dow Chem. Co.*, 993 F.3d 174, 183–84 (2d Cir. 2021) (holding that chemical manufacturers did not "act under" federal direction in supplying the Navy with 1,4-dioxane–inhibited TCA because the government purchased "generic" commercial solvents and never dictated how defendants should manufacture them). All-the-more with off-the-shelf sales only to contractors. *See* Declaration of Scott Summy, *In re: AFFF*, No. 2:18-mn-2873-RMG, Dkt. No. 3393-3, at ¶ 19 (D.S.C. July 10, 2023) ("DuPont also did not sell any of its fluorosurfactant or telomer raw material products to the Department of Defense[.]").

DuPont sold branded fluorosurfactant products like Forafac™, marketed broadly for the open market, whether commercial or MilSpec AFFF. *In re: AFFF*, No. 2:18-mn-2873-RMG, Dkt. No. 600, at 3; Dkt. No. 3393, at 5–6. They were not tailor-made for the latter, and nothing in the MilSpec ever required their use. *In re: AFFF*, 2022 WL 4291357, at *2, 7. In every respect, they were commercial chemicals indistinguishable from the generic inputs courts have consistently held are outside the reach of section 1442. *See BP*, 31 F.4th at 230. To hold otherwise "would bring every seller of contracted goods and services within the ambit of § 1442

11

when the government is a customer." *Id.* (refusing "to adopt such a sweeping interpretation" of the "acting under" requirement).

## II.    DuPont does not plausibly allege and cannot show a causal connection between its charged conduct and its alleged federal conduct.

Section 1442 also requires that DuPont's charged conduct be carried out "for or relating to" its asserted federal authority. This causal nexus element is broad—encompassing a "connection or association"—and courts "credit a removing defendant's theory of the case" when making the assessment. *Maryland v. 3M Co.*, 130 F.4th 380, 389 (4th Cir. 2025) (citing *Express Scripts*, 996 F.3d at 256; *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017)).

But here, two limits cabin its breadth. First, a notice of removal's allegations must still satisfy a plausibility standard: a removing defendant must plead *facts* that "plausibly allege" a federal nexus, not hypothetical or possible removal grounds. *See Maryland*, 130 F.4th at 388–89. Second, the connection cannot be stretched beyond recognition. Removal fails when the federal role is "too attenuated" from the charged conduct. *BP*, 31 F.4th at 234. For this reason, "the acting-under and causal-nexus prongs often 'collapse into a single requirement.'" *BP*, 31 F.4th at 228 (citing *In re: Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007)); *see also Graves v. 3M Co.*, 17 F.4th 764, 769 (8th Cir. 2021).

By these metrics, DuPont's causal theories fail even under §1442's liberal standard. To be sure, courts have held that *3M*'s evidence of supplying MilSpec AFFF to upstream military bases established a plausible causal nexus. *See, e.g., Maryland*, 140 F.4th at 390. But DuPont is a different story—not just in its lack of supervision and mere off-the-shelf sales. In six of nine cases, where DuPont does allege upstream MilSpec AFFF sources, it alleges no facts placing *its own products* in any of the AFFF allegedly used at those locations. And in the remaining three, DuPont offers not even a *pretense* of factual relation—identifying no upstream source at all and

12

removing solely because those Plaintiffs also have federal cases against 3M that were re-assigned to this MDL.

**A.  DuPont does not allege that any of its products were in MilSpec AFFF at any identified location.**

Like pleadings, a notice of removal must contain "a short and plain statement of the grounds for removal," 28 U.S.C. § 1446(a), and meet the same plausibility standard that stems from Rule 8. *Ellenburg v. Spartan Motors Chassis, Inc.*, 519 F.3d 192, 199 (4th Cir. 2008). That means "there must be 'a plausible allegation' that federal jurisdiction is proper.'" *Maryland*, 130 F.4th at 387 (quoting *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014)). Thus, while "it need not *prove* the basis for jurisdiction, the notice of removal must *plausibly allege* the basis while satisfying the pleading standards established in *Twombly* and *Iqbal*." *Hall v. Coca-Cola Co.*, 2018 WL 4928976, at *6 (E.D. Va. Oct. 11, 2018).[5] Factual allegations, while accepted as true, must show "more than 'a sheer possibility'" that jurisdiction is proper. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

DuPont does not cross the plausibility threshold in any of Plaintiffs' cases. Its "theory of the case" in most of them shares the same essential allegations: that MilSpec AFFF was present upstream of, and therefore plausibly contributed to PFAS in, Plaintiffs' water sources:

| Case | Alleged MilSpec AFFF Source(s) | Alleged Causal Nexus | Alleged DuPont Product Involvement |
|---|---|---|---|
| *Clinton* | Greenville-Spartanburg Airport | MilSpec AFFF at this site plausibly migrated via ground- and surface water to Plaintiff's water supply on the Enoree River. | **\*None** |

---

[5] (citing *Dart Cherokee*, 574 U.S. at 89; *Ellenburg*, 519 F.3d at 199–200; *Norair Eng'g Corp. v. URS Fed. Svcs., Inc.*, No. RDB-16-1440, 2016 WL 7228861, at *2–3 (D. Md. Dec. 14, 2016); *Jones v. John Crane-Houdaille, Inc.*, No. CCB-11-2374, 2012 WL 1197391, at *3 (D. Md. Apr. 6, 2012)).

13

| | | | |
|---|---|---|---|
| *Santee Cooper* | Fort Jackson, McEntire Joint NGB, McEntire AASF, McCrady Training Site | MilSpec AFFF at these sites plausibly migrated via ground- and surface water to Plaintiff's water supplies on Lake Marion and Lake Moultrie. | **\*None** |
| *GSWSA* | Myrtle Beach AFB, Salisbury AASF, Stanly County ANGB, Stanly County Airport | MilSpec AFFF at these sites plausibly migrated via ground- and surface water to Plaintiff's water supplies on Bull Creek and the Intracoastal Waterway. | **\*None** |
| *Florence* | Salisbury AASF, Stanly County ANGB, Stanly County Airport | MilSpec AFFF at these sites plausibly migrated via ground- and surface water to Plaintiff's water supply on the Pee Dee River. | **\*None** |
| *Greenwood* | AASF Upstate | MilSpec AFFF at this site plausibly migrated via ground- and surface water to Plaintiff's water supply on Lake Greenwood. | **\*None** |
| *Laurens* | AASF Upstate | MilSpec AFFF at this site plausibly migrated via ground- and surface water to Plaintiff's water supply on Lake Greenwood. | **\*None** |
| *Gaffney* | **\*None** | **\*None. Removal justified solely by MDL transfer of Gaffney's federal court case against 3M.** | **\*None** |
| *Union* | **\*None** | **\*None. Removal justified solely by MDL transfer of Union's federal court case against 3M.** | **\*None** |
| *WRWD* | **\*None** | **\*None. Removal justified solely by MDL transfer of WRWD's federal court case against 3M.** | **\*None** |

*See also* Appendix A (setting out DuPont's causal nexus allegations in each notice of removal).

But even under the liberal standard that has sustained AFFF manufacturers' own removals,

DuPont's causation stories have a missing chapter: *DuPont's* role. Its Notices allege, at most, that

it sold fluorosurfactants to "AFFF manufacturers" in general. *See* Clinton NOR, at ¶¶ 41–42, 50;

14

Santee Cooper NOR, at ¶¶ 44–45, 53; GSWSA NOR, at ¶¶ 45–46, 54; Florence NOR, at ¶¶ 44–45, 53; Greenwood NOR, at ¶¶ 44–45, 53; Laurens NOR, at ¶¶ 44–45, 53; Gaffney NOR, at ¶¶ 39–40, 48; Union NOR, at ¶¶ 39–40, 48; WRWD NOR, at ¶¶ 41–42, 50. They never identify a specific AFFF manufacturer as a DuPont customer, much less allege that any MilSpec AFFF used at the identified locations contained DuPont's ingredients. *See generally id.*

DuPont cannot piggyback the causal nexus of AFFF manufacturers absent these critical facts. That *DuPont's* products reached each Plaintiff's particular water sources via MilSpec AFFF is "possible" only in the same sense that a power outage might result from a downed tree—or blown transformer, or car accident, or lightning, or maintenance, etc. This possibility does not plausibly connect DuPont products to Plaintiffs' water sources; rather, it trivializes the causal nexus requirement. With the QPL listing numerous AFFF products from numerous manufacturers over time, DuPont's theory would effectively give it federal jurisdiction anywhere any MilSpec AFFF was ever present—no matter who made it, what it contained, or whether it had anything to do with DuPont.

DuPont's Notices omit the foundational facts necessary to tie its fluorosurfactants to any alleged MilSpec AFFF sources. Even if it made such allegations, DuPont would still bear the burden—now challenged on remand—of proving them by a preponderance of the evidence. *Byrd v. Deveaux*, 2018 WL 305838, at *2 (D. Md. Jan. 5, 2018) ("When challenged in a motion to remand, the burden is on the party asserting subject matter jurisdiction to prove by a preponderance of evidence the facts necessary to establish the court's jurisdiction."); *see also Saldana v. Glenhaven Healthcare LLC*, 27 F.4th 679, 684 (9th Cir. 2022) ("Defendants seeking removal 'still bear the burden of proving by a preponderance of the evidence that the colorable federal defense and causal nexus requirements for removal jurisdiction are factually supported.'"

15

(quoting *Lake v. Ohana Mil. Cmtys., LLC*, 14 F.4th 993, 1000 (9th Cir. 2021))). Its implausible allegations should be dispositive on their own, but DuPont's Notices give no reason to believe it could fill the gaps even if granted the opportunity.

### 1. DuPont does not even plead the pretense of a causal nexus in *Gaffney*, *WWRD*, and *Union*.

DuPont at least attempts to plead causal facts in six removals. *See* App'x A, at A-1 to -14. Not so in *Gaffney*, *WWRD*, and *Union*. There, DuPont does not identify a single source of MilSpec AFFF. Instead, it justifies removal solely because these Plaintiffs also filed federal actions against 3M—actions transferred to this MDL on 3M's motion. *See id.* at A-14 to -15.

This defect is as obvious as it is egregious: DuPont offers no site, no source, and no factual allegation tying MilSpec AFFF to these Plaintiffs' water supplies—much less fills the DuPont-specific gap common to all removals. Rather than plead facts or reference Plaintiffs' pleadings, DuPont leans on the State of South Carolina's AFFF complaint and its broad allegations about statewide PFAS contamination. *See* Gaffney NOR, at ¶¶ 5, 40 (citing Compl., *South Carolina v. 3M Co. et al.*, No. 2:23-cv-05734-RMG, Dkt. No. 1-1, at ¶¶ 7, 9 (D.S.C.) (hereinafter "State AFFF Complaint")); Union NOR, at ¶¶ 5, 40 (same); WRWD NOR, at ¶¶ 5, 42 (same). Worse, DuPont distorts even those allegations.

DuPont claims the State alleged that "AFFF PFAS" are "ubiquitous" in Plaintiffs' water sources, *id.*, but the State does no such thing. It alleges that "*PFAS contamination*" is "ubiquitous" and that it "believes" AFFF runoff is a "significant contributing factor" in South Carolina—specifically, in the "*direct vicinity of sites where AFFF is and has been used.*" State AFFF Complaint, at ¶¶ 7, 9 (emphases added). In the same pleading, the State attached a map that identifies sites of "suspected AFFF caused contamination"—all of which are far downstream

16

of Gaffney's, Union's, and WRWD's water sources. *See* State AFFF Complaint, ¶ 137 (Fig. 2). In other words, the State's complaint stands for the opposite conclusion that DuPont draws.

All nine removals are meritless, and these three are the most flagrant—filed without a single supporting jurisdictional fact.

**B.    No one "acted under" federal authority in selling AFFF to Part 139 civilian airports.**

DuPont's causal theory fails again in *Clinton* for another reason: its version of the charged conduct—the Greenville-Spartanburg International Airport's ("GSP Airport") purchase of 3M-made MilSpec AFFF, *see* Clinton NOR, at ¶¶ 5, 7, 28–29, 42—is divorced from federal authority. Courts emphasize "that the causal connection element is closely related to the 'acting under' element when the party seeking removal"—like DuPont—"is not itself a federal officer." *Graves v. 3M Co.*, 17 F.4th 764, 769 (8th Cir. 2021). For this reason, 3M could not remove failure-to-warn suits based on its *commercial* sale of MilSpec earplugs: even if the commercial warnings "related to" 3M's government contractor work, 3M was not "acting under" federal authority in selling MilSpec earplugs to *commercial* customers. *Id.* ("But if 3M was not 'acting under' federal authority when it failed to warn commercial earplug customers of the injury risks plaintiffs allege, it may not remove . . . no matter how much connection there was between its commercial warnings and instructions and its earlier actions as government contractor.").

The same is true here. Were DuPont "acting under" federal authority in supplying components used in MilSpec AFFF (it was not), that authority did not extend to MilSpec AFFF sales to civilian airports. FAA regulations never compelled 3M—let alone DuPont—to make or sell anything. *See Grosch v. Tyco Fire Prods. LP*, 2023 WL 5993548, at *2 n.2 (D. Ariz. Sept. 15, 2023) ("Tyco concedes that 'the fact that the FAA requires Part 139 airports to use MilSpec AFFF does not mean Tyco acts under FAA regulations in supplying the product' . . . ."). Airports

17

are the only parties under federal compulsion, and even they do not "act under" federal authority in making the purchase. *See Mich. Dep't of Envt., Great Lakes, and Energy v. Gerald R. Ford. Int'l Airport*, 2024 WL 4867042, at \*3 (6th Cir. 2024) (holding an airport complying with FAA regulations to stock MilSpec AFFF was not "acting under" federal authority but merely complying with the law). Because 3M—and, assuming *arguendo*, DuPont by extension—did not "act under" federal authority in selling MilSpec AFFF to civilian airports, including GSP Airport, its theory of the case cannot sustain removal.[6] *See Graves*, 17 F.4th at 769.

Finally, any attempt to draw a "connection or association" between 3M's sales to civilian airports and its Navy MilSpec work should be rejected as "too attenuated." *BP*, 31 F.4th at 234. That logic is especially strained as to DuPont, which sold an "off-the-shelf" product used in both commercial and MilSpec AFFF. If civilian airport sales could be deemed "relating to" Navy contracts, then by extension every DuPont Forafac™ sale—no matter the customer, time, or place—would fall under section 1442. The absurdity is self-evident.

### III.    DuPont has no "colorable federal defense" because it is undisputed that the government never approved any specification with a DuPont product.

That leaves only DuPont's claim to a colorable government contractor defense. Section 1442 again sets a low bar: DuPont's defense is "colorable" unless it is "immaterial and made solely for the purpose of obtaining jurisdiction or wholly insubstantial and frivolous." *Caremark*,

---

[6] The same defect applies to DuPont's identification of the Stanly County Airport among the sources of MilSpec AFFF purportedly responsible for the contamination in *GSWSA* and *Florence*, along with certain military facilities. *See* GSWSA NOR¸ at ¶¶ 5, 31; Florence NOR, at ¶¶ 5, 30.

Separately, and also detrimental to DuPont's use of this airport as a basis for federal officer jurisdiction, the Stanly County Airport is not even a Part 139 certified airport that would have been required "to use AFFF meeting MilSpec standards" according to DuPont. GSWSA NOR, at ¶ 26; Florence NOR, at ¶ 26; *see* Fed. Aviation Admin., *Part 139 Airport Certification Status List* (Excel file), *available at* https://www.faa.gov/airports/airport_safety/part139_cert/part_139_ airport_certification_status_list (last updated Sept. 9, 2025).

140 F.4th at 198 (quoting *Gov't of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 186 (4th Cir. 2024)). But DuPont's defense necessarily requires proving that the Navy "approved reasonably precise specifications" concerning DuPont's own products. *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512 (1988); *see also Ramey*, 874 F.2d at 950. Even under section 1442's forgiving standard, this is not a colorable claim.

This Court has already recognized that the AFFF MilSpec was a performance standard that called for no particular fluorosurfactant among "at least hundreds" available at the start. *In re AFFF*, 2022 WL 4291357, at *2, 7. While foam manufacturers' defenses might pass the "colorable" mark despite that order, DuPont's cannot. No specification ever called for Forafac™, any other DuPont fluorosurfactant, or the chemical formulas embodied in DuPont's products. *See id.* And by its own words, DuPont sold "only" a component into commerce, "never having any control over the final product." DuPont MSJ, *City of Stuart v. 3M Co.*, No. 2:18-CV-03487-RMG, Dkt. No. 160, at 4 (D.S.C. Dec. 2, 2022). Those admissions foreclose any suggestion that specifications contemplated or approved anything from DuPont.

DuPont's subcontractor cases do not help it. *See, e.g.*, Clinton NOR, at ¶¶ 38–40; *Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67 (3d Cir. 1990) (Army approved precise design specifications for helicopter engine and specifically approved subcontractor's ball bearing design); *Kerstetter v. Pac. Sci. Co.*, 210 F.3d 431 (5th Cir. 2000) (Navy tested, reviewed, and approved subcontractor's design of the pilot restraint system in T-34C trainer aircraft, including the specific buckle alleged to be defective); *Tate v. Boeing Helicopters*, 55 F.3d 1150 (6th Cir. 1995) (Army substantively reviewed and approved subcontractor's tandem-hook design for CH-47D helicopter); *Ramey v. Martin–Baker Aircraft Co.*, 874 F.2d 946 (4th Cir. 1989) (Navy issued

19

detailed specifications for F–18 ejection seat made by subcontractor, including the design of the sear assembly alleged to be defective).

Each case tells the same story: the government-contractor defense can apply to subcontractors only when the government approves *the subcontractor's own work. Cf. Jackson v. Avondale Indus. Inc.*, 469 F. Supp. 3d 689, 704 (E.D. La. 2020) ("The Court . . . refuses to categorically deny the applicability of *Boyle* to at least certain subcontractors who perform work that is *specifically authorized by and provided for in government contracts*.") (emphasis added); *Badilla v. Nat'l Air Cargo, Inc.*, No. 12-cv-1066A, 2013 WL 5723324, at *10 (W.D.N.Y. Oct. 21, 2013) ("Even if the government contractor defense is applicable to [subcontractors, the subcontractor] must still establish that the government 'exercised *significant* control over its relevant actions.'" (quoting *Densberger v. United Techs. Corp.*, 297 F.3d 66, 75 (2d Cir. 2002)).

That is not DuPont. It is one thing for manufacturers of finished AFFF to invoke the MilSpec's performance standards, minimal as they were. It is quite another to stretch those standards to cover a specific, commercial fluorosurfactant that the Navy neither required nor even knew was in the recipe. To say that the government precisely approved an AFFF formulation *with DuPont-specific ingredients or products* is wholly insubstantial, if not frivolous.

## IV.     The Court should award fees and expenses.

This Court "may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of [a] removal." 28 U.S.C. § 1447(c). An award lies within the Court's discretion and is appropriate where the removing party "lacked an objectively reasonable basis for seeking removal." *Stein v. Eonsmoke LLC*, 423 F. Supp. 3d 162, 170 (M.D.N.C. 2019) (quoting *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 136 (2005)).

20

Despite section 1442's liberal standard, DuPont's removals fit that bill. Having cast itself as a distant, arms-length seller to minimize liability in failure-to-warn suits, DuPont now spins the opposite story—that its commercial sales of Forafac™ fluorosurfactants somehow placed it under "precise" DoD specifications and federal authority. Its Notices omit glaring factual gaps in DuPont's causal theories; its own cases show subcontractors must be under direct government supervision to "act under" federal authority; and it never alleges a single fact tying its products to such oversight. Worse still, DuPont does not even plead a causal connection in three removals.

DuPont's Notices are objectively meritless, pressed across nine cases in consolidated state-court litigation involving more than fifty additional defendants. It has needlessly brought those proceedings to a halt—delaying relief for communities whose water supplies serve hundreds of thousands of residents. Plaintiffs respectfully request that the Court remand and award it just costs and expenses, including attorney fees, under section 1447(c).

## CONCLUSION

Plaintiffs' motion to remand should be granted, and they should be awarded their attorneys' fees and expenses.

Respectfully submitted,

/s/ John B. White. Jr.
John B. White, Jr. (Fed. Bar No. 4619)
Marghretta H. Shisko (Fed Bar No. 11601)
Christopher R. Jones (Fed. Bar No. 13204)
Griffin L. Lynch (Fed. Bar No. 9580)
JOHN B. WHITE, JR., P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com
cjones@johnbwhitelaw.com
glynch@johnbwhitelaw.com

Frank Jerome Tapley
Hirlye R. "Ryan" Lutz, III
Brett Cooper Thompson
Robert Akira Watson
CORY WATSON, P.C.
2131 Magnolia Avenue South
Birmingham, AL 35205
(205) 328 2200
jtapley@CoryWatson.com
rlutz@CoryWatson.com
bthompson@CoryWatson.com
awatson@corywatson.com

*Counsel for Plaintiffs City of Clinton, South Carolina;
South Carolina Public Service Authority, a/k/a Santee
Cooper; Gaffney Board of Public Works; City of Union,
South Carolina; Woodruff-Roebuck Water District;
Grand Strand Water and Sewer Authority; Laurens
County Water and Sewer Commission; Greenwood
Commissioners of Public Works; and City of Florence,
South Carolina*

September 29, 2025

*Pursuant to Case Management Order
No. 2.A, filed with the consent of:*

/s/ Scott Summy
Scott Summy
BARON & BUDD, P.C.
3102 Oak Lawn Ave., #1100
Dallas, TX 75219
214-521-3605
Fax: 214-520-1181
ssummy@baronbudd.com

/s/ Joseph F. Rice
Joseph F. Rice
MOTLEY RICE LLC
P.O. Box 1792
Mount Pleasant, SC 29465
843-216-9000
Fax: 843-216-9290
jrice@motleyrice.com

*MDL Plaintiffs' Co-Lead Counsel*

## APPENDIX A – CAUSAL NEXUS ALLEGATIONS

| Case | Alleged Basis for Causal Nexus |
|------|-------------------------------|
| *City of Clinton, S.C. v. AGC Chems. Americas, Inc. et al.* No. 2:25-cv-09486-RMG | Use of MilSpec AFFF at an upstream civilian airport (Greenville-Spartanburg International Airport).<br><br>• *Clinton* **NOR, at ¶ 5**: . . . Here, the alleged PFAS contamination of the Enoree River plausibly resulted at least in part from nearby use of MilSpec AFFF, including at the Greenville-Spartanburg International Airport ("GSP Airport") near Greer, South Carolina. In fact, the State of South Carolina has filed an action against 3M, DuPont, and other Defendants to recover for alleged PFAS contamination of groundwater and surface waters encompassing Plaintiff's water supply, and the State expressly alleges that such PFAS resulted from MilSpec AFFF use at (among other locations) the GSP Airport. The State's case is pending in the *In re AFFF Products Liability Litigation MDL* ("MDL") before Judge Gergel in this District. See Compl., *South Carolina v. 3M Co., et al.*, No. 2:23-cv-05734-RMG (D.S.C.), ECF No. 1-1 ("State AG Complaint"). . . .<br><br>• *Id.* **at ¶ 7**: As set forth below, the Enoree River, an alleged source of the contamination in this action, is also the alleged source of contamination in another case currently in this Court. *Town of Whitmire v. 3M et al.*, D.S.C. Case No. 2:25-cv-00811. In the Town of Whitmire case, 3M Company alleged that PFAS in the Enoree River plausibly derived from MilSpec AFFF use at the Greenville-Spartanburg International Airport, a Part 139 airport located on the Enoree River upriver from Whitmire. See Ex. B. Whitmire Notice of Removal ("Whitmire NOR"), Ex. B., ¶¶ 2, 30-31. 3M cited reports and court records indicating that AFFF was stored at the Greenville-Spartanburg International Airport. *Id.* ¶¶ 30-31. 3M also cited sales records showing that it had sold MilSpec AFFF to the Greenville-Spartanburg International Airport. Id. ¶ 30. Accordingly, 3M alleged that PFAS from AFFF at the airport plausibly had contributed to the alleged downriver contamination of the Enoree River. *Id.* ¶ 33. *See also* Ex. C, 3M Response to Remand Motion, dated July 30, 2025, filed in District of South Carolina, at 8.<br><br>• *Id.* **at ¶ 28**: Specifically, PFAS from the use, storage, and/or disposal of MilSpec AFFF at the GSP Airport plausibly has contributed to the alleged PFAS contamination of Plaintiff's drinking water supply, the Enoree River. The GSP Airport is a "Part 139" airport.[n.10] As noted above, MilSpec AFFF historically has been used at Part 139 airports. In fact, 3M's historical sales records show that it used to sell MilSpec AFFF directly to the GSP Airport. *See* Ex. B. Whitmire NOR, Ex. B., ¶¶ 30. AFFF has been stored at the GSP Airport for use at or around the GSP Airport for airport rescue and firefighting. *See, e.g.*, McFarland Johnson, *GSP Airport Master Plan Update, Chapter 2: Inventory* at 2-51 to 2-52 (Dec. 2019), *available at* |

A-1

| | https://gspairport.com/wp-content/uploads/2021/03/02_Inventory_Final.pdf (inventorying AFFF at airport firefighting and rescue facility at GSP Airport). |
|---|---|
| | • *Id*. at ¶ 29: The GSP Airport is located on the Enoree River and its tributaries upgradient of where Plaintiff draws its drinking water, so AFFF releases at the GSP Airport plausibly are a plausible source of PFAS in Plaintiff's drinking water supply. Notably, the State of South Carolina's own AFFF lawsuit pending in the MDL expressly alleges that MilSpec AFFF was used at civilian airports in South Carolina including at the GSP Airport, and that such AFFF use purportedly has contaminated groundwater and surface waters around that site. *See* State AG Complaint ¶ 50 ("AFFF meeting the MilSpec is commonly used in civilian applications at airports"); *id*. ¶ 142 ("AFFF chemicals have appeared in testing and contaminate the surface waters, groundwater, wetlands, soil, and natural resources at and around specific sites, including but not limited to . . . Greenville-Spartanburg International Airport."). |
| | • *Id*. at ¶ 42: . . . As set forth above, the alleged PFAS contamination here allegedly arose from contamination in the Enoree River, the same water source as in the *Town of Whitmire* action. In that action, 3M Company, an AFFF manufacturer, alleged that PFAS in the Enoree River plausibly derived from MilSpec AFFF use at the Greenville-Spartanburg International Airport, a Part 139 airport located on the Enoree River upriver from Whitmire. Whitmire NOR ¶¶ 2, 30-31. 3M cited reports and court records indicating that AFFF was stored at the Greenville-Spartanburg International Airport. *Id*. ¶¶ 30-31. 3M also cited sales records showing that it had sold MilSpec AFFF to the Greenville-Spartanburg International Airport. *Id*. ¶ 30. Accordingly, 3M alleged that PFAS from AFFF at the airport plausibly had contributed to the alleged downriver contamination of the Enoree River. *Id*. ¶ 33. *See also* Ex. C, 3M Response to Remand Motion, dated July 30, 2025, filed in District of South Carolina, at 8. Thus, Plaintiff's alleged injury was plausibly caused, in part, by the use of Milspec AFFF authorized by the federal government. . . . |
| *S.C. Pub. Serv. Auth. v. AGC Chems. Americas, Inc. et al.* No. 2:25-cv-10305-RMG | Use of MilSpec AFFF at certain upstream military facilities (Fort Jackson, McEntire Joint National Guard Base, McEntire Army Aviation Support Facility, McCrady Training Site).<br><br>• *Santee Cooper* **NOR, at ¶ 5**: . . . Here, the alleged PFAS contamination of Lake Marion and Lake Moultrie plausibly resulted at least in part from nearby use of MilSpec AFFF, including at military facilities such as Fort Jackson, the McEntire Joint National Guard Base ("McEntire JNGB"), the McEntire Army Aviation Support Facility ("McEntire AASF"), and the McCrady Training Site. In fact, the State of South Carolina has filed an action against 3M, EIDP, and other Defendants to recover for alleged PFAS contamination of groundwater and surface waters encompassing Plaintiff's water supply, and the State expressly alleges that such PFAS resulted from MilSpec AFFF use at (among other locations) these military facilities. Plaintiff itself alleges that it is an agency of the State of South Carolina. The State's case is |

A-2

pending in the *In re AFFF Products Liability Litigation MDL* ("MDL") before Judge Gergel in this District. See Compl., *South Carolina v. 3M Co., et al.*, No. 2:23-cv-05734- RMG (D.S.C.), ECF No. 1-1 ("State AG Complaint"). . . .

- *Id*. at ¶ 7: As set forth below, Lake Marion and Lake Moultrie, alleged sources of the contamination in this action, are also alleged sources of contamination in another case currently in this Court. *Berkeley County, South Carolina v. 3M Company, Inc., et al.*, D.S.C., Case No. 2:25- cv-00825-RMG. In the *Berkeley* case, 3M Company alleged that PFAS in Lake Marion and Lake Moultrie plausibly derived from MilSpec AFFF use at military facilities such as Fort Jackson, the McEntire JNGB, the McEntire AASF, and the McCrady Training Site. See Ex. B, Berkeley Notice of Removal¶¶ 2, 30-33 ("Berkeley NOR"). 3M cited reports and court records indicating that AFFF was used, stored, and discharged at these military sites which ultimately lead to contamination at Lake Marion and Lake Moultrie. *Id*. ¶¶ 30-33. Accordingly, 3M alleged that PFAS from AFFF at these military sites plausibly had contributed to the alleged downriver contamination of Lake Marion and Lake Moultrie. *Id*. ¶ 36. *See also* Ex. C, 3M's Consolidated Response to Remand Motions at 8, July 30, 2025, C/A No. 2:18-mn-02873-RMG (D.S.C.).

- *Id*. at ¶ 28: Specifically, PFAS from the use, storage, and/or disposal of MilSpec AFFF at military facilities such as Fort Jackson, the McEntire JNGB, the McEntire AASF, and the McCrady Training Site plausibly has contributed to the alleged PFAS contamination of Plaintiff's drinking water supply, Lake Marion and Lake Moultrie. Those military facilities are all located in areas of South Carolina that are nearby and upgradient from Lake Moultrie and Lake Marion. PFAS releases from AFFF use at Fort Jackson, the McEntire JNGB, the McEntire AASF, and the McCrady Training Site plausibly migrated by groundwater and/or surface water to the Congaree River, which flows to Lake Marion and then to Lake Moultrie. PFAS releases from AFFF use at the McCrady Training Site likewise would migrate by groundwater and/or surface water to Lake Marion and Lake Moultrie via the Wateree River. PFAS from MilSpec AFFF at each facility therefore would be a plausible source of PFAS in Plaintiff's drinking water supplies.

- *Id*. at ¶ 29: Fort Jackson is located in Columbia, South Carolina, and is a confirmed site where the U.S. military has used, stored, and disposed of AFFF. A PFAS investigation of Fort Jackson identified numerous historical sites of AFFF usage, storage, and disposal. *See* Ex. B, Berkeley NOR ¶ 31 (citing Arcadis U.S. Inc., *Final Preliminary Assessment and Site Inspection of Per- and Polyfluoroalkyl Substances, Fort Jackson, South Carolina* at 14-21 (Mar. 2022), available at https://aec.army.mil/Portals/115/PFAS/Jackson_PASI_202203.pdf). The same investigation identified evidence that PFAS from AFFF migrated off-site, including via Mill Creek towards the Congaree River whereby PFAS plausibly impacted Plaintiff's water supplies. *See id.* (citing Arcadis U.S. Inc. at 8 ("Five watersheds receive surface water runoff from a series of creeks within [Fort Jackson's]

A-3

boundaries. . . . Mill Creek drains the southwest portion of Fort Jackson . . . and flows off-post to the south where it eventually enters the Congaree River. . . . A total of 14 of the 16 AOPIs [areas of potential interest for the PFAS/AFFF investigation] are located . . . within the Gills Creek, Mill Creek, and Wildcat Creek drainage areas." (emphases added))).

- *Id*. at ¶ 30: The McEntire JNGB and McEntire AASF, located in Eastover, South Carolina, are likewise confirmed sites of AFFF use, storage, and disposal in the Congaree River basin. PFAS investigations for those facilities identified numerous sites of historical AFFF release where PFAS would have entered stormwater drainage systems and/or otherwise would have migrated off-base and eventually would have entered tributaries of the Congaree River. *See* Ex. B, Berkeley NOR ¶ 32 (citing Leidos, *Final Site Inspection Report for Perfluorooctane Sulfonate and Perfluorooctanoic Acid at McEntire Joint National Guard Base* at 3-2, 4-1 to 4-8 (April 2019), available at https://ar.afcec-cloud.af.mil/ (McEntire Air Guard Base, SC AR#586433); AECOM, Final Site Inspection Report McEntire Army Aviation Support Facility at 2-1 to 2-3, 3-1 to 3-2, 7- 1 to 7-5 (Aug. 2023), available at https://www.nationalguard.mil/Leadership/Joint-Staff/Personal-Staff/Public-Affairs/CommunityEngagement/Environmental/PFAS-Library/South-Carolina/FileId/341923/).

- *Id.* at ¶ 31: Notably, the State of South Carolina's own AFFF lawsuit pending in the MDL expressly alleges that AFFF was used at the McEntire JNGB and McCrady Training Center, and that PFAS from AFFF use at those military faculties (among other AFFF sites) purportedly has contaminated groundwater and surface waters around that site. See State AG Complaint ¶ 142 ("AFFF chemicals have appeared in testing and contaminate the surface waters, groundwater, wetlands, soil, and natural resources at and around specific sites, including but not limited to . . . McCrady Training Center . . . [and] McEntire Joint National Guard Base.").

- *Id.* at ¶ 45: . . . As set forth above, the alleged PFAS contamination here allegedly arose from contamination in Lake Moultrie and Lake Marion, the same water source as in the *Berkeley* action. In that action, 3M Company, an AFFF manufacturer, alleged that PFAS in Lake Moultrie and Lake Marion plausibly derived from MilSpec AFFF use at Fort Jackson, the McEntire JNGB, the McEntire AASF, and the McCrady Training Site located upriver from Berkeley. Berkeley NOR ¶¶ 2, 30-33. 3M cited reports and court records indicating that AFFF was used, stored, and discharged at Fort Jackson, the McEntire JNGB, the McEntire AASF, and the McCrady Training Site. *Id*. ¶¶ 30-33. Accordingly, 3M alleged that PFAS from AFFF at the military sites plausibly had contributed to the alleged downriver contamination of Lake Marion and Lake Moultrie. *Id*. ¶ 36. *See also* Ex. C, 3M's Consolidated Response to Remand Motions at 8, July 30, 2025, Case No. 2:18-mn-02873- RMG (D.S.C.). Thus, Plaintiff's alleged injury was plausibly caused, in part, by the use of Milspec AFFF authorized by the federal government. . . .

A-4

| | |
|---|---|
| *Grand Strand Water & Sewer Auth. v. AGC Chems. Americas, Inc. et al.* No. 2:25-cv-11180-RMG | Use of MilSpec AFFF at certain upstream military facilities (Myrtle Beach Air Force Base, Salisbury Army Aviation Support Facility National Guard Base, Stanly County Air National Guard Base) and a civilian airport (Stanly County Airport). <br><br> • *GSWSA* **NOR, at ¶ 5**: . . . Here, the alleged PFAS contamination of Bull Creek and the Intracoastal Waterway plausibly resulted at least in part from nearby use of MilSpec AFFF, including at military facilities such as the Myrtle Beach Air Force Base, the Salisbury Army Aviation Support Facility National Guard Base ("Salisbury AASF NG Base") and Stanly County Air National Guard Base ("Stanly County ANGB") (the Salisbury AASF NG Base and Stanly County ANGB, collectively, the "Salisbury and Stanly Bases"). In fact, the State of South Carolina has filed an action against 3M, EIDP, and other Defendants to recover for alleged PFAS contamination of groundwater and surface waters encompassing Plaintiff's water supply, and the State expressly alleges that such PFAS resulted from MilSpec AFFF use at military locations, including the Myrtle Beach Air Force Base. The State's case is pending in the *In re AFFF Products Liability Litigation MDL* ("MDL") before Judge Gergel in this District. See Compl., *South Carolina v. 3M Co., et al.*, No. 2:23-cv-05734- RMG (D.S.C.), ECF No. 1-1, ¶¶ 137-142 ("State AG Complaint"). . . . <br> • *Id.* **at ¶ 6**: Further, as set forth below, the Great Pee Dee River, an alleged source of contamination in this action, is also an alleged source of contamination in another case currently in this Court. *Town of Cheraw v. 3M Company*, *Inc., et al.*, D.S.C., Case No. 2:25-cv-00679-RMG. In the *Cheraw* case, 3M Company alleged that PFAS in the Great Pee Dee River plausibly derived from MilSpec AFFF use at military facilities such as the Salisbury and Stanly Bases. *See* <u>Ex. B</u>, Cheraw Notice of Removal ("Cheraw NOR"), ¶¶ 2, 31-34. 3M cited reports and court records indicating that AFFF was used, stored, and discharged at these military sites which ultimately lead to contamination at the Great Pee Dee River. *Id*. ¶¶ 31-34. Accordingly, 3M alleged that PFAS from AFFF at these military sites plausibly contributed to the alleged downriver contamination of the Great Pee Dee River. *Id*. ¶ 35. *See also* <u>Ex. C</u> 3M's Consolidated Response to Remand Motions, dated July 30, 2025, D.S.C., Case No. 2:18-mn-02873-RMG, at 7-8. <br> • *Id*. **at ¶ 28**: Specifically, PFAS from the use, storage, and/or disposal of MilSpec AFFF at military facilities such as the Myrtle Beach Air Force Base and the Salisbury and Stanly Bases have plausibly contributed to the alleged PFAS contamination of Plaintiff's drinking water supplies. Those facilities are all located in areas of South Carolina that are nearby and upgradient from Bull Creek and the Intracoastal Waterway. PFAS releases from AFFF use at the Myrtle Beach Air Force Base plausibly migrated by groundwater and/or surface water to the Intracoastal Waterway. PFAS releases from the Salisbury and Stanly Bases plausibly migrated by groundwater and/or surface water to the Waterways, which flow through the Great Pee Dee River to Bull Creek. PFAS |

A-5

from MilSpec AFFF at each facility therefore would be a plausible source of PFAS in Plaintiff's drinking water supplies.

- *Id*. at ¶ 29:  The Myrtle Beach Air Force Base is located in Myrtle Beach, South Carolina, and is a confirmed site where the U.S. military has used, stored, and disposed of AFFF. A PFAS investigation of the Myrtle Beach Air Force Base identified numerous historical sites of AFFF usage, storage, and disposal. See State AG Compl. ¶ 142 n.55 (citing *Strategy to Assess the Impact of Per- and Polyfluoroalkyl Substances on Ambient Surface Waters in South Carolina*, DHEC Bureau of Water (Apr. 30, 2021), https://des.sc.gov/sites/des/files/media/document/ BOW_PFAS_SurfaceWaterStrategy_0.pdf ("Strategy to Assess PFAS in South Carolina")). The same investigation identified the HUC-10 watershed (denominated "Little River") as a "priority study area" by the South Carolina Department of Health and Environmental Control due to AFFF use at the Myrtle Beach Air Force Base. Strategy to Assess PFAS in South Carolina at 1, 7 13, 24, 29. As such, it is plausible that PFAS from AFFF migrated off-site to Intracoastal Waterway and to Plaintiff's Myrtle Beach SWTP which is located within the Little River HUC-10 watershed.

- *Id*. at ¶ 30: The Salisbury AASF NG Base in Salisbury, North Carolina, plausibly has contributed to the alleged PFAS contamination of Plaintiff's drinking water supply, the Great Pee Dee River. The Salisbury AASF NG Base is located in the Yadkin-Pee Dee watershed (which stretches between North Carolina and South Carolina), and PFAS releases there plausibly would be a source of PFAS in Plaintiff's drinking water supply. Further, the Salisbury AASF NG Base is a confirmed site where the U.S. military has used and stored AFFF. See Cheraw NOR ¶ 31 (citing AECOM, FINAL Site Inspection Report, Salisbury Army Aviation Support Facility #2, North Carolina (May 2022), at 3-1 to 3-2, 7-1 to 7-2, https://www.nationalguard.mil/Leadership/ Joint-Staff/Personal-Staff/Public-Affairs/CommunityEngagement/Environmental/PFAS-Library/North-Carolina/FileId/343153/). A PFAS investigation for the Salisbury AASF NG Base identified pathways whereby PFAS from AFFF use plausibly had migrated off-site to surrounding groundwater and surface water that can have impacted Plaintiff's water supply, the Great Pee Dee River: a report detailing the PFAS investigation specifically identifies pathways whereby PFAS may have impacted the Yadkin River, which is the upper course of the Great Pee Dee River. *Id*. (citing AECOM at 7-1 to 7-3).

- *Id*. at ¶ 31:  Additionally, PFAS in Plaintiff's water supply also plausibly derives from the use of MilSpec AFFF at the Stanly County ANGB and Stanly County Airport, located in Stanly County, North Carolina. The Stanly County ANGB and Stanly County Airport are also located in the Yadkin–Pee Dee watershed where PFAS releases plausibly would be a source of PFAS in Plaintiff's drinking water supply. The reports for PFAS investigations for Stanly County ANGB indicated that drainage from the site is towards a tributary of the Pee Dee River and identified pathways whereby PFAS plausibly migrated off-site into groundwater. See Cheraw NOR ¶ 32 (citing AMEC Foster

A-6

| | Wheeler, *Final Report, FY16 Phase I Regional Site Inspections For Perfluorinated Compounds, Stanly Co. ANGB* at E-2 to E-3 (Mar. 25, 2019) (available at https://ar.cce.af.mil/Search) (AR#585624); BB&E, Inc., *Final Perfluorinated Compounds Preliminary Assessment Site Visit Report, Stanly County ANGB* at 7 (Jan. 2016) (available at https://ar.cce.af.mil/Search) (AR#470209)). Further, the State of North Carolina has a case pending in the MDL against 3M and other Defendants in which the complaint expressly alleges that AFFF use at the Stanly ANGB and Stanly County Airport have contaminated surrounding drinking water supplies including the Pee Dee River. Compl. ¶¶ 1-12, 36-51, 120-136, *North Carolina v. 3M Co., et al.*, No. 2:22-cv-00014 (D.S.C.), ECF No. 1-1. |
| | • *Id.* at ¶ 32: Notably, the State of South Carolina's own AFFF lawsuit pending in the MDL incorporates maps which purportedly show the "association between AFFF-using sites and chemicals known to appear in AFFF" and purportedly support the State's allegation that "AFFF is the most probable source of contamination at these testing locations." State AG Complaint ¶ 138. Specifically, those maps identify both Salisbury AASF NG Base and Stanly ANGB as military facilities that allegedly are "probable source[s] of contamination" with PFAS. *Id.*; *compare id.* ¶ 136 n.54 (citing Environmental Working Group ("EWG") website for information depicted in the maps incorporated by the complaint), *with* EWG, *PFAS Contamination in the U.S.*, https://www.ewg.org/interactive-maps/pfas_contamination/map/ (identifying the Salisbury AASF NG Base and the Stanly ANGB as likely AFFF PFAS sites). |
| | • *Id.* at ¶ 46: . . . As set forth above, the alleged PFAS contamination here allegedly arose from contamination in the Great Pee Dee River, the same water source as in the *Cheraw* action, as well as contamination in the Intracoastal Waterway. In *Cheraw*, 3M Company, an AFFF manufacturer, alleged that PFAS in the Great Pee Dee River plausibly derived from MilSpec AFFF use at the Salisbury and Stanly Bases located upriver from Cheraw. Cheraw NOR ¶¶ 2, 31-34. 3M cited reports and court records indicating that AFFF was used, stored, and discharged at the Salisbury and Stanly Bases. *Id.* ¶¶ 31-34. Accordingly, 3M alleged that PFAS from AFFF at the military sites plausibly had contributed to the alleged downriver contamination the Great Pee Dee River. *Id.* ¶ 35. *See also* Ex. C, 3M's Consolidated Response to Remand Motions, dated July 30, 2025, D.S.C., Case No. 2:18- mn-02873-RMG, at 7-8. Further, South Carolina has specifically admitted that the Myrtle Beach Air Force Base is a source of PFAS from Milspec AFFF that contaminates the Intracoastal Waterway. State AG Compl. ¶ 142. Thus, Plaintiff's alleged injury was plausibly caused, in part, by the use of Milspec AFFF authorized by the federal government. . . . |
| *City of Florence, S.C. v. AGC Chems. Americas, Inc. et al.* No. 2:25-cv-11725-RMG | Use of MilSpec AFFF at certain upstream military facilities (Salisbury Army Aviation Support Facility National Guard Base, Stanly County Air National Guard Base) and a civilian airport (Stanly County Airport). |

- *Florence* **NOR, at ¶ 5**: . . . Here, the alleged PFAS contamination of the Great Pee Dee River plausibly resulted at least in part from nearby use of MilSpec AFFF, including at military facilities such as the Salisbury Army Aviation Support Facility National Guard Base ("Salisbury AASF NG Base") and Stanly County Air National Guard Base ("Stanly County ANGB") (the Salisbury AASF NG Base and Stanly County ANGB, collectively, the "Salisbury and Stanly Bases"). In fact, the State of South Carolina has filed an action against 3M, EIDP, and other Defendants to recover for alleged PFAS contamination of groundwater and surface waters encompassing Plaintiff's water supply, and the State expressly alleges that such PFAS resulted from MilSpec AFFF use at military facilities. The State's case is pending in the *In re AFFF Products Liability Litigation MDL* ("MDL") before Judge Gergel in this District. See Compl., *South Carolina v. 3M Co., et al.*, No. 2:23-cv-05734-RMG (D.S.C.), ECF No. 1-1 ("State AG Complaint").

- *Id*. **at ¶ 6:** Further, as set forth below, the Great Pee Dee River, an alleged source of contamination in this action, is also an alleged source of contamination in another case currently in this Court. *Town of Cheraw v. 3M Company, Inc., et al.*, D.S.C., Case No. 2:25-cv-00679-RMG. In the *Cheraw* case, 3M Company alleged that PFAS in the Great Pee Dee River plausibly derived from MilSpec AFFF use at military facilities such as the Salisbury and Stanly Bases. *See* Ex. B, Cheraw Notice of Removal ("Cheraw NOR"), ¶¶ 2, 31-34. 3M cited reports and court records indicating that AFFF was used, stored, and discharged at these military sites which ultimately led to contamination at the Great Pee Dee River. *Id*. ¶¶ 31-34. Accordingly, 3M alleged that PFAS from AFFF at these military sites plausibly contributed to the alleged downriver contamination of the Great Pee Dee River. *Id*. ¶ 35. *See also* Ex. C, 3M's Consolidated Response to Remand Motions, dated July 30, 2025, D.S.C., Case No. 2:18-mn-02873-RMG, at 7-8.

- *Id.* **at ¶ 28**: Specifically, PFAS from the use, storage, and/or disposal of MilSpec AFFF at military facilities such as the Salisbury and Stanly Bases have plausibly contributed to the alleged PFAS contamination of Plaintiff's drinking water supplies.

- *Id*. **at ¶ 29**: The Salisbury AASF NG Base in Salisbury, North Carolina, plausibly has contributed to the alleged PFAS contamination of Plaintiff's drinking water supply, the Great Pee Dee River. The Salisbury AASF NG Base is located in the Yadkin-Pee Dee watershed (which stretches between North Carolina and South Carolina), and PFAS releases there plausibly would be a source of PFAS in Plaintiff's drinking water supply. Further, the Salisbury AASF NG Base is a confirmed site where the U.S. military has used and stored AFFF. *See* Cheraw NOR ¶ 31 (citing AECOM, FINAL Site Inspection Report, Salisbury Army Aviation Support Facility #2, North Carolina (May 2022), at 3-1 to 3-2, 7-1 to 7-2, https://www.nationalguard.mil/Leadership/ Joint-Staff/Personal-Staff/Public-Affairs/CommunityEngagement/Environmental/PFAS-Library/North-Carolina/FileId/343153/). A PFAS investigation for the Salisbury AASF NG Base identified pathways whereby PFAS

A-8

from AFFF use plausibly had migrated off-site to surrounding groundwater and surface water that can have impacted Plaintiff's water supply, the Great Pee Dee River: a report detailing the PFAS investigation specifically identifies pathways whereby PFAS may have impacted the Yadkin River, which is the upper course of the Great Pee Dee River. *Id.* (citing AECOM at 7-1 to 7-3).

- *Id.* **at ¶ 30**: Additionally, PFAS in Plaintiff's water supply also plausibly derives from the use of MilSpec AFFF at the Stanly County ANGB and Stanly County Airport, located in Stanly County, North Carolina. The Stanly County ANGB and Stanly County Airport are also located in the Yadkin–Pee Dee watershed where PFAS releases plausibly would be a source of PFAS in Plaintiff's drinking water supply. The reports for PFAS investigations for Stanly County ANGB indicated that drainage from the site is towards a tributary of the Pee Dee River and identified pathways whereby PFAS plausibly migrated off-site into groundwater. *See* Cheraw NOR ¶ 32 (citing AMEC Foster Wheeler, *Final Report, FY16 Phase I Regional Site Inspections For Perfluorinated Compounds, Stanly Co. ANGB* at E-2 to E-3 (Mar. 25, 2019) (available at https://ar.cce.af.mil/Search) (AR#585624); BB&E, Inc., *Final Perfluorinated Compounds Preliminary Assessment Site Visit Report, Stanly County ANGB* at 7 (Jan. 2016) (available at https://ar.cce.af.mil/Search) (AR#470209)). Further, the State of North Carolina has a case pending in the MDL against 3M and other Defendants in which the complaint expressly alleges that AFFF use at the Stanly ANGB and Stanly County Airport have contaminated surrounding drinking water supplies including the Pee Dee River. Compl. ¶¶ 1-12, 36-51, 120-136, *North Carolina v. 3M Co., et al.*, No. 2:22-cv-00014 (D.S.C.), ECF No. 1-1.

- *Id.* **at ¶ 31**: Notably, the State of South Carolina's own AFFF lawsuit pending in the MDL incorporates maps which purportedly show the "association between AFFF-using sites and chemicals known to appear in AFFF" and purportedly support the State's allegation that "AFFF is the most probable source of contamination at these testing locations." State AG Complaint ¶ 138. Specifically, those maps identify both Salisbury AASF NG Base and Stanly ANGB as military facilities that allegedly are "probable source[s] of contamination" with PFAS. *Id.*; *compare id.* ¶ 136 n.54 (citing Environmental Working Group ("EWG") website for information depicted in the maps incorporated by the complaint), *with* EWG, *PFAS Contamination in the U.S.*, https://www.ewg.org/interactive-maps/pfas_contamination/map/ (identifying the Salisbury AASF NG Base and the Stanly ANGB as likely AFFF PFAS sites).

- *Id.* **at ¶ 45**: . . . As set forth above, the alleged PFAS contamination here allegedly arose from contamination in the Great Pee Dee River, the same water source as in the *Cheraw* action. In *Cheraw*, 3M Company, an AFFF manufacturer, alleged that PFAS in the Great Pee Dee River plausibly derived from MilSpec AFFF use at the Salisbury and Stanly Bases located upriver from Cheraw. Cheraw NOR ¶¶ 2, 31-34. 3M cited reports and court records indicating that AFFF was used, stored, and discharged at the

A-9

| | |
|---|---|
| | Salisbury and Stanly Bases. *Id.* ¶¶ 31-34. Accordingly, 3M alleged that PFAS from AFFF at the military sites plausibly had contributed to the alleged downriver contamination the Great Pee Dee River. *Id.* ¶ 35. *See also* Ex. C, 3M's Consolidated Response to Remand Motions, dated July 30, 2025, D.S.C., Case No. 2:18-mn-02873-RMG, at 7-8. Further, North Carolina has specifically admitted that the Salisbury and Stanly Bases are sources of PFAS from Milspec AFFF that contaminate the Great Pee Dee River. Compl. ¶¶ 1-12, 36-51, 120-136, *North Carolina v. 3M Co., et al.*, No. 2:22-cv-00014 (D.S.C.), ECF No. 1-1. Thus, Plaintiff's alleged injury was plausibly caused, in part, by the use of Milspec AFFF authorized by the federal government. |
| *Greenwood Comm'rs of Pub. Works v. AGC Chems. Americas, Inc. et al.* No. 2:25-cv-11669-RMG | Use of MilSpec AFFF at an upstream military facility (Army Aviation Support Facility Upstate), a civilian airport (Donaldson Field Airport), and a Lockheed Martin facility. <br><br> • *Greenwood* **NOR, at ¶ 5**: . . . Here, the alleged PFAS contamination of Lake Greenwood plausibly resulted at least in part from nearby use of MilSpec AFFF, including at military facilities such as the Army Aviation Support Facility Upstate ("AASF Upstate") in Greenville, South Carolina. In fact, the State of South Carolina has filed an action against 3M, EIDP, and other Defendants to recover for alleged PFAS contamination of groundwater and surface waters encompassing Plaintiff's water supply, and the State expressly alleges that such PFAS resulted from MilSpec AFFF use at military facilities. The State's case is pending in the *In re AFFF Products Liability Litigation MDL* ("MDL") before Judge Gergel in this District. See Compl., *South Carolina v. 3M Co., et al.*, No. 2:23-cv-05734-RMG (D.S.C.), ECF No. 1-1 ("State AG Complaint"). . . . <br><br> • *Id.* **at ¶ 6**: Further, as set forth below, the Saluda and Reedy Rivers, tributaries of Lake Greenwood, are alleged sources of contamination in this action, are also alleged sources of contamination in another case currently in this Court, *Joint Municipal Water and Sewer Commission v. 3M Company, Inc.*, Case No. 2:25-cv-00711 (D.S.C.). In the *Joint Municipal* case, 3M Company alleged that PFAS in Lake Murray, downstream from Lake Greenwood via the Saluda and Reedy Rivers, plausibly derived from MilSpec AFFF use at AASF Upstate. *See* Ex. B, Joint Municipal Notice of Removal ("Joint Municipal NOR"), ¶¶ 2, 31. 3M cited reports and court records indicating that AFFF was used, stored, and discharged at these military sites which led to contamination of the Saluda and Reedy Rivers, and ultimately Lake Murray. *Id.* ¶¶ 31-34. Accordingly, 3M alleged that PFAS from AFFF at these military sites plausibly contributed to the alleged downriver contamination of Lake Murray. *Id.* ¶ 34. *See also* Ex. C, 3M's Consolidated Response to Remand Motions, dated July 30, 2025, D.S.C., Case No. 2:18-mn-02873-RMG, at 8. <br><br> • *Id.* **at ¶ 28**: Specifically, PFAS from the use, storage, and/or disposal of MilSpec AFFF at military facilities such as the AASF Upstate have plausibly contributed to the alleged PFAS contamination of Plaintiff's drinking water supplies. |

A-10

- *Id*. at ¶ **29**: The AASF Upstate in Greenville, South Carolina, plausibly contributed to the alleged PFAS contamination of Plaintiff's drinking water supply, Lake Greenwood. AASF Upstate is located upgradient of Lake Greenwood where Plaintiff draws its drinking water, and AFFF releases at AASF Upstate plausibly would be a source of PFAS in Plaintiff's drinking water supply. Further, AASF Upstate is a confirmed site where the U.S. military has used and stored AFFF. See Joint Municipal NOR ¶ 31 (citing AECOM, *FINAL Site Inspection Report, Army Aviation Support Facility Upstate* at 2-3 to 2-4 (August 2023), https://www.nationalguard.mil/Leadership/Joint-Staff/Personal-Staff/Public-Affairs/Community Engagement/Environmental/PFAS-Library/South-Carolina/FileId/341921/). Elevated PFAS levels reportedly were detected in groundwater at and/or around locations at the facility where AFFF was used. *See id*. (citing AECOM at 6-2 to 6-4). Moreover, the PFAS investigation for AASF Upstate identified evidence that PFAS from AFFF plausibly migrated off-site and thus may have impacted Plaintiff's water supply. Multiple pathways were identified whereby PFAS plausibly migrated off-site including to the Reedy River, a tributary of the Saluda River, which flows to Lake Greenwood where Plaintiff draws its water supply. *See id.* (citing AECOM at 2-2) (explaining that AASF Upstate is located in the Brushy Creek-Reedy River watershed and that drainage systems carry water to Marrow Bone Creek which is connected to the Reedy River); *id*. (citing AECOM at 7-2) (explaining that PFAS may have migrated via soil and groundwater to a pond connected to Marrow Bone Creek and from there to the Reedy River).
- *Id*. at ¶ **30**: In addition, AFFF is known to have been used at other sites immediately adjacent to AASF Upstate in Greenville, South Carolina. Those include an aircraft manufacturing facility operated by Lockheed Martin Corporation, which plausibly further contributed to PFAS in Plaintiff's water supply. In fact, 3M's historical sales records include sales of MilSpec AFFF that were delivered to the Greenville, South Carolina address where the Lockheed Martin facility is located. AASF Upstate is also adjacent to a "Part 139" airport, Donaldson Field Airport. As noted above, MilSpec AFFF historically has been used at Part 139 airports, and Donaldson Field Airport has supported some military operations in addition to commercial operations.
- *Id*. at ¶ **31**: Notably, the State of South Carolina's own AFFF lawsuit pending in the MDL incorporates maps which purportedly show the "association between AFFF-using sites and chemicals known to appear in AFFF" and purportedly support the State's allegation that "AFFF is the most probable source of contamination at these testing locations." State AG Complaint ¶ 138. Specifically, those maps identify AASF Upstate as a military facility that allegedly is a "probable source of contamination" with PFAS. *Id*.; *compare id.* ¶ 136 n.54 (citing Environmental Working Group ("EWG") website for information depicted in the maps incorporated by the complaint), *with* EWG, *PFAS Contamination in the U.S.*, https://www.ewg.org/interactive-

A-11

| | |
|---|---|
| | maps/pfas_contamination/map/ (identifying the AASF Upstate as a likely AFFF PFAS site). |
| | • *Id*. at ¶ 45: . . . As set forth above, the alleged PFAS contamination here allegedly arose from contamination in the Saluda and Reedy Rivers, the same water sources as in the *Joint Municipal* action. In *Joint Municipal*, 3M Company, an AFFF manufacturer, alleged that PFAS in the Saluda and Reedy Rivers plausibly derived from MilSpec AFFF use at the AASF Upstate located upriver from Lake Greenwood and Lake Murray. Joint Municipal NOR ¶¶ 2, 31-34. 3M cited reports and court records indicating that AFFF was used, stored, and discharged at the AASF Upstate. *Id*. ¶¶ 31-34. Accordingly, 3M alleged that PFAS from AFFF at the military sites plausibly had contributed to the alleged downriver contamination at Lake Murray. *Id*. ¶ 35. *See also* Ex. C, 3M's Consolidated Response to Remand Motions, dated July 30, 2025, D.S.C., Case No. 2:18-mn-02873-RMG, at 7- 8. Thus, Plaintiff's alleged injury was plausibly caused, in part, by the use of Milspec AFFF authorized by the federal government. . . . |
| *Laurens Cnty. Water & Sewer Comm'n v. AGC Chems. Americas, Inc. et al.* No. 2:25-cv-11655-RMG | Use of MilSpec AFFF at an upstream military facility (Army Aviation Support Facility Upstate), a civilian airport (Donaldson Field Airport), and a Lockheed Martin facility.<br><br>• *Laurens* **NOR, at ¶ 5**: . . . Here, the alleged PFAS contamination of Lake Greenwood plausibly resulted at least in part from nearby use of MilSpec AFFF, including at military facilities such as the Army Aviation Support Facility Upstate ("AASF Upstate") in Greenville, South Carolina. In fact, the State of South Carolina has filed an action against 3M, EIDP, and other Defendants to recover for alleged PFAS contamination of groundwater and surface waters encompassing Plaintiff's water supply, and the State expressly alleges that such PFAS resulted from MilSpec AFFF use at military facilities. The State's case is pending in the *In re AFFF Products Liability Litigation MDL* ("MDL") before Judge Gergel in this District. See Compl., *South Carolina v. 3M Co., et al.*, No. 2:23-cv-05734-RMG (D.S.C.), ECF No. 1-1 ("State AG Complaint"). . . .<br>• *Id*. at ¶ 6: Further, as set forth below, the Saluda and Reedy Rivers, tributaries of Lake Greenwood, are alleged sources of contamination in this action, are also alleged sources of contamination in another case currently in this Court, *Joint Municipal Water and Sewer Commission v. 3M Company, Inc*., Case No. 2:25-cv-00711 (D.S.C.). In the *Joint Municipal* case, 3M Company alleged that PFAS in Lake Murray, downstream from Lake Greenwood via the Saluda and Reedy Rivers, plausibly derived from MilSpec AFFF use at AASF Upstate. *See* Ex. B, Joint Municipal Notice of Removal ("Joint Municipal NOR"), ¶¶ 2, 31. 3M cited reports and court records indicating that AFFF was used, stored, and discharged at these military sites which led to contamination of the Saluda and Reedy Rivers, and ultimately Lake Murray. *Id*. ¶¶ 31-34. Accordingly, 3M alleged that PFAS from AFFF at these military sites plausibly contributed to the alleged downriver contamination of Lake Murray. *Id*. ¶ 34. *See* |

A-12

*also* <u>Ex. C</u>, 3M's Consolidated Response to Remand Motions, dated July 30, 2025, D.S.C., Case No. 2:18-mn-02873-RMG, at 8.

- *Id.* **at ¶ 28**: Specifically, PFAS from the use, storage, and/or disposal of MilSpec AFFF at military facilities such as the AASF Upstate have plausibly contributed to the alleged PFAS contamination of Plaintiff's drinking water supplies.
- *Id.* **at ¶ 29**: The AASF Upstate in Greenville, South Carolina, plausibly contributed to the alleged PFAS contamination of Plaintiff's drinking water supply, Lake Greenwood. AASF Upstate is located upgradient of Lake Greenwood where Plaintiff draws its drinking water, and AFFF releases at AASF Upstate plausibly would be a source of PFAS in Plaintiff's drinking water supply. Further, AASF Upstate is a confirmed site where the U.S. military has used and stored AFFF. See Joint Municipal NOR ¶ 31 (citing AECOM, *FINAL Site Inspection Report, Army Aviation Support Facility Upstate* at 2-3 to 2-4 (August 2023), https://www.nationalguard.mil/Leadership/Joint-Staff/Personal-Staff/Public-Affairs/Community Engagement/Environmental/PFAS-Library/South-Carolina/FileId/341921/). Elevated PFAS levels reportedly were detected in groundwater at and/or around locations at the facility where AFFF was used. *See id.* (citing AECOM at 6-2 to 6-4). Moreover, the PFAS investigation for AASF Upstate identified evidence that PFAS from AFFF plausibly migrated off-site and thus may have impacted Plaintiff's water supply. Multiple pathways were identified whereby PFAS plausibly migrated off-site including to the Reedy River, a tributary of the Saluda River, which flows to Lake Greenwood where Plaintiff draws its water supply. *See id.* (citing AECOM at 2-2) (explaining that AASF Upstate is located in the Brushy Creek-Reedy River watershed and that drainage systems carry water to Marrow Bone Creek which is connected to the Reedy River); *id.* (citing AECOM at 7-2) (explaining that PFAS may have migrated via soil and groundwater to a pond connected to Marrow Bone Creek and from there to the Reedy River).
- *Id.* **at ¶ 30**: In addition, AFFF is known to have been used at other sites immediately adjacent to AASF Upstate in Greenville, South Carolina. Those include an aircraft manufacturing facility operated by Lockheed Martin Corporation, which plausibly further contributed to PFAS in Plaintiff's water supply. In fact, 3M's historical sales records include sales of MilSpec AFFF that were delivered to the Greenville, South Carolina address where the Lockheed Martin facility is located. AASF Upstate is also adjacent to a "Part 139" airport, Donaldson Field Airport. As noted above, MilSpec AFFF historically has been used at Part 139 airports, and Donaldson Field Airport has supported some military operations in addition to commercial operations.
- *Id.* **at ¶ 31**: Notably, the State of South Carolina's own AFFF lawsuit pending in the MDL incorporates maps which purportedly show the "association between AFFF-using sites and chemicals known to appear in AFFF" and purportedly support the State's allegation that "AFFF is the most probable source of contamination at these testing locations." State AG Complaint ¶

A-13

<table>
<tr><td></td><td>138. Specifically, those maps identify AASF Upstate as a military facility that allegedly is a "probable source of contamination" with PFAS. *Id*.; *compare id.* ¶ 136 n.54 (citing Environmental Working Group ("EWG") website for information depicted in the maps incorporated by the complaint), *with* EWG, *PFAS Contamination in the U.S.*, https://www.ewg.org/interactive-maps/pfas_contamination/map/ (identifying the AASF Upstate as a likely AFFF PFAS site).

- *Id*. at ¶ 45: . . . As set forth above, the alleged PFAS contamination here allegedly arose from contamination in the Saluda and Reedy Rivers, the same water sources as in the *Joint Municipal* action. In *Joint Municipal*, 3M Company, an AFFF manufacturer, alleged that PFAS in the Saluda and Reedy Rivers plausibly derived from MilSpec AFFF use at the AASF Upstate located upriver from Lake Greenwood and Lake Murray. Joint Municipal NOR ¶¶ 2, 31-34. 3M cited reports and court records indicating that AFFF was used, stored, and discharged at the AASF Upstate. *Id*. ¶¶ 31-34. Accordingly, 3M alleged that PFAS from AFFF at the military sites plausibly had contributed to the alleged downriver contamination at Lake Murray. *Id*. ¶ 35. *See also* Ex. C, 3M's Consolidated Response to Remand Motions, dated July 30, 2025, D.S.C., Case No. 2:18-mn-02873-RMG, at 7- 8. Thus, Plaintiff's alleged injury was plausibly caused, in part, by the use of Milspec AFFF authorized by the federal government. . . .</td></tr>
<tr><td>*Gaffney Bd. of Pub. Works v. AGC Chems. Americas, Inc. et al.*
No. 2:25-cv-10635-RMG</td><td>Transfer of related action against 3M Company, *Gaffney Bd. of Pub. Works v. 3M Co.*, No. 2:25-cv-04668-RMG (D.S.C.), to the AFFF MDL.

- *Gaffney* **NOR, at ¶ 7**: As set forth below, the Broad River, an alleged source of the contamination in this action, is also the alleged source of contamination in another case currently in this Court. *Gaffney Bd. of Public Works v. 3M Co.*, D.S.C., Case No. 2:25-cv-04668. This case is identical to the case at issue; however, it is solely filed against 3M. *See* <u>Ex. B</u>, Complaint, dated May 29, 2025, D.S.C. Case No. 2:25-cv-04668. On July 28, 2025, 3M moved to transfer the federal *Gaffney* case to the AFFF MDL because the case is related to the AFFF MDL. *See* <u>Ex. C</u>, Motion to Transfer, dated July 28, 2025, D.S.C., Case No. 2:25-cv-04668. On August 5, 2025, 3M's motion to transfer the federal *Gaffney* case to the AFFF MDL was granted. *See Gaffney*, Dkt. No. 18, D.S.C., Case No. 2:25-cv-04668 (text order granting 3M's motion to transfer to the AFFF MDL). As this case relies on the same factual predicate and contamination as the federal *Gaffney* case, removal is warranted.
- *Id*. at ¶ 40: . . . As set forth above, the alleged PFAS contamination here allegedly arose from contamination in the Broad River, the same water source as in the federal *Gaffney* action, and water where AFFF PFAS contamination has been referred to as "ubiquitous." State AG Compl. ¶¶ 7, 9. Accordingly, Plaintiff's alleged injury was plausibly caused, in part, by the use of Milspec AFFF authorized by the federal government. . . .</td></tr>
</table>

A-14

| *City of Union, S.C. v. AGC Chems. Americas, Inc. et al.* No. 2:25-cv-11014-RMG | Transfer of related action against 3M Company, *City of Union, S.C. v. 3M Co.*, No. 2:25-cv-04657-RMG (D.S.C.), to the AFFF MDL. <br><br> • *Union* **NOR, at ¶ 7**: As set forth below, the Broad River, an alleged source of the contamination in this action, is also the alleged source of contamination in another case currently in this Court. *City of Union, South Carolina v. 3M Co.*, D.S.C., Case No. 2:25-cv-04657. This case is identical to the case at issue; however, it is solely filed against 3M. *See* Ex. B, Complaint, dated May 29, 2025, D.S.C. Case No. 2:25-cv-04657. On July 28, 2025, 3M moved to transfer the federal *Union* case to the AFFF MDL because the case is related to the AFFF MDL. *See* Ex. C, Motion to Transfer, dated July 28, 2025, D.S.C., Case No. 2:25-cv-04657. On August 5, 2025, 3M's motion to transfer the federal *Union* case to the AFFF MDL was granted. *See Union*, Dkt. No. 18, D.S.C., Case No. 2:25-cv-04657 (text order granting 3M's motion to transfer to the AFFF MDL). As this case relies on the same factual predicate and contamination as the federal *Union* case, removal is warranted. <br> • *Id.* **at ¶ 40**: . . . As set forth above, the alleged PFAS contamination here allegedly arose from contamination in the Broad River, the same water source as in the federal *Union* action, and water where AFFF PFAS contamination has been referred to as "ubiquitous." State AG Compl. ¶¶ 7, 9. Accordingly, Plaintiff's alleged injury was plausibly caused, in part, by the use of Milspec AFFF authorized by the federal government. . . . |
| *Woodruff-Roebuck Water Dist. v. AFL Telecomms., LLC et al.* No. 2:25-cv-11043-RMG | Transfer of related action against 3M Company, *Woodruff-Roebuck Water Dist. v. 3M Co.*, No. 2:25-cv-04682-RMG (D.S.C.), to the AFFF MDL. <br><br> • *WRWD* **NOR, at ¶ 7**: As set forth below, the North, Middle, and South Tyger Rivers, alleged sources of the contamination in this action, are also the alleged source of contamination in another case currently in this Court. *Woodruff-Roebuck Water District* v. 3M Co., D.S.C., Case No. 2:25-cv-04682. This case is identical to the case at issue; however, it is solely filed against 3M. *See* Ex. B, Complaint, dated May 29, 2025, D.S.C. Case No. 2:25-cv-04682. On July 28, 2025, 3M moved to transfer the federal *Woodruff* case to the AFFF MDL because the case is related to the AFFF MDL. *See* Ex. C, Motion to Transfer, dated July 28, 2025, D.S.C., Case No. 2:25-cv-04682. On August 5, 2025, 3M's motion to transfer the federal *Woodruff* case to the AFFF MDL was granted. *See Woodruff*, Dkt. No. 18, D.S.C., Case No. 2:25-cv-04682 (text order granting 3M's motion to transfer to the AFFF MDL). As this case relies on the same factual predicate and contamination as the federal *Woodruff* case, removal is warranted. <br> • *Id.* **at ¶ 42**: . . . As set forth above, the alleged PFAS contamination here allegedly arose from contamination in the North, Middle, and South Tyger Rivers, the same water sources as in the federal *Woodruff* action, and water where AFFF PFAS contamination has been referred to as "ubiquitous." State AG Compl. ¶¶ 7, 9. Accordingly, Plaintiff's alleged injury was plausibly caused, in |

| | part, by the use of Milspec AFFF authorized by the federal government. . . . |